1  Shaun H. Crosner (SBN 259065)
   SCrosner@PasichLLP.com
2  Jacquelyn M. Heitman (SBN 278337)
   JHeitman@PasichLLP.com
3  L. Noelle Malindzak (SBN 335622)
   NMalindzak@PasichLLP.com
4  PASICH LLP
   1230 Rosecrans Avenue, Suite 690
5  Manhattan Beach, CA 90266
   Telephone: (424) 313-7860
6  Facsimile: (424) 313-7890
7
8  Attorneys for Plaintiffs

9

10          **UNITED STATES DISTRICT COURT**

11          **CENTRAL DISTRICT OF CALIFORNIA**

12

13  INTERNATIONAL MEDICAL              Case No. 2:24-cv-01915
    DEVICES, INC., JAMES J. ELIST, M.D.,
14  A MEDICAL CORPORATION, DR.         **COMPLAINT FOR**
    JAMES ELIST; and MENOVA
15  INTERNATIONAL, INC.                **BREACH OF CONTRACT;
                                        BREACH OF THE IMPLIED**
16                                     **COVENANT OF GOOD FAITH
              Plaintiffs,               AND FAIR DEALINGS; AND
17                                      DECLARATORY RELIEF**
         vs.
18
    JAMES RIVER INSURANCE
19  COMPANY, ADMIRAL INSURANCE         **DEMAND FOR JURY TRIAL**
    COMPANY
20

21
              Defendants.
22

23

24

25

26

27

28

_____
              **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs International Medical Devices, Inc. ("IMD"), James J. Elist, M.D., a Medical Corporation ("Elist Medical"), Dr. James Elist ("Dr. Elist"), and Menova International, Inc. ("Menova") (collectively, the "Plaintiffs") complain of Defendants James River Insurance Company ("James River") and Admiral Insurance Company ("Admiral") (collectively, the "Insurers") and allege as follows:

## NATURE OF THIS LAWSUIT

1.     This is a lawsuit by the Plaintiffs to collect promised insurance coverage under a General Liability Policy issued by James River and under a Physicians, Surgeons & Dentists Professional Liability Policy issued by Admiral. Each of the Plaintiffs is insured under one or both of these policies.  Since 2022, Plaintiffs have faced a putative class action lawsuit that triggered the Insurers' broad duties under their policies.  However, contrary to the terms of their policies and the law, the Insurers both wrongfully denied coverage to the Plaintiffs.  In refusing to honor their duties, the Insurers are consciously depriving their insureds of the financial security and the benefits of the policies, breaching the policies, and acting in bad faith.  As a result of the Insurers' breaches, anticipatory breaches, and bad faith, the Plaintiffs have been forced to incur substantial defense costs that the Insurers should have paid and have been forced to bring this lawsuit to obtain the benefits promised it under the policies.

## JURISDICTION AND VENUE

2.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332 based on complete diversity of citizenship between the parties and because the amount in controversy, exclusive of costs and interest, exceeds $75,000 against each defendant.

3.     This Court has personal jurisdiction over each Insurers pursuant to Federal Rule of Civil Procedure 4(k)(1)(A).  Each Insurer has engaged in transactions or business within this state from which this action arises.

4.    Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because jurisdiction is founded on diversity of citizenship and a substantial part of the events giving rise to this action occurred in this District.

## THE PARTIES

5.    Plaintiff IMD is a California corporation with a principal place of business in Los Angeles County.

6.    Plaintiff Elist Medical is a California corporation with a principal place of business in Los Angeles County.

7.    Plaintiff Dr. Elist is an individual residing in Beverly Hills, California.

8.    Plaintiff Menova is a California corporation with a principal place of business in Los Angeles County.

9.    Dr. Elist is a renowned urologist who invented and developed Penuma, a patented silicone implant and medical procedure specially designed for penile enlargements.  IMD is the manufacturer of the Penuma silicone implant.  As part of Elist Medical's practice, Dr. Elist performs surgeries using Penuma implants.  Dr. Elist is the founder and sole owner of IMD and Elist Medical.  Dr. Elist also is the President, Secretary, and a Corporate Officer of IMD, and he is the Chief Executive Officer Chief Financial Officer and Secretary of Elist Medical.

10.    Menova holds the intellectual property rights to Penuma.  IMD and Menova entered into an indemnity agreement, pursuant to which IMD is obligated to defend and indemnify Menova against any claims arising out of, among other things, bodily injury caused by the Penuma.  Specifically, pursuant to the July 25, 2016 Distributor Indemnification Agreement, IMD is obligated to defend and indemnify Menova, and its directors and officers, against all liabilities including attorney's fees and costs, related to

> personal injuries, whether in based in contract, or tort . . . directly or indirectly ***arising out of  . . . any acts of [IMD], its directors, officers, employees, subsidiaries,***

1  ***affiliates, agents, representatives, contractors,***

2  ***manufacturers, distributors, successors and/or assigns***,

3  (ii) any breach of any representation, warranty, or

4  covenant of this Agreement ***and/or (iii) any injury or***

5  ***damage***, including, without limitation, adverse health

6  consequence, directly or indirectly caused, or ***alleged to***

7  ***be caused, by the [Penuma implants]*** (collectively, the

8  "Indemnified Claims").

9      11.    Plaintiffs are informed and believe, and on that basis allege, that James

10  River is an Ohio organization with a principal place of business in Virginia.  It is

11  authorized to do business, and is doing business, as a surplus lines insurer in the

12  State of California and the County of Los Angeles.

13      12.    Plaintiffs are informed and believe, and on that basis allege, that

14  Admiral is a Delaware corporation with a principal place of business in New Jersey.

15  It is authorized to do business, and is doing business, as a surplus lines insurer in the

16  State of California and the County of Los Angeles.

17              **THE POLICIES**

18           ***The James River Insurance Policy***

19      13.    James River issued IMD a General Liability Policy, policy number

20  00061113-8, for the December 2, 2021, to December 2, 2022, policy period (the

21  "James River Policy").  A true and correct copy of at least the relevant portions of

22  the James River Policy is attached hereto as **Exhibit A** and incorporated herein by

23  reference.

24      14.    The James River Policy provides $10,000,000 of coverage in the

25  aggregate, subject to a $5,000 per claim deductible.  In advance of issuing the James

26  River Policy to IMD, James River engaged in, or had reasonable opportunities to

27  engage in, extensive underwriting investigation, and became familiar and

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1  knowledgeable regarding the nature and scope of IMD's business and the nature of
2  the risks that it was insuring against.

3      15.    The James River Policy's Coverage A Insuring Agreement obligates
4  James River to pay those sums that IMD "becomes legally obligated to pay as
5  damages because of 'bodily injury' caused by an 'occurrence.'" James River Policy,
6  § I – Coverages, Coverage A Bodily Injury and Property Damage Liability, ¶ 1.a-b.
7  The James River Policy further provides that James River has the "duty to defend . .
8  . any 'suit' seeking those damages." *Id.*

9      16.    In pertinent part, the James River Policy defines "bodily injury" to
10  mean "bodily injury, sickness or disease sustained by a person, including death
11  resulting from any of these at any time." *Id.*, § VI – Definitions, ¶ 3.

12      17.    The James River Policy defines "occurrence" as "an accident, including
13  continuous or repeated exposure to substantially the same general harmful
14  conditions." *Id.,* ¶ 13.

15      18.    In Section II- Who is an Insured," the James River Policy provides, "if
16  you are designated in the Declarations as: . . . d. an organization other than a
17  partnership, joint venture or limited liability company, you are an insured.  Your
18  "executive officers" and directors are insureds, but only with respect to their duties
19  as your officers or directors.

20      19.    The James River Policy defines "executive officer" to mean "a person
21  holding any of the officer positions created by your charter, constitution, by-laws or
22  any other similar governing document." *Id.*, § VI – Definitions, ¶ 6.

23      20.    The James River Policy includes a Supplementary Payments
24  Endorsement.  Under that Endorsement, if James River has a duty to defend its
25  insured and an indemnitee of the insured is also named as a party to the same
26  lawsuit, James River is obligated "to defend that indemnitee," so long as all of the
27  following conditions are met:

28          a.    the "suit" against the indemnitee seeks damages for which the

5

1    insured has assumed liability of the indemnitee in a contract or

2    agreement that is an "insured contract"

3    b.    this insurance applies to such liability assumed by the insured;

4    c.    the obligation to defend. . . has also been assumed by the insured

5    in the same "insured contract";

6    d.    the allegations in the "suit" and the information we know about

7    the "occurrence" are such that no conflict appears to exist

8    between the interests of the insured and the interests of the

9    indemnitee; and

10    e.    the indemnitee: (1) agrees in writing to. . . (a) cooperate.

11    *Id.,* Supplementary Payments Endorsement.

12    21.    The James River Policy defines "insured contract" to mean, in relevant

13    part, "that part of any other contract or agreement pertaining to your business . . .

14    under which you assume the tort liability of another party to pay for 'bodily injury'

15    or 'property damage' to a third person or organization."  *Id.*, § VI – Definitions, ¶ 9.

16    ***The Admiral Insurance Policy***

17    22.    Admiral issued Elist Medical a Physicians, Surgeons & Dentists

18    Professional Liability Policy, policy number EO000030651-07, for the period

19    September 25, 2021, to September 25, 2022, policy period (the "Admiral Policy").

20    For good and valuable consideration, Admiral issued Elist Medical an Extended

21    Reporting Period Endorsement on the Admiral Policy, extending the reporting

22    period to report a claim to September 25, 2023.  A true and correct copy of at least

23    the relevant portions of the Admiral Policy is attached hereto as **Exhibit B** and

24    incorporated herein by reference.

25    23.    The Admiral Policy provides $1,000,000 of coverage for each "Claim,"

26    with $3,000,000 of coverage in the aggregate, subject to a $2,500 per claim

27    deductible.  In advance of issuing the Admiral Policy, Admiral engaged in, or had

28    reasonable opportunities to engage in, extensive underwriting investigation, and

6

became familiar and knowledgeable about the nature and scope of Elist Medical's business and the nature of the risks that it was insuring against.

24.    The Admiral Policy promises that Admiral "will pay on behalf of [Elist Medical] those amounts . . . which [Elist Medical] is legally obligated to pay as 'damages' for a 'claim' . . . provided that the 'claim' results from a 'medical incident.'" Ex. B, Admiral Policy, § I – Insuring Agreement.  The Admiral Policy provides that Admiral has the "duty to defend any 'claim' or suit against [Elist Medical] seeking 'damages' because of a 'medical incident', even if any of the allegations of the suit are groundless, false or fraudulent." *Id.*

25.    In pertinent part, the Admiral Policy defines "medical incident" to mean "any negligent act, error or omission arising out of the (1) furnishing of 'professional services' by the 'Insured', any member, partner, officer, director or stockholder of the 'Insured' or any person acting under the personal direction, control, or supervision of the 'Insured' for whose conduct the 'Insured' may be held vicariously liable[.]" *Id.*, § II – Definitions, ¶ G.

26.    The Admiral Policy defines "professional services" as "services performed in person, by telephone or by other form of electronic communication by you for others involving specialized training, knowledge, and skill while in pursuit of the profession or services as stated in the 'Named Insured's' Business on the Declarations[.]" *Id,* Amendatory Endorsement Definition of Professional Services. The business stated in the Declarations is described as "Urology Including Surgery." *Id.*, Declarations.

27.    The Admiral Policy defines "Claim" to mean, in pertinent part, "service of suit." *Id.*, § II – Definitions, ¶ B.

28.    The Admiral Policy defines "Insured" to mean, in pertinent part, "the 'Named Insured,'" and "if you are:  . . . an association or corporation, you are an 'Insured.'  Your executive officers, directors, trustees, governors and stockholders are "Insureds,' but only with respect to acts or omissions arising out of the

7

furnishing of professional medical or dental services to others. . ."  *Id.*, § II – Definitions, ¶ F.

## THE UNDERLYING LAWSUIT AND THE INSURERS' BREACHES

### *The Pena Lawsuit*

29.    On May 19, 2022, Edward Pena, on behalf of himself and all others similarly situated (collectively, the "Putative Class Members"), filed a putative class action in the United States District Court for the Central District of California, Eastern Division, case No. 2:22-cv-03391, against multiple defendants, including IMD, Elist Medical, Dr. Elist, and Menova ("*Pena* Lawsuit").  The *Pena* Lawsuit pertains to the Penuma device and procedure. The *Pena* Lawsuit alleges that Plaintiffs jointly developed and marketed Penuma.  The Putative Class Members further allege that IMD and other defendants falsely represented that Penuma is permanent but reversible, and they further allege that Penuma leads to infections and complications that require removal of the device—which they, in turn, allege causes permanent damage and bodily injury.  A true and correct copy of the May 19, 2022, complaint in the *Pena* Lawsuit is attached hereto as **Exhibit C** and incorporated herein by reference.

30.    On June 15, 2022, the Putative Class Members filed a first amended complaint in the *Pena* Lawsuit.  The first amended complaint is substantially identical to the original complaint, except for minor changes to paragraphs 102 through 105 in the second cause of action.  A true and correct copy of the June 15, 2022, first amended complaint in the *Pena* Lawsuit is attached hereto as **Exhibit D** and incorporated herein by reference.

31.    On January 20, 2023, the Putative Class Members filed a second amended complaint ("SAC"), asserting three causes of action for (1) violation of California's False Advertising Law; (2) violation of California's Consumers Legal Remedies Act; and (3) violation of California's Unfair Competition Law.  A true

1  and correct copy of the January 20, 2023, second amended complaint in the *Pena*

2  Lawsuit is attached hereto as **Exhibit E** and incorporated herein by reference.

3      32.    The Pena Lawsuit alleges that Dr. Elist performed Mr. Pena's "surgery

4  to implant the Penuma device in Mr. Pena's body." SAC, ¶ 26.  Further, the *Pena*

5  Lawsuit alleges that "Dr. Elist personally trains all urologists authorized to implant

6  the Penuma." SAC, ¶ 35.

7      33.    The Putative Class Members allege they each suffered bodily injury

8  and damage resulting from the Penuma devices.  Among other similar allegations of

9  bodily injury and damage, the Putative Class Members allege in the SAC that:

10     i)    "implantation of the Penuma device not only does not usually result in

11         any lengthening of the penis, it frequently causes scarring, resulting in

12         the penis becoming shorter.  In addition, contrary to Defendants'

13         misrepresentations that the procedure is 'permanent' but 'reversible,'

14         the procedure frequently leads to infections and complications that

15         require removal of the device, which, in turn, causes permanent damage

16         to the penis." *Id.*, ¶ 26;

17     ii)   "the Penuma procedure often results in abnormal and deformed-looking

18         penises." *Id.*, ¶ 25;

19     iii)  "Mr. Pena's penis did not look or feel natural.  Instead, he had no

20         feeling on the top of the shaft and pain on bottom of the shaft. . . . Mr.

21         Pena suffered pain during intercourse and especially severe pain after

22         intercourse.  The implant eventually punctured the skin and poked out

23         through a small hole, through which fluid discharged.  Mr. Pena could

24         not sleep on his back or his stomach.  He woke up multiple times in the

25         middle of the night with painful erections, making it extremely difficult

26         for him to sleep for at least 3 months.  Mr. Pena could not even bend

27         down to tie his shoe without pain." *Id.*, ¶ 28;

28     iv)   "Mr. Pena has continued to suffer complications, including retraction,

9

loss of sensation, and scarring. These complications have caused Mr. Pena significant pain and mental anguish." *Id*., ¶ 29;

    v)    "many patients experience sexual dysfunction, including loss of sensation, as a consequence of receiving the Penuma implant." *Id*., ¶ 56;

    vi)    "[T]he procedure frequently led to complications requiring removal of the device, resulting in permanent damage to the penis . . ." *Id*., ¶ 59;

    vii)    "[T]he procedure. . . frequently causes painful infections that lead to yet more scarring. A substantial number of men have had to have the Penuma device removed because of such infection and scarring, leading to a loss of sensation in and/or permanent shortening of the penis." *Id*., ¶ 63; and

    viii)    "When infection, disfigurement, or other complications require the Penuma to be removed, patients suffer a significant shortening of their non-erect penises. Because the pseudocapsule of scar tissue, which is attached to the penile shaft, contracts over time after removal of the Penuma device, patients' flaccid penises appear shorter—often one to two inches shorter." *Id*., ¶ 64.

34.    The *Pena* Lawsuit remains pending as of the date of this complaint.

### *James River's Breaches*

35.    On or about April 12, 2023, IMD, Dr. Elist, and Menova (collectively, the "James River Insureds") tendered the defense of the *Pena* Lawsuit to James River.

36.    On May 25, 2023, James River denied coverage for the *Pena* Lawsuit under the James River Policy. In denying coverage, James River stated that Mr. Pena "does not seek compensatory damages for 'bodily injury' as defined in the policy; rather, he seeks only injunctive relief and restitutionary damages on his contractual theories. These are not 'sums' that the insured becomes obligated to pay

as damages because of bodily injury' within the meaning of the Policy. Thus, the allegations in the Lawsuit do not fall within the Insuring Agreement of the Policy's Coverage A."  James River took this position even though the *Pena* Lawsuit plainly includes covered or potentially covered allegations of bodily injuries sufficient to trigger James River's duty to defend under well-established principles of California insurance law.

37.    On July 7, 2023, the James River Insureds sent a letter to James River, disputing the coverage positions taken by James River, and identifying the numerous bodily injury allegations in the *Pena* Lawsuit and the damages sought relating thereto.  The James River Insureds further requested that James River reverse its position and acknowledge its obligation to provide coverage for the *Pena* Lawsuit.

38.    James River has failed and refused to retract its wrongful position, repeatedly disclaiming any obligation to defend the James River Insureds in the *Pena* Lawsuit or otherwise indemnify them for any future damages or settlements.

39.    As a result of James River's wrongful denial, the James River Insureds have been forced to fund their own defense in the *Pena* Lawsuit.  The James River Insureds have incurred, and will continue to incur, substantial costs and expenses to defend against the *Pena* Lawsuit.

40.    To the extent not waived or otherwise excused, the James River Insureds have complied with all terms and conditions in the James River Policy. Therefore, the James River Insureds are entitled to all benefits of the insurance provided by the James River Policy.

### *Admiral's Breaches*

41.    On June 12, 2023, Elist Medical and Dr. Elist (collectively, the "Admiral Insureds") tendered the defense of the *Pena* Lawsuit to Admiral.

42.    On June 29, 2023, Admiral sent a letter to the Admiral Insureds denying coverage for the *Pena* Lawsuit under the Admiral Policy.  Admiral based its

11

wrongful denial on its contention the *Pena* Lawsuit "is not a covered claim for damages arising from a medical incident" and that the *Pena* Lawsuit "does [not] involve claims of a negligent act, error, or omission involving urological surgery but rather alleges misrepresenting and falsely marketing the safety and effectiveness of the Penuma device."

43.    On July 12, 2023, the Admiral Insureds sent a letter to Admiral, disputing Admiral's positions and pointing to the allegations in the *Pena* Lawsuit that trigger coverage under the Admiral Policy.  The Admiral Insureds further requested that Admiral reverse its position and acknowledge its obligation to provide coverage to the Admiral Insureds for the *Pena* Lawsuit.

44.    On August 10, 2023, Admiral sent another letter to the Admiral Insureds' counsel, reiterating Admiral's wrongful denial.

45.    To date, Admiral has wrongfully failed and refused to meet its obligations to provide a defense to the Admiral Insureds in connection with the *Pena* Lawsuit, repeatedly disclaiming any obligation to defend the *Pena* Lawsuit or otherwise indemnify the Admiral Insureds for any future damages or settlements.

46.    As a result of Admiral's wrongful denial, the Admiral Insureds have been forced to fund their own defense in the *Pena* Lawsuit.  The Admiral Insureds have incurred, and will continue to incur, substantial costs and expenses to defend against the *Pena* Lawsuit.

47.    To the extent not waived or otherwise excused, the Admiral Insureds have complied with all terms and conditions in the Admiral Policy. Therefore, the Admiral Insureds are entitled to all benefits of the insurance provided by the Admiral Policy.

## FIRST CAUSE OF ACTION

### (*For Breach of Contract against James River*)

48.    The James River Insureds repeat and incorporate by reference the allegations of paragraphs 1 through 47 above.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

49.     James River has a duty under the James River Policy, the law, and insurance industry custom and practice to defend the James River Insureds against claims that fall within the scope of the coverage provided by the James River Policy. James River's duty to defend arose at least at the time that the James River Insureds' reasonable and necessary defense fees and costs relating to the *Pena* Lawsuit exceeded applicable retention of the Policy and will continue through final resolution of the *Pena* Lawsuit.

50.     James River also has a duty under the James River Policy to indemnify the James River Insureds for any settlement or judgment in the *Pena* Lawsuit.

51.     Furthermore, James River also has a duty under the James River Policy, the law, and insurance industry custom and practice to promptly conduct a full and thorough investigation, including all bases that might support the James River Insureds' claim for coverage for the *Pena* Lawsuit.  James River also has a duty to give at least as much consideration to the James River Insureds' interests as it gave its own interests in assessing coverage for the *Pena* Lawsuit.

52.     James River breached its duty to the James River Insureds under the James River Policy by, among other things,

    a.     Failing to perform a meaningful investigation into the James River Insureds' claim for coverage for the *Pena* Lawsuit;

    b.     Failing to acknowledge its duty to defend the James River Insureds in the *Pena* Lawsuit;

    c.     Failing to acknowledge its duty to indemnify the James River Insureds for any settlement or judgment in the *Pena* Lawsuit;

    d.     Asserting grounds for denying coverage for the *Pena* Lawsuit that it knows are not supported by, and in fact are contrary to, the terms of its policy, the law, insurance custom and practices, and the facts; and

    e.     Otherwise refusing to perform duties under its policy.

13

**COMPLAINT AND DEMAND FOR JURY TRIAL**

53.     As a direct and proximate result of James River's breach of contract, the James River Insureds have sustained damages in excess of the retention of the policies and in excess of the jurisdiction requirements, plus interest at the legal rate. The James River Insureds continue to suffer damages because of James River's contractual breaches and will seek leave to amend this complaint once they ascertain the full extent of their damages.

## SECOND CAUSE OF ACTION

### *(For Tortious Breach of the Implied Covenant of Good faith and Fair Dealing against James River)*

54.     The James River Insureds reallege and incorporate by reference paragraphs 1 through 47 and 49 through 52, above.

55.     Implied in the James River Policy is a covenant that James River would act in good faith and deal fairly with the James River Insureds, that James River would do nothing to interfere with the rights of the James River Insureds to receive benefits due under the James River Policy, and that James River would give at least the same level of consideration to the James River Insureds' interests as it gave to its own interest.

56.     Furthermore, James River had a duty under the James River Policy, the law, and insurance industry custom and practice to promptly conduct a full and thorough investigation, including all bases that might support its insureds' claim for coverage for the *Pena* Lawsuit, before asserting coverage defenses or denying coverage.

57.     Instead of complying with these duties, James River acted in bad faith by, among other things,

> a.     Failing to perform a meaningful investigation into the James River Insureds' claim for coverage for the *Pena* Lawsuit;
>
> b.     Failing to acknowledge its duty to defend the James River Insureds in the *Pena* Lawsuit;

14

c.    Failing to acknowledge its duty to indemnify the James River Insureds for any settlement or judgment in the *Pena* Lawsuit;

d.    Asserting grounds for limiting coverage for the *Pena* Lawsuit that it knows are not supported by, and in fact are contrary to, the terms of the James River Policy, the law, insurance custom and practices, and the facts; and

e.    Otherwise refusing to perform duties under the James River Policy.

58.    In breach of the implied covenant of good faith and fair dealing, James River did the things and committed the acts alleged above for the purpose of consciously withholding from the James River Insureds the rights and benefits to which they are and were entitled under the James River Policy. James River's acts are inconsistent with the reasonable expectations of its insureds, are contrary to established insurance industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the James River Policy, and constitute bad faith.

59.    As a direct and proximate result of James River's acts, the James River Insureds have sustained damages in excess of the James River Policy's retention and in excess of the jurisdictional requirements, plus interest at the legal rate. The James River Insureds continue to suffer damages because of James River's bad faith and will seek leave to amend this complaint once the James River Insureds ascertain the full extent of their damages. Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), the James River Insureds are entitled to recover attorneys' fees that they have previously incurred, and continue to incur, in their efforts to obtain the benefits due under the James River Policy that James River wrongfully withheld, and are withholding, in bad faith. The James River Insureds also are entitled to interest thereon at the maximum legal rate.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

60.    The James River Insureds are informed and believe, and on that basis allege, that James River—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business—performed, authorized, or ratified the bad faith conduct alleged above.

61.    James River's conduct is despicable and has been done with a conscious disregard of its insureds' rights, constituting oppression, fraud, and/or malice.  James River has engaged in a series of acts designed to deny its insureds the benefits due under the James River Policy.  Specifically, James River, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarded the James River Insureds' rights and forced its insureds to incur substantial financial losses, thereby inflicting substantial financial damage on the James River Insureds.  James River ignored its insureds' interests and concerns with the requisite intent to injury within the meaning of California Civil Code section 3294.  Therefore, the James River Insureds are entitled to recover punitive damages from James River in an amount sufficient to punish and to make an example of James River and to deter similar conduct in the future.

### THIRD CAUSE OF ACTION

### (*For Declaratory Relief Against James River*)

62.    The James River Insureds repeat and incorporate by reference the allegations of paragraphs 1 through 47 and 49 through 52, above.

63.    A controversy exists between James River and the James River Insureds. Specifically, the James River Insureds contend that pursuant to the terms of the James River Policy, James River is obligated to defend and indemnify the James River Insureds with respect to the *Pena* Lawsuit.

64.    James River disputes these contentions and contends it is not obligated to provide coverage for the *Pena* Lawsuit.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

65.     Therefore, an actual and justiciable controversy exists between James River and the James River Insureds concerning the matters alleged herein.

66.     The James River Insureds seek a judicial declaration by this Court in accord with their contentions and rejecting James River's contentions and stating that the *Pena* Lawsuit is covered under the James River Policy.

67.     A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their respective rights and duties.

## <u>FOURTH CAUSE OF ACTION</u>

### (*For Breach of Contract against Admiral*)

68.     The Admiral Insureds repeat and incorporate by reference the allegations of paragraphs 1 through 47 above.

69.     Admiral has a duty under the Admiral Policy, the law, and insurance industry custom and practice to defend the Admiral Insureds against claims that fall within the scope of the coverage provided by the Admiral Policy. Admiral's duty to defend arose at least at the time that the Admiral Insureds' reasonable and necessary defense fees and costs relating to the *Pena* Lawsuit exceeded applicable retention of the Policy and will continue through final resolution of the *Pena* Lawsuit.

70.     Admiral also has a duty under the Admiral Policy to indemnify the Admiral Insureds for any settlement or judgment in the *Pena* Lawsuit.

71.     Furthermore, Admiral also has a duty under the Admiral Policy, the law, and insurance industry custom and practice to promptly conduct a full and thorough investigation, including all bases that might support the Admiral Insureds' claim for coverage for the *Pena* Lawsuit.  Admiral also has a duty to give at least as much consideration to the Admiral Insureds' interests as it gave its own interests in assessing coverage for the *Pena* Lawsuit.

72.     Admiral breached its duty to the Admiral Insureds under the Admiral Policy by, among other things,

       a.     Failing to perform a meaningful investigation into the Admiral

17

Insureds' claim for coverage for the *Pena* Lawsuit;

b.   Failing to acknowledge its duty to defend the Admiral Insureds in the *Pena* Lawsuit;

c.   Failing to acknowledge its duty to indemnify the Admiral Insureds for any settlement or judgment in the *Pena* Lawsuit;

d.   Asserting grounds for denying coverage for the *Pena* Lawsuit that it knows are not supported by, and in fact are contrary to, the terms of its policy, the law, insurance custom and practices, and the facts; and

e.   Otherwise refusing to perform duties under its policy.

73.   As a direct and proximate result of Admiral's breach of contract, the Admiral Insureds have sustained damages in excess of the retention of the policies and in excess of the jurisdiction requirements, plus interest at the legal rate.  The Admiral Insureds continue to suffer damages because of Admiral's contractual breaches and will seek leave to amend this complaint once they ascertain the full extent of their damages.

## FIFTH CAUSE OF ACTION

### (For Tortious Breach of the Implied Covenant of Good faith and Fair Dealing against Admiral)

74.   The Admiral Insureds reallege and incorporate by reference paragraphs 1 through 47 and 69 through 72, above.

75.   Implied in the Admiral Policy is a covenant that Admiral would act in good faith and deal fairly with the Admiral Insureds, that Admiral would do nothing to interfere with the rights of the Admiral Insureds to receive benefits due under the Admiral Policy, and that Admiral would give at least the same level of consideration to the Admiral Insureds' interests as it gave to its own interest.

76.   Furthermore, Admiral had a duty under the Admiral Policy, the law, and insurance industry custom and practice to promptly conduct a full and thorough

investigation, including all bases that might support its insureds' claim for coverage for the *Pena* Lawsuit, before asserting coverage defenses or denying coverage.

77.    Instead of complying with these duties, Admiral acted in bad faith by, among other things,

a.    Failing to perform a meaningful investigation into the Admiral Insureds' claim for coverage for the *Pena* Lawsuit;

b.    Failing to acknowledge its duty to defend the Admiral Insureds in the *Pena* Lawsuit;

c.    Failing to acknowledge its duty to indemnify the Admiral Insureds for any settlement or judgment in the *Pena* Lawsuit;

d.    Asserting grounds for limiting coverage for the *Pena* Lawsuit that it knows are not supported by, and in fact are contrary to, the terms of the Admiral Policy, the law, insurance custom and practices, and the facts; and

e.    Otherwise refusing to perform duties under the Admiral Policy.

78.    In breach of the implied covenant of good faith and fair dealing, Admiral did the things and committed the acts alleged above for the purpose of consciously withholding from the Admiral Insureds the rights and benefits to which they are and were entitled under the Admiral Policy.  Admiral's acts are inconsistent with the reasonable expectations of its insureds, are contrary to established insurance industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the Admiral Policy, and constitute bad faith.

79.    As a direct and proximate result of Admiral's acts, the Admiral Insureds have sustained damages in excess of the Admiral Policy's retention and in excess of the jurisdictional requirements, plus interest at the legal rate.  The Admiral Insureds continue to suffer damages because of Admiral's bad faith and will seek leave to amend this complaint once the Admiral Insureds ascertain the full extent of their damages.  Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985),

19

the Admiral Insureds are entitled to recover attorneys' fees that they have previously incurred, and continue to incur, in their efforts to obtain the benefits due under the Admiral Policy that Admiral wrongfully withheld, and are withholding, in bad faith. The Admiral Insureds also are entitled to interest thereon at the maximum legal rate.

80.    The Admiral Insureds are informed and believe, and on that basis allege, that Admiral—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business—performed, authorized, or ratified the bad faith conduct alleged above.

81.    Admiral's conduct is despicable and has been done with a conscious disregard of its insureds' rights, constituting oppression, fraud, and/or malice. Admiral has engaged in a series of acts designed to deny its insureds the benefits due under the Admiral Policy.  Specifically, Admiral, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarded the Admiral Insureds' rights and forced its insureds to incur substantial financial losses, thereby inflicting substantial financial damage on the Admiral Insureds. Admiral ignored its insureds' interests and concerns with the requisite intent to injury within the meaning of California Civil Code section 3294.  Therefore, the Admiral Insureds are entitled to recover punitive damages from Admiral in an amount sufficient to punish and to make an example of Admiral and to deter similar conduct in the future.

## SIXTH CAUSE OF ACTION

### (*For Declaratory Relief Against Admiral*)

82.    The Admiral Insureds repeat and incorporate by reference the allegations of paragraphs 1 through 47 and 69 through 72 above.

83.    A controversy exists between Admiral and the Admiral Insureds. Specifically, the Admiral Insureds contend that pursuant to the terms of the Admiral Policy, Admiral is obligated to defend and indemnify the Admiral Insureds with

1  respect to the *Pena* Lawsuit.

2  84.  Admiral disputes these contentions and contends it is not obligated to

3  provide coverage for the *Pena* Lawsuit.

4  85.  Therefore, an actual and justiciable controversy exists between Admiral

5  and the Admiral Insureds concerning the matters alleged herein.

6  86.  The Admiral Insureds seek a judicial declaration by this Court in

7  accord with their contentions and rejecting Admiral's contentions and stating that

8  the *Pena* Lawsuit is covered under the Admiral Policy.

9  87.  A declaration is necessary at this time in order that the parties' dispute

10 may be resolved and that they may be aware of their respective rights and duties.

11 WHEREFORE, Plaintiffs pray for relief as follows:

12 **ON THE FIRST CAUSE OF ACTION**

13 1.  For damages, plus interest as allowed by law, according to proof at the

14 time of trial;

15 **ON THE SECOND CAUSE OF ACTION**

16 2.  For damages according to proof at the time of trial, including

17 reasonable attorneys' fees incurred in obtaining the benefits due under the James

18 River Policy, plus interest; and

19 3.  For punitive damages in an amount to be determined at the time of trial;

20 **ON THE THIRD CAUSE OF ACTION**

21 4.  For a declaration in accord with the James River Insureds' contentions

22 more fully described above;

23 **ON THE FOURTH CAUSE OF ACTION**

24 5.  For damages, plus interest as allowed by law, according to proof at the

25 time of trial;

26 **ON THE FIFTH CAUSE OF ACTION**

27 6.  For damages according to proof at the time of trial, including

28 reasonable attorneys' fees incurred in obtaining the benefits due under the Admiral

PASICH

1  Policy, plus interest; and

2       7.    For punitive damages in an amount to be determined at the time of trial;

3                    **ON THE SIXTH CAUSE OF ACTION**

4       8.    For a declaration in accord with the Admiral Insureds' contentions

5  more fully described above;

6                    **ON ALL CAUSES OF ACTION**

7       9.    For costs of suit incurred herein; and

8       10.   For such other, further, and/or different relief as may be deemed just

9  and proper.

10

11  DATED: March 8, 2024              PASICH LLP

12

13                                   By:*/s/ Shaun H. Crosner*
                                        Shaun H. Crosner
14                                      Jacquelyn M. Heitman
                                        L. Noelle Malindzak
15                                      Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action for those claims that may be tried by jury under the law.

DATED: March 8, 2024                    PASICH LLP

                                        By: */s/ Shaun H. Crosner*
                                            Shaun H. Crosner
                                            Jacquelyn M. Heitman
                                            L. Noelle Malindzak
                                            Attorneys for Plaintiffs

**COMPLAINT AND DEMAND FOR JURY TRIAL**

# EXHIBIT A

# IMPORTANT NOTICE:

**1.   The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2.   The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3.   The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4.   The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners— is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

**5.   Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

**6.   For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7.   California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

**8.   If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

# COMMERCIAL GENERAL LIABILITY POLICY DECLARATIONS

**COMPANY:**  **POLICY NUMBER**
JAMES RIVER INSURANCE COMPANY  00061113-8
6641 WEST BROAD STREET, SUITE 300
RICHMOND, VA 23230

**1. NAMED INSURED AND MAILING ADDRESS**      **PRODUCER:** 14107

International Medical Devices Inc        AP Specialty (El Segundo)
8500 Wilshire Blvd Suite 707           1960 East Grand Avenue, Suite 210
Beverly Hills, CA 90211               El Segundo, CA 90245

**2. POLICY PERIOD:** From 12/02/2021 to 12/02/2022 12:01 A.M. Standard Time at your Mailing Address above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON STATEMENTS IN THE APPLICATION(S) AND SUBJECT TO ALL OF THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**3. LIMITS OF INSURANCE**

| | | |
|---|---|---|
| General Aggregate Limit | $ 10,000,000 | |
| Products / Completed Operations Aggregate Limit | $ 10,000,000 | |
| Personal & Advertising Injury Limit | $ 1,000,000 | Any one person or organization |
| Each Occurrence Limit | $ 10,000,000 | |
| Damage to Premises Rented to You Limit | $ 50,000 | Any one premises |
| Medical Expense Limit | Excluded | Any one person |
| Deductible | $ 5,000 | Each claim |

**4. RETROACTIVE DATE (CG 00 02 only)** – This insurance does not apply to "Bodily Injury", "Property Damage" or "Personal and Advertising Injury" which occurs before the Retroactive Date, if any, shown below.

Retroactive Date: See IL1201-0403 Amendment of Limits of Insurance and Retroactive Date

**5. LOCATION OF PREMISES YOU OWN, RENT OR OCCUPY** (Same as Item 1 unless shown below):
8500 Wilshire Blvd Suite 707, Beverly Hills, CA, 90211

**6. DESCRIPTION OF BUSINESS**

Form of Business: Corporation

Business Description: Distributor of Solid Silicone Carving Blocks for Urological Purposes and Provides Product Advice

**7. CLASSIFICATION AND PREMIUM**

| CLASSIFICATION | CODE NO. | EXPOSURE | DESCRIPTION | RATE | ADVANCE PREMIUM |
|---|---|---|---|---|---|
| Medical, Dental, or Surgical Diagnostic or Treatment Machines or Devices Mfg. | 56808 | 4,000,000 | Per $1,000 of Receipts / assets | Refer to LS2025US-0907 - Life Sciences Premium Endorsement | $75,000.00 |
| Cyber Liability | | | | | 529.00 |
| Company Fee | | | | | $ 350.00 |
| Premium Shown is Payable at Inception Audit Frequency (if applicable): Annual | | | Total Policy Premium: May be Subject to Audit | | $ 75,879.00 |

**8. FORMS / ENDORSEMENTS APPLICABLE:**
See Schedule A – Schedule of Forms
**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

Policy Fee: $350.00
Broker Fee: $1,325.00
CA State Tax: $2,276.37
CA Stamp Fee: $189.70

# SCHEDULE A

FORMS AND ENDORSEMENTS THAT APPLY TO THIS POLICY:

**POLICY NO.  00061113**

| FORM NUMBER | DESCRIPTION |
|---|---|
| PN-03US-1219 | California Surplus Lines Policyholder Notice |
| LS0005US-0416 | Commercial General Liability Policy Declarations |
| AP0001US-0403 | Schedule A |
| CG0002-1207 | Commercial General Liability Coverage Form -Claims Made |
| BFR4001-0721 | Cyber Coverage Insurance |
| AP2702US-0107 | Extended Reporting Period Endorsement |
| AP2704US-0406 | Restricted Reporting Endorsement |
| AH2307US-1016 | Deductible Endorsement - Damages and Expenses |
| AP2103US-0607 | Minimum Policy Premium |
| AP2108US-0811 | Supplementary Payments (Defense Costs) within Limits of Insurance |
| LS2010US-0505 | Non-Stacking Endorsement |
| LS2025US-0907 | Life Sciences Premium Endorsement |
| LS2012US-0505 | Professional Liability Endorsement |
| AP2004US-0403 | Additional Insured - Managers or Lessors of Premises |
| AP2007US-0307 | Additional Insureds - Vendors |
| AP2104US-1012 | Common Policy Conditions |
| AP2107US-0403 | Binding Arbitration |
| LS2104US-1110 | Specified Products or Substance Exclusion with Scheduled Exceptions |
| CG0068-0509 | Recording and Distribution of Material or Information in Violation of the Law Exclusion |
| CG2107-0514 | Exclusion - Access or Disclosure of Confidential or Personal Info and Data-Related Liability - Limited BI Exception Not Incl |
| CG2135-1001 | Exclusion - Coverage C - Medical Payments |
| CG2136-0305 | Exclusion - New Entities |
| CG2147-1207 | Employment-Related Practices Exclusion |
| CG2167-1204 | Fungi or Bacteria Exclusion |
| IL0021-0908 | Nuclear Energy Liability Exclusion |
| AP2028US-0505 | Exclusion - Electronic Media |
| AP2031US-0411 | Exclusion - Cross Suits |
| AP2032US-0518 | Exclusion - Employers Liability |
| AP2036US-1105 | Absolute Pollution and Pollution Related Liability - Exclusion |
| AP2042US-0811 | Business Conduct Exclusion |
| AP2111US-1105 | Exclusion - Punitive Damages |
| AP5054US-0311 | Combined Policy Exclusions |
| GC2131US-0403 | Fiduciary Exclusion |
| LS2015US-0505 | Communicable Disease Exclusion |
| AP5027R-0115 | Rejection of Coverage for Certified Acts of Terrorism Coverage |
| CG2175-0115 | Exclusion of Certified Acts of Terrorism and Exclusion of Other Acts of Terrorism Committed Outside the United States |
| AP5048US-0410 | California - Service of Suit |
| IL1201-0403 | Policy Changes |
| ILP001-0104 | US Treasury Departments Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| AP0100US-0403 | Privacy Policy |

**COMMERCIAL GENERAL LIABILITY**
**CG 00 02 12 07**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**COVERAGES A AND B PROVIDE
CLAIMS-MADE COVERAGE
PLEASE READ THE ENTIRE FORM CAREFULLY**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **VI** – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "bodily injury" or "property damage" is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods.

**c.** A claim by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such claim is received and recorded by any insured or by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **a.** above.

All claims for damages because of "bodily injury" to the same person, including damages claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury", will be deemed to have been made at the time the first of those claims is made against any insured.

All claims for damages because of "property damage" causing loss to the same person or organization will be deemed to have been made at the time the first of those claims is made against any insured.

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not or never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

 © ISO Properties, Inc., 2006

**(2)** A watercraft you do not own that is:

    **(a)** Less than 26 feet long; and

    **(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

    **(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

© ISO Properties, Inc., 2006

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if:

**(1)** The offense was committed in the "coverage territory";

**(2)** The offense was not committed before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

**(3)** A claim for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods.

**c.** A claim made by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such claim is received and recorded by any insured or by us, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **a.** above.

All claims for damages because of "personal and advertising injury" to the same person or organization as a result of an offense will be deemed to have been made at the time the first of those claims is made against any insured.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the Retroactive Date, if any, shown in the Declarations.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

© ISO Properties, Inc., 2006

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

 © ISO Properties, Inc., 2006

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle or any "suit" against an insured we defend:

   **a.** All expenses we incur.

   **b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   **e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   **f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   **g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

   These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   **a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   **b.** This insurance applies to such liability assumed by the insured;

   **c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   **d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   **e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   **f.** The indemnitee:

   **(1)** Agrees in writing to:

   **(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

   **(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

   **(c)** Notify any other insurer whose coverage is available to the indemnitee; and

   **(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

   **(2)** Provides us with written authorization to:

   **(a)** Obtain records and other information related to the "suit"; and

   **(b)** Conduct and control the defense of the indemnitee in such "suit".

© ISO Properties, Inc., 2006

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   **(1)** "Bodily injury" or "personal and advertising injury":

      **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

      **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(a)** above;

      **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(a)** or **(b)** above; or

      **(d)** Arising out of his or her providing or failing to provide professional health care services.

   **(2)** "Property damage" to property:

      **(a)** Owned, occupied or used by,

      **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

      you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker") or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a claim. To the extent possible, notice should include:

    **(1)** How, when and where the "occurrence" or offense took place;

    **(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

Notice of an "occurrence" or offense is not notice of a claim.

**b.** If a claim is received by any insured, you must:

**(1)** Immediately record the specifics of the claim and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or a "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is effective prior to the beginning of the policy period shown in the Declarations of this insurance and applies to "bodily injury" or "property damage" on other than a claims-made basis, if:

**i.** No Retroactive Date is shown in the Declarations of this insurance; or

**ii.** The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations of this insurance;

**(ii)** That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

**(iii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iv)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(v)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

© ISO Properties, Inc., 2006

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2006

10. **Your Right To Claim And "Occurrence" Information**

We will provide the first Named Insured shown in the Declarations the following information relating to this and any preceding general liability claims-made Coverage Part we have issued to you during the previous three years:

a. A list or other record of each "occurrence", not previously reported to any other insurer, of which we were notified in accordance with Paragraph **2.a.** of the Section **IV** – Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition. We will include the date and brief description of the "occurrence" if that information was in the notice we received.

b. A summary by policy year, of payments made and amounts reserved, stated separately, under any applicable General Aggregate Limit and Products-Completed Operations Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

You must not disclose this information to any claimant or any claimant's representative without our consent.

If we cancel or elect not to renew this Coverage Part, we will provide such information no later than 30 days before the date of policy termination. In other circumstances, we will provide this information only if we receive a written request from the first Named Insured within 60 days after the end of the policy period. In this case, we will provide this information within 45 days of receipt of the request.

We compile claim and "occurrence" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers, or others to whom this information is furnished by or on behalf of any insured. Cancellation or non-renewal will be effective even if we inadvertently provide inaccurate information.

## SECTION V – EXTENDED REPORTING PERIODS

1. We will provide one or more Extended Reporting Periods, as described below, if:

a. This Coverage Part is canceled or not renewed; or

b. We renew or replace this Coverage Part with insurance that:

(1) Has a Retroactive Date later than the date shown in the Declarations of this Coverage Part; or

(2) Does not apply to "bodily injury", "property damage" or "personal and advertising injury" on a claims-made basis.

2. Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to claims for:

a. "Bodily injury" or "property damage" that occurs before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations; or

b. "Personal and advertising injury" caused by an offense committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations.

Once in effect, Extended Reporting Periods may not be canceled.

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for:

a. Five years with respect to claims because of "bodily injury" and "property damage" arising out of an "occurrence" reported to us, not later than 60 days after the end of the policy period, in accordance with Paragraph **2.a.** of the Section **IV** – Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition;

b. Five years with respect to claims because of "personal and advertising injury" arising out of an offense reported to us, not later than 60 days after the end of the policy period, in accordance with Paragraph **2.a.** of the Section **IV** – Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition; and

c. Sixty days with respect to claims arising from "occurrences" or offenses not previously reported to us.

The Basic Extended Reporting Period does not apply to claims that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

4. The Basic Extended Reporting Period does not reinstate or increase the Limits of Insurance.

5. A Supplemental Extended Reporting Period of unlimited duration is available, but only by an endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, set forth in Paragraph **3.** above, ends.

You must give us a written request for the endorsement within 60 days after the end of the policy period. The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

 © ISO Properties, Inc., 2006

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**a.** The exposures insured;

**b.** Previous types and amounts of insurance;

**c.** Limits of Insurance available under this Coverage Part for future payment of damages; and

**d.** Other related factors.

The additional premium will not exceed 200% of the annual premium for this Coverage Part.

This endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for claims first received during such period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period starts.

**6.** If the Supplemental Extended Reporting Period is in effect, we will provide the supplemental aggregate limits of insurance described below, but only for claims first received and recorded during the Supplemental Extended Reporting Period.

The supplemental aggregate limits of insurance will be equal to the dollar amount shown in the Declarations in effect at the end of the policy period for such of the following limits of insurance for which a dollar amount has been entered:

General Aggregate Limit
Products-Completed Operations Aggregate Limit

Paragraphs **2.** and **3.** of Section **III** – Limits Of Insurance will be amended accordingly. The Personal and Advertising Injury Limit, the Each Occurrence Limit and the Damage To Premises Rented To You Limit shown in the Declarations will then continue to apply, as set forth in Paragraphs **4.**, **5.** and **6.** of that Section.

## SECTION VI – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    **(1)** Equipment designed primarily for:

        **(a)** Snow removal;

        **(b)** Road maintenance, but not construction or resurfacing; or

        **(c)** Street cleaning;

    **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    **(1)** Products that are still in your physical possession; or

    **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        **(a)** When all of the work called for in your contract has been completed.

        **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

    **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

    **(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work" and

**(2)** The providing of or failure to provide warnings or instructions.

# CYBER COVERAGE INSURANCE

**THE ENDORSEMENT'S AGGREGATE LIMIT OF LIABILITY WILL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DAMAGES, CLAIM EXPENSES, PRIVACY BREACH EXPENSES, SYSTEM COMPROMISE, EXTORTION THREAT, PCI FINES.**

**THIS ENDORSEMENT PROVIDES INDEPENDENT COVERAGES, TERMS, AND DEFINITIONS.**

**PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY**

Various provisions in this Endorsement restrict coverage. Read the entire **Endorsement** carefully to determine what is and what is not covered, in addition to rights and duties.

**TO REPORT A CLAIM OR INCIDENT INVOLVING THIS COVERAGE ENDORSEMENT CALL THE HOTLINE # 888-526-3731**

**OR EMAIL: jamesriver_claims@moxfive.com**

### SCHEDULE OF INSURANCE

| Coverage | Limit of Insurance / Sublimit of Insurance |
|---|---|
| **ENDORSEMENT AGGREGATE COVERAGE LIMIT** | $100,000 |
| **A.  LIABILITY COVERAGE LIMIT (Inclusive of the following Coverages):** | |
| 1.  Media | $ 100,000 |
| 2.  Network Security | $ 100,000 |
| 3.  Data Compromise | |
| **a.**  Privacy | $ 100,000 |
| **b.**  Regulatory Proceeding Coverage | $ 50,000 |
| Regulatory Fines (Sub Limit) | $ 10,000 |
| **B.  FIRST PARTY EXPENSE COVERAGE LIMIT (Inclusive of the following Coverages):** | |
| 1.  Privacy Breach Event | $ 50,000 |
| 2.  System Compromise | $ 50,000 |
| 3.  Extortion Threat | $ 10,000 |
| 4.  Payment Card Industry (Sub Limit) | $ 10,000 |
| **C.  ENDORSEMENT DEDUCTIBLE** | $ 1,000 |
| **D.  ENDORSEMENT PREMIUM** | $529.00 |

**ENDORSEMENT PERIOD** From 12/02/2021 to 12/02/2022
At 12:01 A.M. Standard Time at the address of the **Named Insured** as stated herein.

## SECTION I: INSURING AGREEMENTS

This Section lists the coverages that apply if indicated in the Schedule and have a Limit of Liability on the Schedule. If no Limit of Liability is set forth for an Insuring Agreement, coverage has not been purchased for such Insuring Agreement. Various provisions in this **Endorsement** restrict coverage and coverage is subject to certain conditions precedent set forth in this **Endorsement**. Read the entire **Endorsement** carefully to determine rights and duties and what is and is not covered.

**A.** LIABILITY COVERAGE

    **1.** MEDIA
    The **Company** will pay on the **Insured's** behalf the **Damages** the **Insured** becomes legally obligated to pay resulting from a **Claim** directly arising from any **Media Wrongful Event** first **Discovered** during the **Endorsement Period**.

    **2.** NETWORK SECURITY
    The **Company** will pay on the **Insured's** behalf the **Damages** the **Insured** becomes legally obligated to pay resulting from a **Claim** directly arising from any **Network Security Event** first **Discovered** during the **Endorsement Period** when such **Network Security Event** is directly caused by a **Targeted Attack.**

    **3.** DATA COMPROMISE

        **a.** PRIVACY
        The **Company** will pay on the **Insured's** behalf the **Damages** the **Insured** becomes legally obligated to pay resulting from a **Claim** directly arising from a **Privacy Breach Event** first **Discovered** during the **Endorsement Period** when such **Privacy Breach Event** is directly caused by a **Targeted Attack**, or due to the **Accidental Release** of **Protected Information** directly by the **Named Insured**.

        **b.** REGULATORY
        The **Company** will pay on the **Insured's** behalf the **Regulatory Fines** and **Claim Expenses** that the **Insured** becomes legally obligated to pay resulting from a **Regulatory Proceeding Claim** directly arising from a **Privacy Breach Event** first **Discovered** during the **Endorsement Period** when such **Privacy Breach Event** is directly caused by a **Targeted Attack**, or due to the **Accidental Release** of **Protected Information** directly by the **Named Insured**.

**B.** FIRST PARTY EXPENSE COVERAGE

    **1.** PRIVACY BREACH EVENT
    The **Company** will pay the **Named Insured** for **Privacy Breach Expenses** directly arising from a **Privacy Breach Event** first **Discovered** during the **Endorsement Period** when such **Privacy Breach Event** is directly caused by a **Targeted Attack**, or due to the **Accidental Release** of **Protected Information** directly by the **Named Insured**.

    **2.** SYSTEM COMPROMISE
    The **Company** will pay the **Named Insured** for **Data Replacement Expenses** and **Computer System Restoration Expenses** directly arising from a **System Compromise Event** first **Discovered** during the **Endorsement Period** when such **System Compromise Event** is directly caused by a **Targeted Attack**.

    **3.** EXTORTION THREAT
    The **Company** will pay the **Named Insured** for **Extortion Threat Losses** directly arising from an **Extortion Threat Event** first **Discovered** during the **Endorsement Period,** directly caused by a **Targeted Attack**.

**4.** PAYMENT CARD INDUSTRY
The **Company** will pay on the **Named Insured's** behalf the **PCI Fines** that the **Named Insured** becomes legally obligated to pay under a **PCI Claim** directly arising from a **PCI Security Violation Event** first **Discovered** during the **Endorsement Period** when such **PCI Security Violation Event** is directly caused by a **Targeted Attack**.

## SECTION II: LIMITS OF INSURANCE AND DEDUCTIBLE

**A.** LIMITS OF INSURANCE

**1.** ENDORSEMENT AGGREGATE COVERAGE LIMIT OF INSURANCE
The Aggregate Coverage Limit of Insurance for the **Endorsement Period** set forth in the Schedule attached is the maximum aggregate limit of the **Company's** liability for all **Damages** and **Losses**, under all Insuring Agreements combined under this **Endorsement**, regardless of the number of **Claims**, the number of **Losses** or the number of claimants.

**2.** LIABILITY LIMIT OF INSURANCE
If a Limit of Insurance is set forth for an Insuring Agreement in the Schedule under the heading "Liability Coverage Limit", then such Limit of Insurance is the maximum limit of the **Company's** liability for all **Damages** from all **Claims** in the aggregate under the applicable Insuring Agreement, which amount is part of, and not in addition to, the **Endorsement** Aggregate Coverage Limit of Insurance for the **Endorsement Period** set forth in the Schedule. **Claims Expenses** are part of **Damages** and as such are included in the Limit of Insurance, reducing the available Limits of Insurance and shall be applied against the Deductible.

**3.** FIRST PARTY EXPENSE COVERAGE LIMIT OF INSURANCE
If a Limit of Insurance is set forth for an Insuring Agreement in the Schedule under the heading "First Party Expense Coverage Limit," then such Limit of Insurance is the maximum limit of the **Company's** liability for all **Loss** in the aggregate under the applicable Insuring Agreement, which amount is part of, and not in addition to, the **Endorsement** Aggregate Coverage Limit, for the **Endorsement Period** set forth in the Schedule.

**4.** EVENT LIMIT
The Limit of Liability for all **Damages** and **Losses** arising from the same **Privacy Breach Event**, **Network Security Event**, **Media Wrongful Event**, **System Compromise Event, PCI Security Violation Event** or **Extortion Threat Event** shall be limited to the Sub Limit  of Insurance and subject to the Aggregate Coverage Limit set forth in the Schedule for such **Privacy Breach Event**, **Network Security Event**, **Media Wrongful Event**, and a **System Compromise Event, PCI Security Violation Event** or **Extortion Threat Event**.

**B.** DEDUCTIBLE

**1.** The **Company** shall only be liable for the amount of **Damages** arising from a **Claim**, or for a **Loss**, which is in excess of the applicable Deductible set forth in the Schedule under the heading Deductible. Such Deductible shall be the sole obligation of the **Named Insured**. The **Company** has no obligation to the **Named Insured** or to any other person or entity to pay all or any portion of any Deductible amount for or on the **Named Insured's** behalf.

**2.** For the purpose of applying the Deductible, the **Named Insured** shall pay:

**a.** One single Deductible amount for **Damages** arising from each **Claim** and all its **Related Claims**.  In the event such **Claim** and all its **Related Claims** trigger more than one Deductible, then the highest of such Deductibles shall be deemed the Retention applicable to **Damages** arising from all such **Related Claims**.

   **b.** One single Deductible amount for each **Loss** and all its **Related Losses**. In the event such **Loss** and all its **Related Losses** trigger more than one Deductible, then the highest of such Deductibles shall be deemed the Retention applicable to **Losses** arising from all such **Related Losses**.

   **c.** One single Deductible amount in the event that a **Claim** and **Loss** arise out of, or are based upon or attributable to a continuous, repeated, the same, related, or substantially similar **Circumstances** or series of **Circumstances**, then the highest applicable Deductible shall apply to all **Damages** or **Losses** arising therefrom.

Any advancement or payment by the **Company** within the applicable Deductible shall apply toward exhaustion of the applicable Limit of Insurance.

## SECTION III: DEFENSE AND SETTLEMENT

**A.** DUTY TO DEFEND

The **Company** has the right and duty to defend any suit arising under any **Claim** against the **Insured** seeking **Damages** which are payable under this **Endorsement**, even if any of the allegations are groundless, false, or fraudulent. The **Company** has no duty to defend or pay any **Damages** or **Claim Expenses** for a **Claim**:

   **1.** Not first **Discovered** during the **Endorsement Period**; or
   **2.** For which coverage is excluded or not otherwise covered by this **Endorsement**.

**B.** SETTLEMENT

The **Company** has the right to investigate, direct the defense of, and/or settle any **Claim** as the **Company** deems expedient.

**C.** TERMINATION OF DUTY TO DEFEND

   **1.** The **Company's** right and duty to defend ends when the Aggregate Coverage Limit of Insurance or applicable Limit of Insurance is exhausted by the **Company's** payments or the **Company** deposits the remaining Aggregate Coverage Limit of Insurance or applicable Limit of Insurance with a court of competent jurisdiction.
   **2.** The **Company's** right and duty to defend ends when the **Company** makes the determination that there is no coverage available under this **Endorsement** at which time the **Company** may withdraw its defense.

**D.** COMPANY'S APPROVAL REQUIRED

The **Insured** shall not admit any liability, make any payment, assume any obligation, incur any expense, enter into or negotiate any settlement, stipulate to any judgment or award, or dispose of any **Claim** without **Approval** from the **Company**.

**E.** SELECTION OF COUNSEL

The **Company** shall have the right to select and appoint counsel to defend any **Claim**. The **Insured** shall not appoint counsel to defend any **Claim** without the prior **Approval** of the **Company.** Any costs incurred by an **Insured** for work performed by counsel, when that counsel was not approved by the **Company** shall be borne by the **Insured** and shall not erode the applicable **Deductible.** The **Company** shall have the right to substitute its chosen counsel for any counsel previously selected by the **Insured** without the **Company's** consent unless otherwise prohibited by applicable law.

**SECTION IV: REPORTING REQUIREMENTS**

**A.** INSURED'S DUTY TO REPORT

It is a condition precedent to coverage under this **Endorsement** that if the **Named Insured** first **Discovers** during the **Endorsement Period** any **Claim,** or any **Circumstance** which could reasonably be expected to give rise to a **Claim, Loss** or **Targeted Attack** and prior to any payment with respect to such **Claim**, **Loss** or **Targeted Attack**, the **Named Insured** provide a written notice as follows:

**1.** As soon as practicable during the **Endorsement Period** but in all cases no later than 30 days after first **Discovered** during the **Endorsement Period.**

**2.** If this **Endorsement** is not renewed or is cancelled for any reason, within 30 days after the **Endorsement Period** ends. Provided that, if the **Company** sends written notice to the **Named Insured** that this **Endorsement** is being cancelled for non-payment of premium, as a condition precedent to coverage for a **Claim** or **Loss**, the **Named Insured** must notify the **Company** of any such **Claim**, **Loss** or **Targeted Attack** prior to the effective date of the cancellation; provided further that notice by the **Named Insured** to any **Vendor** does not constitute notice of a **Claim** or **Loss** notice under this **Endorsement**.

**B.** REQUIRED INFORMATION

In addition to providing the notice in paragraph A of this Section IV, each notice must include a written report with the following information:

**1.** The names of the claimant or potential claimant, the **Impacted Individuals** and any other persons or entities involved, the specific **Third Party Liability Event** or the **Regulatory Proceeding** which may form the basis of the **Claim**, a description of how the **Named Insured** first **Discovered** the **Circumstances** giving rise to the **Claim**, and the nature and extent of the potential damages; and

**2.** The reason the **Named Insured** reasonably believes such **Circumstances** are likely to result in a **Claim.**

**C.** NO COVERAGE

**1.** No coverage will be provided for:

  **a.** Any **Damages** incurred or paid prior to the time the **Claim** or any related **Claim** is notified to the **Company**.

  **b.** Any **Loss** incurred or paid prior to the time the **Loss** is notified to the **Company**, unless otherwise authorized in writing by the **Company**.

**2.** No coverage under this **Endorsement** will be provided if the **Named Insured** or its **Knowledge Group Members** report any matter knowing it to be false or fraudulent.

**D.** DETERMINATION OF FIRST DISCOVERY

**1.** Each **Claim** and all its **Related Claims** will be treated as a single **Claim** first **Discovered** on the earliest of the following:

  **a.** When the earliest of the **Related Claims** was first **Discovered** by the **Named Insured** or a **Knowledge Group Member**.

  **b.** When the earliest of the **Related Claims** is treated by the **Company** as having been first **Discovered**.

This applies regardless of the following:

  **a.** The number of **Related Claims**.

  **b.** The number or identity of claimants.

  **c.** The number or identity of **Impacted Individuals** involved.

    **d.**  Whether the **Related Claims** are asserted in a class action or otherwise.
    **e.**  The timing of the **Related Claims**, even if the **Related Claims** were received or **Discovered** in more than one **Endorsement Period**.

**2.**  Each **Loss** and all **Related Losses**, whenever occurring, will be deemed to be a single **Loss** first **Discovered** when the earliest of such **Related Losses** was first **Discovered**.

**3.**  Any **Claim** or **Loss** arising from a **Privacy Breach Event** shall be treated as a **Claim** or **Loss** first **Discovered** at the time the **Named Insured** or a **Knowledge Group Member** first **Discovered** such **Privacy Breach Event**.

**4.**  Any **Claim** or **Losses** arising from the same or related **Privacy Breach Event**, **Network Security Event**, **Media Wrongful Event**, **System Compromise Event**, **PCI Security Violation Event** or **Extortion Threat Event**, shall be deemed to be only one event, first **Discovered** at the time the **Named Insured** or a **Knowledge Group Member** first **Discovered** the first of such events, and is subject to one deductible, and the **Endorsement** Aggregate Coverage Limit of Insurance set forth in the Schedule.

## SECTION V: DUE DILIGENCE AND COOPERATION

**A.**  DUE DILIGENCE REQUIREMENTS

**1.**  It is a condition precedent to coverage under this **Endorsement** that the **Named Insured** shall maintain its **Computer System** in accordance with industry accepted standards and use due diligence to prevent and mitigate against any **Damages** or **Loss**. This includes, but is not limited to, complying with reasonable and industry accepted protocols for:

    **a.**  Providing and maintaining physical security for the **Named Insured's** premises and the **Named Insured's Computer System**.
    **b.**  Providing appropriate computer, Internet and network security for the **Named Insured's Computer System**, and ensuring that such security is updated and patched with commercially reasonable frequency.
    **c.**  Installing, maintaining, updating and patching back-ups, firewalls, and virus scans for the **Named Insured's Computer System** with commercially reasonable frequency.
    **d.**  Providing and maintaining password protection and encryption for all **IOT Devices**, **Portable Devices** and **Peripheral Hardwired Devices**;
    **e.**  Providing and maintaining encryption for **Protected Information** and financial transactions such as credit card, debit card, and check processing.
    **f.**  Providing and maintaining secure disposal procedures of files containing **Protected Information** no longer needed for use.

**B.**  COOPERATION

The **Insured** agrees not to take any action or fail to take any required action that prejudices the **Insured's** rights or the **Company's** rights with respect to a **Claim** or **Loss**. In the event of a **Claim** or a **Loss**, the **Insured** must do any or all of the following upon the **Company's** request:

**1.**  Fully assist and cooperate with the **Company** in the conduct, defense, investigation, negotiation, and settlement of a **Loss** or **Claim** or investigation of coverage of a **Loss** or **Claim**.
**2.**  Submit to an examination under oath; provide the **Company** with written statements; attend meetings and negotiations; produce and make available all information, books, records, documents, and other materials which the **Company** deems relevant; authorize the **Company** to obtain records and other information.
**3.**  Take necessary steps to protect the **Computer System** and **Protected Information** from further loss or damage and keep a record of the expenses necessary to do so.

**4.**  Attend hearings, depositions, proceedings, trials, and appeals; assist the **Company** in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and pursuing or enforcing any right of contribution or indemnity against a person or entity who may be liable to the **Insured**.

**5.**  Accept the **Company's** assignment of counsel unless otherwise prohibited by applicable law.

## SECTION VI: EXCLUSIONS

**A.**  The **Company** shall not be liable to pay, indemnify or reimburse **Damages**, **Claim Expenses** or **Losses** based upon, arising out of, attributable to, caused by or resulting from:

**1.**  Any of the following, whether actual or alleged:

    **a.**  Direct creation of **Malicious Code** or intentional tampering with any **Computer System** by the **Named Insured** or its **Knowledge Group Members**.

    **b.**  Dishonest, fraudulent, criminal, or malicious act, error, or omission by the **Named Insured** or its **Knowledge Group Members**.

    Provided, however, the above sub-parts shall not apply:

      **i.**  To any **Insured** who did not intentionally and knowingly commit, acquiesce or participate in the conduct that gave rise to the **Claim, Regulatory Proceeding Claim, PCI Claim, Privacy Breach Event, System Compromise Event** or **Extortion Threat Event**;

      **ii.**  In the absence of a final judgment, adjudication or binding arbitration ruling adverse to such **Insured**.

    Upon such final adverse judgment, adjudication, or final arbitration ruling, the **Insured** shall reimburse the **Company** for all **Damages**, **Losses,** and **Claim Expenses we** have incurred or paid.

**2.**  Any **Network Security Event, Regulatory Proceeding**, **PCI Security Violation Event, Privacy Breach Event, Extortion Threat Event, System Compromise Event,,** or **Network Disruption Event** that was not directly caused by a **Targeted Attack.**

**3.**  Any **Named Event.**

**4.**  Any internet system failure, internet service failure, internet service provider failure, or failure of any device or computer system. This exclusion does not apply to internet systems, devices or computer systems owned or leased by, and operated under the control of, the **Named Insured**.

**5.**  Any failure, including but not limited to security failure, or interruption of service of a cloud provider or other entity providing hardware, software or other services to the **Named Insured** over the Internet, including but not limited to the provision of software as a service, infrastructure as a service, platform as a service, or data storage as a service.

**6.**  Any actual mechanical, electrical, or utility  failure including but not limited to power interruption, surge, brownout, blackout, or any defect of telephone, telecommunications, satellite systems, data transmission lines, and any related infrastructure.

**7.**  Any of the following, whether actual or alleged:

    **a.**  Bodily injury, sickness, disease, or death of any person.

    **b.**  Physical injury to, or loss or destruction of, tangible property, including but not limited to the loss of use thereof, or the loss of use of tangible property which has not been physically injured, lost, damaged or destroyed.

This exclusion shall not apply to a **Claim** for mental injury, mental anguish, or emotional distress directly resulting from a **Privacy Breach Event** or a **Media Wrongful Event.** For purposes of this exclusion, data is not considered tangible property.

8. Any of the following:

   a. **Nuclear reaction**, nuclear radiation, radioactive contamination, radioactive substance, electromagnetic field, electromagnetic radiation, or electromagnetism.

   b. War, invasion, acts of foreign enemies, hostilities (whether war is declared or not), rebellion, revolution, insurrection, war-like action, coup, usurped powers or military power, including but not limited to state sponsored actors.

   c. Fire, flood, earthquake, volcanic eruption, explosion, lightning, wind, hail, tidal wave, landslide, act of God or other physical event.

9. Any actual or alleged unlawful or unauthorized obtaining, gathering, collecting, acquiring, using, distribution or sale by the **Named Insured** or its **Knowledge Group Members** of any **Protected Information**.

10. The unsolicited dissemination of any communication to actual or prospective customers of the **Named Insured**, its **Knowledge Group Members,** or any third party.

11. Any actual or alleged violation of the Telecommunications Act, the CAN-SPAM Act, or any other federal, state or local legislation, regulation or law protecting a person's or entity's right of seclusion or privacy. Provided, however, that this exclusion will not apply to other **Privacy Laws** or **Regulatory Proceeding Claims.**

12. Any actual or alleged gaining of any profit or advantage to which the **Named Insured** or its **Knowledge Group Member** is not legally entitled.

13. Any actual or alleged patent infringement or theft, copying, misappropriation, display, or publication of any patent, process, confidential or proprietary information, or trade secret.

14. Any actual or alleged breach of contract, agreement, understanding, warranty including but not limited to product warranty, or other guarantee or promise. This exclusion shall not apply to the following:

    a. Solely with respect to actual or alleged breach of contract, liability that would have attached to the **Named Insured** or its **Knowledge Group Members** in the absence of such contract.

    b. **PCI Fines.**

    c. Alleged violations of a written confidentiality or data/system security agreement.

15. Any liability or obligation the **Named Insured** assumes under any contract, agreement, understanding, warranty including but not limited to product warranty, or other guarantee or promise. This exclusion shall not apply to the following:

    a. Liability that would have attached to the **Named Insured** in the absence of any such contract, agreement, understanding, warranty or other guarantee or promise.

    b. **PCI Fines.**

    c. Alleged violations of a written confidentiality agreement.

16. Any seizure, nationalization, confiscation, destruction, deletion or expropriation of any **Protected Information** or any **Computer System** held or used by the **Named Insured** or its **Knowledge Group Members** by order of any governmental authority.

17. Any of the following, whether actual or alleged:

    **a.** Violation of any federal, state, local, foreign legislation, regulation, or law prohibiting any restraint of trade or antitrust activity.

    **b.** Any price fixing, price discrimination, monopoly or monopolization, predatory pricing, unfair competition, collusion, conspiracy.

    **c.** Any unfair, false, misleading, or deceptive trade or business practice.

    **d.** False, misleading, deceptive, or fraudulent statement or representation in advertising or promoting the products, services, or business of the **Named Insured.**

**18.** Any of the following, whether actual or alleged:

    **a.** Discrimination of any kind.

    **b.** Wrongful employment practice of any kind.

**19.** Any fact, **circumstance**, subject, decision, transaction, event, or situation:

    **a.** That was the subject of notice to another carrier prior to the Effective Date of this **Endorsement**; or

    **b.** Which any **Named Insured** or **Knowledge Group Member Discovered** prior to the Effective Date of this **Endorsement**, which could give rise to any **Claim** or **Loss**.

**20.** The presence, discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, oil or other petroleum substances or derivatives, waste materials or other irritants, contaminants, pollutants or any other substances, including asbestos, fungus, mold and lead, which are or may be injurious to public health, property or the environment ("hazardous substances"), including:

    **a.** The cost of cleanup or removal of hazardous substances;

    **b.** The cost of such actions as may be necessary to monitor, assess and evaluate, the presence, discharge, dispersal, escape, release, or threat of same, of hazardous substances;

    **c.** The cost of disposal of hazardous substances or the taking of such other action as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare or to property or the environment, which may otherwise result; or

    **d.** Any cost, based upon, arising from, in consequence of, directly or indirectly resulting from, or involving in any way any government direction or request that the **Named Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize hazardous substances.

**B.** The **Company** shall not be liable to pay **Damages** or **Claim Expenses** resulting from any **Claim** by any of the following:

    **1.** Any person, other than an **Impacted Individual** for a **Privacy Breach Event.**

    **2.** Any entity owned or controlled by, or is under common ownership or control with, the **Named Insured**.

    **3.** Any person or entity which owns or controls any **Named Insured**.

    **4.** Any entity of which any **Impacted Individual** is a Director, Officer, Partner, or Principal Shareholder.

    **5.** Any independent contractor of the **Named Insured**.

## SECTION VII: GENERAL CONDITIONS

**A.** TERMINATION

The cancellation and nonrenewal provisions of the policy to which this **Endorsement** is attached shall apply to this **Endorsement**. This **Endorsement** shall remain in effect until the expiration of the **Endorsement Period** unless:

1. The policy to which this **Endorsement** is attached is cancelled or non-renewed prior to the expiration of the **Endorsement Period**; or

1. This **Endorsement** is removed at the request of the **Named Insured**, such removal to be confirmed by further endorsement to the policy.

**B.** CHANGE IN CONTROL

During the **Endorsement Period:**

1. The **Named Insured** consolidates or merges with or into, or sells more than 50% of its assets to, any other natural person or entity or group of persons or entities acting in concert, such that the **Named Insured** is not the surviving entity; or

2. Any natural person or entity or group of persons or entities acting in concert acquire more than (50%) of the issued and outstanding voting equity securities of the **Named Insured** or control voting rights representing the right to vote for election of or to appoint more than 50% of the directors or trustees of the **Named Insured.**

If either of the above events take place, hereinafter referred to as the "Transaction", then this Policy shall continue in full force and effect as to any **Claim Discovered** prior to the Transaction, and as to any **Loss** first **Discovered** prior to the Transaction. There shall be no coverage afforded by any provision of this Policy for any **Claim Discovered** after the Transaction or any **Loss** first **Discovered** after the Transaction. The **Named Insured** shall give the **Company** written notice of the Transaction as soon as practicable but not later than thirty (30) days after the Transaction.

**C.** BANKRUPTCY

Bankruptcy or insolvency of the **Named Insured** will not relieve the **Insured** or the **Company** of any obligations under this **Endorsement** unless such obligations are in violation of applicable law.

**D.** EXCESS COVERAGE

This insurance shall be excess of any other insurance that applies to any coverage hereunder and shall not contribute with any or all other insurance, whether collectible or not.

**E.** ASSIGNMENT

This **Endorsement** and any and all interests and rights hereunder are not assignable without the **Company's Approval**.

**F.** TERMS TO CONFORM TO APPLICABLE LAW

Where necessary, the **Company** shall amend the terms and conditions of this **Endorsement** to conform to applicable law.

**G.** TERRITORY

This **Endorsement** applies to acts committed or **Losses** occurring taking place anywhere in the world except countries or states against which the United States has implemented trade or diplomatic sanctions; provided, however, that any **Claim** must be brought in or directed to the United States.

**H.** SANCTIONS

Any **Claim** or **Loss** or matter uninsurable under any act, statute, rule, regulation, ordinance, common law, or other law of the United States of America concerning trade or economic sanctions or export control laws is not covered under this **Endorsement** and this insurance does not apply to the extent

that trade or economic sanctions or other similar laws or regulations prohibit the **Company** from providing insurance.

**I.**  LEGAL ACTION AGAINST THE COMPANY

No person or organization has a right under this **Endorsement** to sue the **Company** under this **Endorsement** unless all of its terms and conditions have been fully complied with.

A person or organization may sue the **Company** to recover on an agreed settlement or on a final judgment against an **Insured**; but the **Company** will not be liable for **Damages** that are not payable under the terms of this **Endorsement** or that are in excess of the applicable limit of insurance associated with the **Claim** for which the action against the **Company** is being brought. An agreed settlement means a settlement and release of liability signed by the **Company**, the **Insured** and the claimant or the claimant's legal representative.

**J.**  NO JOINDER

No individual or entity shall have any right under this **Endorsement** to join the **Company** as a party or otherwise bring  the **Company** into any **Claim** seeking **Damages** or to determine the liability of the **Insured**; nor shall the **Company** be impleaded by the **Insured** or the **Insured's** legal representative in any such **Claim**.

**K.**  SUBROGATION

In the event of any payment under this **Endorsement**, the **Company** shall be subrogated to the extent of such payment to all the **Insured's** rights of recovery thereof, and the **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the **Company** to effectively bring suit in the name of the **Insured.** The **Company** may waive its subrogation rights against any third party, provided that such waiver of subrogation is executed in writing prior to any **Privacy Breach Event** or **Loss** giving rise to such right of subrogation.

The **Company** assumes no duty to recover any amounts paid under this **Endorsement**; however, any amounts as may be recovered pursuant to the exercise of the **Company's** rights of subrogation shall be applied as follows: (i) to the repayment of expenses incurred in exercising any rights of subrogation; (ii) to **Damages** and **Losses** in excess of the Limits of Liability hereunder; and (iii) to **Damages** and **Losses** paid by the **Company.**

**L.**  HEADINGS

The titles of paragraphs, sections, provisions, or endorsements of or to this **Endorsement** are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the **Endorsement**.

**M.**  NOTICE

All notices and requests for **Approval** shall be sent to the **Company** and shall be hand delivered or sent by (i) registered, certified mail; (ii) overnight mail by a reputable international express mail carrier; (iii) by facsimile; or (iv) electronic mail; provided that notice shall be sufficient proof of notice when the notice is received by the **Company**; provided further that notice sent by facsimile will be deemed received with the automated confirmation of receipt and electronic mail will be deemed received only upon non-automated response to such email.

**SECTION VIII: DEFINITIONS**

A.  **Accidental Release** means the unintentional or unknowing dissemination of **Protected Information** by means other than **Malicious Code, Named Event, or a Targeted Attack.**

B.  **Approval** and **Approved** means the **Company's** written approval in response to a request for approval by the **Named Insured** that is requested by notice as set forth in section VII. M of this **Endorsement**.

C.  **Circumstances** means facts, subjects, situations, decisions, causes, persons, transactions, events, acts, errors or omissions, or class of persons or events.

D.  **Claim** means each of the following first made during the **Endorsement Period**:

   1.  For the purposes of **Third Party Liability Events**, a written demand or assertion of a legal right for monetary damages or services, including the service of a civil complaint or similar proceeding, or request for arbitration or mediation brought by or on behalf of one or more affected individuals.
   2.  For the purposes of Section I.B.5. The PAYMENT CARD INDUSTRY INSURING AGREEMENT, a **PCI Claim**.
   3.  For the purposes of Section I.A.3.b., the REGULATORY INSURING AGREEMENT, a **Regulatory Proceeding Claim**.

E.  **Claim Expenses** means each of the following, with respect to any **Claim**, first incurred during the **Endorsement Period:**

   1.  Reasonable and necessary fees, costs and expenses charged by any **Vendor** or lawyer **Approved** by the **Company** for the investigation, adjustment, settlement and/or defense of such **Claim.**
   2.  Reasonable and necessary expenses charged by a **Vendor** to investigate a **Targeted Attack** of the **Named Insured's Computer System.**
   3.  All interest which accrues after a judgment and is within the applicable Limit of Insurance or Aggregate Limit of Insurance, each as set forth in the Schedule.
   4.  The premiums for appeal, attachment, or similar bonds, but only for bond amounts within the Applicable Limits of Insurance. The **Company** does not have any obligation to furnish these bonds.

   **Claim Expenses** do not include the following:
   i.   Salaries, wages, fees, remuneration, overhead, benefits, or expenses of the **Company's** or the **Named Insured's Knowledge Group Members**.
   ii.  Fees, costs, and expenses incurred prior to the time that a **Claim** was reported to and **Approved** by the **Company.**
   iii. Fees, costs, and expenses incurred without the **Company's Approval**.
   iv.  Fees, costs, and expenses incurred to improve or upgrade the **Named Insured's Computer System** beyond what it was prior to the **Claim.**
   v.   Fees, costs, and expenses to comply with any injunctive or other non-monetary equitable, declaratory, regulatory, or administrative relief.

F.  **Company** means the Insurer as titled on the schedule page of this **Endorsement**.

G.  **Computer System** means a computer or series of interconnected computers owned or leased, and operated under the control of the **Named Insured** and includes **Peripheral Hardwired Devices**. **Computer System** also includes the following, if owned or leased and operated under the control of the **Named Insured**:

   1.  **Electronic Media**.
   2.  **Portable Devices**.
   3.  **IOT Devices**.

**H.  Computer System Restoration Expenses** means the reasonable and necessary fees, costs and
expenses charged by a **Vendor** to restore the software in the **Named Insured's Computer System**,
if damaged by a **System Compromise Event**, to its operating performance immediately before the
**System Compromise Event**, including costs to reinstall, or replace the software, or the configuration
or correction of the configuration of the **Named Insured's Computer System**.  If such software
cannot reasonably be restored, the term **Computer System Restoration Expenses** means the
actual, reasonable and necessary costs and expenses incurred by the **Vendor** to reach this
determination.

**Computer System Restoration Expenses** does not include any of the following:

**1.**  The cost of new or replacement hardware.
**2.**  Salaries, wages, fees, remuneration, overhead, benefits, or expenses of the **Company's** or the
**Named Insured's Knowledge Group Members**.
**3.**  Fees, costs or expenses to enhance, upgrade or otherwise modify, or improve the **Named
Insured's Computer System** beyond the level that existed immediately prior to the occurrence
of a **System Compromise Event**, including but not limited to costs and expense to replace,
remediate or improve the **Named Insured's Computer System,** or identify or remove software
programs errors, malware, computer viruses or vulnerabilities or create or develop software or
trade secrets.
**4.**  Any costs in excess of the actual cash value of the **Named Insured's Computer System**.
**5.**  Indirect or consequential losses.

**I.  Corporate Information** means any business information of a third party not insured under this
**Endorsement**, which is not available to the general public and is provided to the **Named Insured** or
a **Knowledge Group Member,** subject to a mutually executed written confidentiality agreement, or
which the **Named Insured** or a **Knowledge Group Member** is legally required to maintain in
confidence.  The term **Corporate Information** does not include **Personally Identifiable
Information**.

**J.  Crypto Currency** means a digital or virtual currency that uses crypto currency for security and uses
encryption techniques to regulate the generation of units of currency and verify the transfer of funds,
operating independently of a central bank.

**K.  Damages** means:

**1.**  With respect to a **Third Party Claim**, **Claim Expenses** and any monetary amount the **Insured**
becomes legally obligated to pay, including but not limited to any or all the following:
    **a.**  Judgments for compensatory damages.
    **b.**  Settlements to which the **Company** has agreed to in writing.
    **c.**  Attorney's fees and other litigation costs added to that part of any judgment paid by the
    **Company**, when such fees and costs are awarded by law or court order.
    **d.**  Pre-Judgment interest on that part of any judgment paid by the **Company.**
**2.**  With respect to a **PCI Claim**, the **PCI Fines**.
**3.**  With respect to a **Regulatory Proceeding Claim**, the **Regulatory Fines**.

**Damages** does not include any of the following:

    **i.**  Any monetary amount which the **Insured** is not legally obligated to pay.
    **ii.**  Any monetary amount which is not insurable under the applicable law or jurisdiction pursuant
    to which the **Endorsement** is construed.
    **iii.**  Past, present and future earned and unearned royalties, profits, fees, costs, expenses,
    commissions, or the return of royalties, profits, fees, costs, expenses, commissions, and
    profits unjustly held or obtained.
    **iv.**  Consideration charged by, paid by or owed to the **Insured**, including but not limited to
    restitution, disgorgement, reduction, or return of any consideration.
    **v.**  Costs and expenses required to comply with any injunctive or other non-monetary equitable,
    declaratory, regulatory, or administrative relief.

    **vi.** Discounts, prizes, awards, coupons, or other incentives offered to the **Insured's** clients or **Impacted Individuals**

    **vii.** Civil or criminal fines or penalties imposed by law, except **PCI Fines** and **Regulatory Fines.**

    **viii.** Punitive and exemplary damages.

    **ix.** The multiple portion of any multiplied damages.

    **x.** Taxes, loss of tax benefit or fines, tax penalties or sanctions imposed against the **Named Insured**.

**L.** **Data Replacement Expenses** means the reasonable and necessary fees, costs and expenses charged by a **Vendor** to research, re-create or replace electronic data on the **Named Insured's Computer System** that is damaged by a **System Compromise Event**, provided that such research, re-creation or replacement must be from written records or electronic backup of such electronic data. If such electronic data cannot reasonably be researched, recreated or replaced, the term **Data Replacement Expenses** means the reasonable and necessary costs and expenses incurred by the **Vendor** to reach this determination.

    **Data Replacement Expenses** does not include any of the following:

    **1.** Salaries, wages, fees, remuneration, overhead, benefits, or expenses of the **Company's** or the **Named Insured's Knowledge Group Members**.

    **2.** Fees, costs or expenses to enhance, upgrade or otherwise modify, or improve the **Computer System** beyond the level that existed immediately prior to the occurrence of a **System Compromise Event**, including but not limited to updating, upgrading or enhancing electronic data or replacing, remediating or improving any **Computer System,** or improving networks and data security practices, procedures or policies.

    **3.** Re-creation or replacement of software programs or operating systems that are not commercially available.

    **4.** Re-creation or replacement of data that is obsolete, unnecessary or useless to the **Named Insured**.

    **5.** Indirect or consequential losses.

**M.** **Discovers** or **Discovered** means the time the **Named Insured** or a **Knowledge Group Member** receives notice of, becomes aware of or receives, as applicable, any of the following: (i) any **Circumstance** which is reasonably likely to give rise to a **Claim** or **Loss**, or (ii) any **Claim** or **Loss** or potential **Claim** or **Loss**, regardless when the **Circumstance** occurred and regardless of the potential amount of the **Claim** or **Loss**.

**N.** **Electronic Media** means any electronic information which is unique to the **Named Insured**, including audio or visual information, ready-for-use applications, programs, and other content in machine-readable format.

**O.** **Electronic Media Advertising** means **Electronic Media** which advertises or promotes the **Named Insured's** products or services.

**P.** **Endorsement** means this **Endorsement** issued by the **Company**.

**Q.** **Endorsement Period** means the **Endorsement Period** set forth in the Schedule.

**R.** **Exploit** means a vulnerability in a **Computer System** through which **Malicious Code**, or software designed to find, create, or take advantage of such vulnerability, can enter such **Computer System**.

**S.** **Extortion Threat Event** means a credible threat, or a series of credible threats by a third party to cause or continue one or more **System Compromise Events** or the **Unauthorized Access or Unauthorized Use** of **Protected Information**, plus a demand by such third party for money from the **Named Insured** or a **Knowledge Group Member** where the payment of such money is a condition of mitigation or removal of such threat or series of threats.

**T.  Extortion Threat Losses** means the **Funds Paid** by the **Named Insured** or a **Knowledge Group Member** in response to an **Extortion Threat Event** to the party that made the **Extortion Threat Event**, and the reasonable and necessary fees, costs, and expenses charged by a **Vendor** to respond to confirm, negotiate or pay an **Extortion Threat Event**.

**U.  Funds Paid** means the value of the funds paid that are in the form of check, wire transfer, credit card payment, debit card payment or **Crypto currency**.  **Funds Paid** excludes cash payments.

**V.  Impacted Individuals** means any person whose **Personally Identifying Information** is in the care, custody or control of the **Named Insured** and is lost, stolen, accidentally released or accidentally published by a **Privacy Breach Event** covered under this **Endorsement**. This definition is subject to all of the following provisions:

  **1.  Impacted Individual** does not include any business or organization. Only an individual person may be an **Impacted Individual.**
  **2.  Impacted Individual** may reside anywhere in the world.
  **3.  The **Personally Identifiable Information** must be kept by the **Named Insured** in the ordinary course and scope of its business operations.

**W.  IOT Device** means any electronic device, other than a **Portable Device**, or hardwire connected device, that connects to the **Named Insured's Computer System** directly or through a **VPN**.  **IOT Devices** include, but are not limited to, smart printers, industrial control systems, security systems, smart speakers, smart televisions and smart appliances.

**X.  Insured** means the **Named Insured** and the **Knowledge Group Members.**

**Y.  Knowledge Group Member(s)** mean the **Named Insured's** employees, principals, officers, executive officers and directors, but only while acting in their capacity as such for the **Named Insured**.

**Z.  Loss(es)** means **Privacy Breach Expenses**, **Data Replacement Expenses**, **Computer System Restoration Expenses**, and **Extortion Threat Losses**.

  **Loss(es)** do not include:

  **1.  The costs or expenses to comply with any order for, grant of or agreement to provide non-monetary relief, including but not limited to injunctive relief, or costs to remove electronic information from a Website or social media site.
  **2.  Consideration charged by or owed to the **Insured,** including but not limited to restitution, disgorgement, reduction, royalties or licensing fees, or return of any consideration.
  **3.  Any costs, fees or expenses incurred or paid by the **Insured** in establishing the existence of or amount of **Loss**, other than to a **Vendor.**
  **4.  Fines, taxes, penalties, loss of tax benefits or sanctions, except for **PCI Fines** and **Regulatory Fines**.

**AA.  Malicious Code** means an unauthorized, unwanted, or harmful program, code, or script, including but not limited to any virus, Trojan horse, worm, time, logic bomb, spyware, malware or spider.

**BB.  Media Wrongful Event** means any or all of the following that is unintentionally or unknowingly caused by **Electronic Media Advertising** first created during the **Endorsement Period**:

  **1.  Libel, slander or other defamation.
  **2.  Infringement of copyright, trademark, title, slogan, trade name, trade dress, service mark, service name, plagiarism or misappropriation of ideas.

**CC.** **Named Insured** means the person(s) and / or entity(ies) listed on the Policy Declarations, to which this endorsement is attached.

**DD.** **Named Event** means the original and any variant of a highly publicized or widespread (with respect to multiplicity of impacted or targeted companies) **Malicious Code** or **Exploit** that becomes known by a common name or moniker adopted by, or is the subject of an alert by, any United States government entity or agency or any computer security or forensics entity or anti-virus software vendor.

**EE.** **Network Disruption Event** means an interruption, disruption, deterioration, failure, suspension, or delay in the performance of the **Named Insured's Computer System**.

**FF.** **Network Security Event** means any one or more of the following caused by a **Network Disruption Event Discovered** during the **Endorsement Period**:

  **1.** The inability of the **Named Insured** or authorized third party user to access the **Named Insured's Computer System**.
  **2.** The failure or corruption of a third party's computer system or network.
  **3.** The inability of an authorized third party user to access its computer system or network.
  **4.** The **Named Insured's** or a **Knowledge Group Member's** transmittal or distribution of **Malicious Code** to a third party's computer system or network.
  **5.** The perpetuation of a denial of service attack on a third party's computer system or network.

**GG.** **Payment Card Services Agreement** means an agreement between the **Named Insured** and a financial institution, credit card or debit Card Company or credit or debit card processor, enabling the **Named Insured** to accept credit card, debit card, prepaid card or other payment cards for payments.

**HH.** **PCI Claim** means the notification of the **Named Insured's** failure to comply or violation of any Payment Card Industry Data Security Standards established by the PCI Security Standards Council, and brought by a party who has entered into a **Payment Card Services Agreement** with the **Named Insured.**

**II.** **PCI Security Violation Event** means the **Named Insured's** failure to comply with Payment Card Industry Data Security Standards.

**JJ.** **PCI Fines** means the fines explicitly defined as a "fine" which the **Named Insured** is legally obligated to pay under a **Payment Card Services Agreement** due to a breach of a **Payment Card Services Agreement** caused by a **PCI Security Violation Event**.  **PCI Fines** do not include (i) subsequent fines arising out of continued noncompliance or the same breach, (ii) any increased transaction costs, or (iii) any chargebacks.

**KK.** **Peripheral Hardwired Devices** means hardwire connected and non-portable devices connected to the **Named Insured's Computer System**, including but not limited to printers, scanners, and routers.

**LL.** **Personally Identifiable Information** means:

  **1.** Information concerning a natural person that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, and any amendment thereto or any rules of regulations promulgated in connection therewith.
  **2.** Medical or heath care information concerning a natural person including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, and any amendments thereto or any rules or regulations promulgated in connection therewith.
  **3.** Information concerning a natural person that is defined as private personal information under any U.S. federal or state law.
  **4.** A natural person's driver's license or state identification number, social security number, unpublished telephone number, unpublished IP address, digital facial identity (not including

photos and videos), digital fingerprint identity, and credit, debit or other financial account number in combination with associate security codes, access codes, passwords or PINs.

If such information allows such person to be uniquely and reliably identified or contacted or allows access to the person's financial account or medical record information.  The term **Personally Identifiable Information** does not include publicly available information that is lawfully made available to the general public, or **Corporate Information**.

**MM. Portable Device** means an electronic portable device such as a computer, smart phone, smart wearable or other similar device that can connect to a network either directly through hardwire or through a VPN.

**NN. Privacy Breach Event** means the following actual or alleged events:

1. Theft, loss, **Accidental Release** or accidental publication of **Protected Information**.
2. **Unauthorized Access or Unauthorized Use** of **Protected Information**.
3. The **Named Insured's** actual or alleged violation of a **Privacy Law**.

**OO. Privacy Breach Expenses** means the reasonable and necessary costs and expenses directly incurred for or by the **Named Insured** in responding to a **Privacy Breach Event**:

1. **Notification Expenses:**

   Notification fees and expenses charged by a **Vendor** to notify an **Impacted Individual** and any regulator required to be notified by applicable law that: (i) a **Privacy Breach Event** occurred, and (ii) there was, may have been or may be **Unauthorized Access or Unauthorized Use** of the **Protected Information.**

2. **Monitoring Expenses:**

   Fees and expenses charged by a **Vendor** to provide credit monitoring, identity theft, or fraud resolution services to an **Impacted Individual** affected by a **Privacy Breach Event.**

3. **Cyber Investigation Expenses:**
   Fees and expenses charged by a **Vendor** to investigate any or all of the following:
   a. Whether an **Unauthorized Access or Unauthorized Use** of the **Named Insured's Computer System** arising from a **Targeted Attack** has occurred.
   b. Whether **Protected Information** has been accessed.
   c. Whether the **Named Insured** has an obligation to provide notice under a **Privacy Law.**

4. **Crisis Management Expenses:**
   a. Fees and expenses charged by a public relations firm, law firm or crisis management firm Approved by the **Company** to perform crisis management services to minimize the potential harm to the **Named Insured's** business from a **Privacy Breach Event.**
   b. Fees and expenses charged by a call center designated or **Approved** in writing by the **Company** to assist in managing incoming calls during and concerning a **Privacy Beach Event**.

   **Privacy Breach Expenses** shall not include the following:
   i. Salaries, wages, fees, remuneration, overhead, benefits, or expenses of the **Company's** or the **Named Insured's Knowledge Group Members**.
   ii. Fees, costs or expenses to enhance, upgrade or otherwise modify, or improve the **Computer System** beyond the level that existed immediately prior to the occurrence of a **Privacy Breach Event**.

**PP. Privacy Law** means any law or regulation governing the protection of **Personally Identifiable Information,** provided that it requires  at least one of the following:

1. Posting privacy policies.
2. Adopting specific privacy or security controls.

3.  Notifying **Impacted Individuals** if their **Personally Identifiable Information** has potentially been accessed or disclosed without authorization.

QQ. **Protected Information** means **Personally Identifiable Information** or **Corporate Information** that is in the direct care, custody and control of the **Named Insured.**

RR. **Regulatory Fines** means the fines or penalties assessed against a **Named Insured** in a **Regulatory Proceeding Claim**, if such fines and penalties are insurable under the applicable law for civil or administrative fines or penalties, in all cases arising from a **Privacy Breach Event Discovered** during the **Endorsement Period**

SS. **Regulatory Proceeding Claim** means each of the following first **Discovered** during the **Endorsement Period** that alleges the failure to comply with a U.S. federal or state law governing the protection of **Personally Identifiable Information**:

1.  A written demand to the **Named Insured** for documentation or information commenced by service of a complaint or similar pleading brought by a federal or state regulatory body or regulator; or
2.  An investigation or civil proceeding brought against the **Named Insured** by a federal or state regulatory body or regulator and commenced by service of a complaint or similar pleading.

TT. **Related Claims** mean all **Claims** that are based upon, arising from, in consequence of, directly or indirectly resulting from, or involving in any way continuous, repeated, same, related, or substantially similar **Circumstances**, or a continuous, repeated, same, related, or substantially similar series of **Circumstances.**

UU. **Related Losses** mean all **Losses** that are based upon, arising from, in consequence of, directly or indirectly resulting from, or involving in any way continuous, repeated, same, related, or substantially similar **Circumstances**, or a continuous, repeated, same, related, or substantially similar series of **Circumstances**.

VV. **System Compromise Event** means the **Unauthorized Access or Unauthorized Use** of the **Named Insured's Computer System** that materially degrades or damages the performance of the **Named Insured's Computer System** or corrupts or destroys any **Electronic Media** in the **Named Insured's Computer System**.

WW. **Targeted Attack** means any attack upon the **Named Insured's Computer System** by **Malicious Code,** or by **Unauthorized Access or Unauthorized Use**, or attempted **Unauthorized Access or Unauthorized Use,** of the **Named Insured's Computer System** that is specifically directed against the **Named Insured's Computer System**.

XX. **Third Party Claims** means Claims directly arising from a **Third Party Liability Event**.

YY. **Third Party Liability Event** means third party liability arising from any or all of the following:

1.  **Media Wrongful Event**.
2.  **Network Security Event**.
3.  **Privacy Breach Event.**

ZZ. **Unauthorized Access or Unauthorized Use** means the access to or use of the **Named Insured's Computer System** by a person or organization not authorized to do so, or the access to or use of the **Named Insured's Computer System** by an authorized person in an unauthorized manner.

AAA. **Vendor** means a third party organization that the **Company** has either (i) designated, or (ii) **Approved**.

**BBB. VPN** means a virtual private network unique and connected to the series of interconnected computers owned, leased by or operated under the control of the **Named Insured**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE

**Section V - Extended Reporting Period** is deleted in its entirety and replaced by:

## SECTION V – EXTENDED REPORTING PERIOD

**1.**  We will provide one or more Extended Reporting Periods as described below, if:

    **a.**  This Coverage Part is cancelled or not renewed unless such cancellation or non renewal is due to non payment of premium or deductibles or your failure to comply with all the terms and conditions of this policy; or

    **b.**  We renew or replace this Coverage Part with insurance that:

        **(1)**  Has a Retroactive Date later than the date shown in the Declarations of this Coverage Part; or
        **(2)**  Does not apply to "bodily injury," "property damage," "personal and advertising injury" on a claims-made basis.

**2.**  Extended Reporting Periods do not extend the policy period nor do they reinstate or increase the Limits of Insurance. They apply only to claims for:

    **a.**  "Bodily injury" or "property damage" that occurs before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations; or

    **b.**  "Personal and advertising injury" caused by an offense committed before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations.

    Once in effect, Extended Reporting Periods may not be cancelled.

**3.**  A Basic Extended Reporting Period is automatically provided without additional charge. This period begins with the end of the policy period and ends:

    **a.**  Thirty (30) days after the end of the policy period with respect to claims reported to us, in accordance with the Duties in the Event of "Claim" or "Suit" provisions, as amended by endorsement to this policy; or

    **b.**  Thirty (30) days after the end of the policy period for all other claims.

    The Basic Extended Reporting Period does not apply to claims that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

**4.**  A Supplemental Extended Reporting Period may be available, but only by endorsement and for an extra charge. This Supplemental Extended Reporting Period, if purchased, begins with the end of the policy period and ends on the date specified in Endorsement AP2703US with respect to "claims" first made to the insured after the end of the policy period and reported to us during the Supplemental Extended Reporting Period.

**a.** To purchase a Supplemental Extended Reporting Period endorsement, you must give us a written request for this endorsement within 30 days after the end of the policy period. The Supplemental Extended Reporting Period will not go into effect unless we have received your payment of the additional premium.

**b.** We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

    **1.** The exposures insured;

    **2.** Previous types and amounts of insurance;

    **3.** Limits of Insurance available under this Coverage Part for future payment of damages; and

    **4.** Other related factors.

**c.** Endorsement AP2703US shall set forth the terms, not inconsistent with this Section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for claims first received during such period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period begins.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# RESTRICTED REPORTING ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**ITEM 2. Duties in the Event of Occurrence, Offense, Claim Or "Suit"** is deleted and replaced with the following:

**2**. **Duties in the Event of "Claim" or "Suit"**

  **a.**  The insured shall provide written notice to us as soon as practicable following receipt of any "claim" or "suit".  The insured shall also include in such written notice details of the "claim" or "suit".

  **b.**  If a "claim" or "suit" is received by any insured:

    **(1)**  Immediately record the specifics of the "claim" or "suit" and the date received; and

    **(2)**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

  **c.**  You and any other involved insured must:

    **(1)**  Authorize us to obtain records and other information;

    **(2)**  Fully cooperate with us or our designee in the investigation, settlements, conduct of "suits" or other proceedings and the enforcing of any right of contribution or indemnity against another who may be liable to you.  You shall, as we at our discretion may require, attend hearings and trials, assist in securing and giving evidence, and obtaining the attendance of witnesses; and

    **(3)**  Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of "damage" to which this insurance may also apply.

  **d.**  No insured will, except at the Insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense.

**SECTION VI – DEFINITIONS** is amended to include:

"Claim" means a written demand for monetary damages.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# DEDUCTIBLE ENDORSEMENT – DAMAGES AND EXPENSES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Coverage | Amount and Basis of Deductible |
| --- | --- |
| If provided by this policy: | |
| Bodily Injury Liability, Property Damage Liability, Professional or Personal and Advertising Injury Liability | $            **PER CLAIM** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

1. Our obligation under the Bodily Injury Liability, Property Damage Liability, Professional or Personal and Advertising Injury Liability, or any other coverage provided by this policy, to pay "claims expense" and damages on your behalf applies only to the amount of "claims expense" and damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

2. The deductible amount shown above applies under the coverages respectively to all "claims expense" and   damages sustained by one person, or organization, as the result of any one "occurrence".

3. The terms of this insurance, including those with respect to:

    a. Our right and duty to defend any "suits" seeking those damages; and

    b. Your duties in the event of an "occurrence", offense, claim, or "suit"

    apply irrespective of the application of the deductible amount.

4. We may pay any part or all of the deductible amount on your behalf to effect settlement of any claim or "suit".  This advance payment on your behalf will be invoiced to you and shall be promptly reimbursed to us within 30 days of the invoice date.  Failure to reimburse us for deductible amounts paid on your behalf may result in policy cancellation as stated in common policy conditions.

5. "Claims expense" shall include investigations, adjustment and legal expenses, interests and fees, including court costs and premiums on bonds incurred by us.  "Claims expense" does not include salary charges of regular employees of the Company.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM POLICY PREMIUM

This endorsement modifies and amends insurance provided under the following:

ALL COVERAGE PARTS

This endorsement sets forth the minimum earned premium for the policy.  The minimum earned premium for this policy is calculated in accordance with the following:

1.  The minimum premium for the policy period is 100% of the total policy premium as shown on the policy declarations page plus any premium adjustment by endorsements and any additional premium developed by audit.

2.  Audits that indicate a return premium will not reduce the minimum as stated in paragraph 1.

3.  If the insured cancels this policy and the policy is not subject to audit, the return premium will be 90% of the unearned policy premium; however in no event will the Company retain less than **25**% of the minimum premium shown in paragraph 1. above.

4.  If the insured cancels this policy and the policy is subject to audit, the earned premium will be determined by final audit, however in no event will it be less than **25**% of the minimum premium as described in paragraph 1. above.

5.  If the Company cancels the policy for any reason, other than for non-payment of premium, then the insured will be returned the full amount of the unearned premium without any minimum premium restrictions.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SUPPLEMENTARY PAYMENTS (DEFENSE COSTS) WITHIN LIMITS OF INSURANCE

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE** and **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY** are amended by adding the following:

Supplementary Payments shall reduce the Limits of Insurance of this policy and shall first be subtracted from the Limits of Insurance with the remainder, if any, being the amount available to pay damages because of "bodily injury" or "property damage" or "personal and advertising injury" to which this insurance applies.

If the Limit of Insurance of the policy is exhausted prior to final settlement by the payment of settlements, judgments, awards, Supplementary Payments or any combination thereof, we shall have the right to withdraw from any further defense by tendering control of the defense of the "suit" to you.

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement, a.(2)** is deleted and replaced with the following:

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or Supplementary Payments under Coverages **A** or **B** or medical expenses under Coverage **C**.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 1. Insuring Agreement, a.(2)** is deleted and replaced with the following:

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or Supplementary Payments under Coverages **A** or **B** or medical expenses under Coverage **C**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B** is deleted and replaced with the following:

   **1.**   We will pay, with respect to any claim we investigate or settle or any "suit" against the insured we defend:
   **a.** All expenses we incur, including the cost of investigations, adjustment and legal expenses.
   **b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.
   **c.** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.
   **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of the time off from work.
   **e.** All costs court taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

    **f.**  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

    **g.**  All interest on the full amount of any judgment that accrues after the entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will reduce the Limits of Insurance

**2.**  If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party of the "suit", we will defend that indemnitee if all of the following conditions are met:

    **a.**  The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

    **b.**  This insurance applies to such liability assumed by the insured;

    **c.**  The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

    **d.**  The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

    **e.**  The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

    **f.**  The indemnitee:

      **(1)**  Agrees in writing to:

        **(a)**  Cooperate with us in the investigation, settlement or defense of the "suit";

        **(b)**  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

        **(c)**  Notify any other insurer whose coverage is available to the indemnitee; and

        **(d)**  Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      **(2)**  Provides us with written authorization to:

        **(a)**  Obtain records and other information related to the "suit"; and

        **(b)**  Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. These payments will be deemed to be damages for "bodily injury" and "property damage" and will reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorney's fees and necessary litigation expenses as Supplementary Payments ends when:

    **a.**  We have used up the applicable Limit of Insurance in the payment of judgments or settlements or Supplementary Payments; or

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

     **b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION III – LIMITS OF INSURANCE** paragraphs **2.**, **3.**, **4.**, **5.**, and **6.** are deleted and replaced with the following:

    **2.** The General Aggregate Limit is the most we will pay for the sum of:

        **a.** Medical expenses under Coverage **C**;

        **b.** Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

        **c.** Damages under Coverage **B**; and

        **d.** All Supplementary Payments.

    **3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for the sum of damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard" and all Supplementary Payments.

    **4.** Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages and all Supplementary Payments because of all "personal and advertising injury" sustained by and one person or organization.

    **5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

        **a)** Damages under Coverage **A**;

        **b)** Medical expenses under Coverage **C**; and

        **c)** All Supplementary Payments

        because of all "bodily injury" and "property damage" arising out of any one "occurrence"

    **6.** Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages and all Supplementary Payments because of "property damage" to any one premise, while rented to you, or in the case of damage by fire, while rented to you or temporary occupied by you with permission of the owner.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NON-STACKING ENDORSEMENT

ALL COVERAGE PARTS

If this policy and any other policy issued to you by us apply to the same claim or "suit", the maximum Limit of Liability under all policies shall not exceed that of the policy with the highest applicable Limit of Liability.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIFE SCIENCES PREMIUM ENDORSEMENT

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

**Composite Rate**

The premium stated in the declarations of this Policy is an estimated premium only. Upon expiration of the policy, the earned premium shall be computed by applying a rate of:

$9.62            per   $1,000       of        revenue

If the earned premium thus computed exceeds the estimated premium paid, you shall pay the excess to us.

It is understood that a complete re-survey of the exposures and revision of rate may be made at any time at our request. You agree to notify us at any time exposures change or your operation changes.

**Exposure Base Definitions**

One or more of the following may be entered under the Exposure column of the Declarations. These Exposure Bases designate the base used for determining your premium. The following are definitions of these Exposure  Bases.

**"Receipts" or "Revenue" means:**

1. The gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:
    a. All goods or products, sold or distributed;
    b. Operations performed during the policy period;
    c. Rentals; and
    d. Dues or fees.
2. The following items shall not be deducted from gross sales:
    a. Foreign exchange discounts;
    b. Freight allowance to customers;
    c. Total sales of consigned goods and warehouse receipts;
    d. Trade or cash discounts;
    e. Bad debts; and
    f. Repossession of items sold on installments (amount actually collected.)
3. The following items shall be deducted from gross sales:
    a. Sales or excise taxes which are collected and submitted to a governmental division;
    b. Credits for repossessed merchandise and products returned.
    c. Allowances for damaged and spoiled goods;
    d. Finance charges for items sold on installments;
    e. Freight charges on sales if freight is charged as a separate item on customers invoice; and
    f. Royalty income from patent rights or copyrights which are not product sales.

The rates apply per $1,000 of receipts.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**"Participant" or "Participants" means:**

The total annual number of individuals who enroll as test subjects in clinical trials covered during the policy period.

The rates apply per participant.

The following Premium Audit Condition is added to this policy.  If the policy already includes a Premium Audit Condition, such condition is deleted and replaced with the following:

**Premium Audit**

**a.**  We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.**  Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill.

**c.**  The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request. We have the right, but not the obligation, to conduct a physical audit of records needed for premium computation after the expiration of this policy.

**d.**  Your refusal to maintain or provide needed records, or to allow us to conduct a physical audit of needed records, will result in our developing and calculating a final audit premium based on information available to us and without your cooperation. If final premium audits calculated without your cooperation result in additional premium, you are obligated to pay such additional premium.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The definition of "occurrence" in **SECTION VI - DEFINITIONS** is deleted and replaced by the following:

"Occurrence" means

    a.  an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    b.  acts, errors or omissions in the rendering or failure to render those professional services specified in the Declarations Page of this policy.

The following exclusion is added to the policy:

This insurance does not apply to any claim or "suit" arising out of:

1. The rendering of or failure to render direct patient care by any person or organization, including the furnishing of medical services, medication or appliances, or the furnishing of beverages to a patient;

2. Any malpractice, error, act or omission committed during the rendering of or failure to render medical professional services or advice by any health care provider, resident, intern or other person or organization under contract or agreement with you.

3. Any criminal act by any professional care provider;

4. Any liability that you or your employee may have as a proprietor, hospital administrator, officer, stockholder or member of the board of directors, trustees or governors of any

    a.  Hospital, nursing home or sanitarium;
    b.  Clinic with bed and board facility; or
    c.  Laboratory or other business.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE
PRODUCTS/COMPLETED OPERATIONS LIABILITYCOVERAGE

**SCHEDULE**

Where required by written contract or written agreement

Who is an "Insured" is amended to include as an Insured the person or organization shown in the Schedule as an Additional Insured.  The coverage afforded to the Additional Insured is solely limited to liability directly caused by the ownership, maintenance or use of that part of the premises leased to you by the Additional Insured and shown in the Schedule.

Where no coverage shall apply herein for the Named Insured, no coverage or defense shall be afforded to the Additional Insured.

With respect to the coverage afforded to the Additional Insured, the following exclusions apply:

This coverage does not apply to:

1.  Any "occurrence" which takes place after you cease to be a tenant in that premises;

2.  Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule;

3.  "Bodily injury" or "property damage" or "personal and advertising injury" arising out of the sole negligence of the Additional Insured;

4.  "Bodily injury', "property damage" or "personal and advertising injury" arising out of the claimed negligence of the Additional Insured other than directly caused by "your work" in the ownership, maintenance or use of that part of the premises leased to you which shall be imputed to the Additional Insured; or

5.  "Bodily injury", "property damage" or "personal and advertising injury" to any employee of the Named Insured or to any obligation of the Additional Insured to indemnify another because of damages arising out of such injury.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSUREDS - VENDORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| Where required by written contract or written agreement |

Who is an "Insured" is amended to include as an Insured the person or organization shown in the Schedule as an Additional Insured but only with respect to the distribution or sale in the regular course of the Additional Insured's business of "your product", and, for "bodily injury" or "property damage" arising out of the defective manufacturing, designing or warning of "your product".  The coverage afforded to the Additional Insured is solely limited to liability directly caused by "your product" which is imputed to the Additional Insured.

Where no coverage shall apply herein for the Named Insured, no coverage or defense shall be afforded to the Additional Insured.

With respect to the coverage afforded to the Additional Insured, the following exclusions apply:

1. This coverage does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;
   b. Any express warranty unauthorized by you;
   c. Any physical or chemical change in the product made intentionally by the vendor;
   d. Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instruction from the manufacturer, and then repackaged in the original container;
   e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;
   f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;
   g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor;
   h. "Bodily injury" or "property damage" or "personal and advertising injury" arising out of the sole negligence of the Additional Insured; or
   i. "Bodily injury", "property damage" or "personal and advertising injury" to any employee of the Named Insured or to any obligation of the Additional Insured to indemnify another because of damages arising out of such injury.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

2.  This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

3.  In the event that the Limits of Insurance provided by this policy exceed the Limits of Insurance required by the written contract or written agreement, the insurance provided by this endorsement shall be limited to the Limits of Insurance required by the written contract or written agreement. This endorsement shall not increase the Limits of Insurance stated in the Declarations.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMON POLICY CONDITIONS

All Coverage Parts in this policy are subject to the following Conditions.

**1. CANCELLATION AND NON-RENEWAL**

A.  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

B.  We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1)  10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2)  30 days before the effective date of cancellation if we cancel for any other reason.

C.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

D.  Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

E.  If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata unless cancellation is due to non payment of premium, in which case the refund may be less than pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

F.  If notice is mailed, proof of mailing will be sufficient proof of notice.

If we elect not to renew this policy, we shall mail written notice to the First Named Insured at the address shown in the Declarations.  Such written notice of non-renewal shall be mailed at least 30 days prior to the end of the policy term.

**2. CHANGES**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**3. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them.

**4. REPRESENTATIONS**

By accepting this policy, you agree:

A.  The statements in the Declarations are accurate and complete;

B.  Those statements are based upon representations you made to us; and

C.  We have issued this policy in reliance upon your representations.

**5. SERVICE OF SUIT**

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the Company's President, or his nominee, at the address shown on the Declarations page of this policy, and that in any suit instituted against any one of them upon this policy, this Company will abide by the final decision of

such Court or of any Appellate Court in the event of an appeal.

The above-named is authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the request of the insured to give a written undertaking to the insured that it or they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, this Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## 6.  TERMS, CONDITIONS AND PREMIUM

On each renewal, continuation, anniversary of the effective date of the policy or on an annual basis, the Company will determine the rate and premium and/or amend the terms and conditions in accordance with the rates and rules then in effect.

## 7.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

In Witness Whereof, this Company has executed and attested these presents; but this policy shall not be valid unless signed by duly authorized representatives of this Company.

**VICE PRESIDENT**                                    **PRESIDENT**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BINDING ARBITRATION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

Should we and the insured disagree as to the rights and obligations owed by us under this policy, including the effect of any applicable statutes or common law upon the contractual obligations otherwise owed, either party may make a written demand that the dispute be subjected to binding arbitration.

When such a request is made, The American Arbitration Association shall be used, with each party selecting an arbitrator from the list of qualified arbitrators for insurance coverage disputes provided by that Association.  The two chosen arbitrators shall select a third arbitrator from the same list; if they cannot agree to a selection, The American Arbitration Association shall make the selection for them.  Each party shall bear the costs of its arbitrator and shall share equally the costs of the third arbitrator and of the arbitration process.  A decision agreed to by two of the arbitrators will be binding.

In the event you prevail in the arbitration and we promptly offer to you arbitration costs and reasonable attorney fees incurred in connection therewith, in addition to the disputed contract benefit, you shall have no right to sue us for breach of implied covenants or unreasonable withholding of contract benefits.

To the extent that we prevail in the arbitration, the arbitrators may award us any expenses and/or damages incurred or paid under reservation of rights in excess of our contract obligations as determined by the arbitrators.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SPECIFIED PRODUCTS OR SUBSTANCE EXCLUSION WITH SCHEDULED EXCEPTION(S)

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

**SCHEDULED EXCEPTIONS**

| Specified Product(s) or Substance(s):<br><br>Exception for Silicone contained in or used to manufacture the insured's solid silicone carving blocks for urological procedures |
| --- |

(If no entry appears above, there are no exceptions to the Products or Substances excluded by this endorsement)

This insurance does not apply to any claim or "suit" arising out of the products or substances listed below.  This insurance also does not apply to any claim or "suit" arising out of any product using or containing or consisting of any of the products or substances listed below.

This exclusion applies to any claim or "suit" arising out of the manufacturing, handling, advertising, distribution, sale, labeling, application, ingestion, consumption, testing, exposure to, or use of the products or substances listed below, whether as a separate ingredient or in combination with any other ingredient or substance in any product. This exclusion also applies to any claim or "suit" arising out of any derivative, combination of or extract of the products or substances listed below:

- Accutane
- DES (diethylstilbestrol,  dienestrol or stilbene derivative)
- Ephedra
- Fenfluramine, Phentermine or Dexfenfluramine
- Isotretinoin
- Latex
- Oxycodone
- Phenylpropanolamine (PPA)
- Silicone
- Steroids or anabolic hormones
- Swine Flu vaccine including any and all strain or strains
- Thalidomide

However, this exclusion shall not apply to the Specified Products or Substances shown in the SCHEDULE above.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

COMMERCIAL GENERAL LIABILITY
CG 00 68 05 09

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** of Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

  **2. Exclusions**

    This insurance does not apply to:

    **q. Recording And Distribution Of Material Or Information In Violation Of Law**

      "Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

      **(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

      **(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

      **(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

      **(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** of Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

  **2. Exclusions**

    This insurance does not apply to:

    **p. Recording And Distribution Of Material Or Information In Violation Of Law**

      "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

      **(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

      **(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

      **(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

      **(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

COMMERCIAL GENERAL LIABILITY
CG 21 07 05 14

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY – LIMITED BODILY INJURY EXCEPTION NOT INCLUDED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **2.p.** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**B.** The following is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

POLICY NUMBER: 00061113-8

COMMERCIAL GENERAL LIABILITY
CG 21 35 10 01

**THIS** ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Description And Location Of Premises Or Classification: |
| --- |
| |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

**1.** Section **I** – Coverage **C** – Medical Payments does not apply and none of the references to it in the Coverage Part apply: and

**2.** The following is added to Section **I** – Supplementary Payments:

**h.** Expenses incurred by the insured for first aid administered to others at the time of an accident for "bodily injury" to which this insurance applies.

    © ISO Properties, Inc.,  2000       □

**COMMERCIAL GENERAL LIABILITY**
**CG 21 36 03 05**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph **3.** of **Section II – Who Is An Insured** does not apply.

            © ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **Fungi Or Bacteria**

   **a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

   **b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

   This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

   **2. Exclusions**

   This insurance does not apply to:

   **Fungi Or Bacteria**

   **a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

   **b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

   "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

© ISO Properties, Inc.,  2003

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

© ISO Properties, Inc., 2007

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

 © ISO Properties, Inc., 2007 IL 00 21 09 08    □

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ELECTRONIC MEDIA

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The coverage under this policy does not apply to any claim or "suit" based on directly or indirectly arising out of the:

1.  Misdirection of electronic mail or other electronic media, including but not limited to, an intranet, extranet or internet connection;
2.  Loss of client information transmitted via electronic media;
3.  Unintentional introduction of a computer virus, worm or malware to a third party computer, computer system, or network causing harm or damage to a computer, computer system, or network; or
4.  Unintentional or unauthorized access by a third party to a computer, computer system, or network, without authorization or exceeding authorization; or arising from the use of electronic media; including but not limited to, possession of an internet website.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – CROSS SUITS

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury"  or any other claim for damages brought by any insured covered by this policy, against any other insured that has an ownership interest in, is operated, controlled, or managed by or is  a parent, subsidiary or affiliate of any such insured.

This exclusion does not apply to any additional insured added to this policy by endorsement if such additional insured is:

1.  specifically named in the Schedule of such endorsement, or

2.  an indemnitee in a written contract or written agreement between any Named Insured and any additional insured signed before the date of the first "occurrence" or first offense and requiring the Named Insured to add such indemnitee as an additional insured;

Provided such additional insured:

a.  is not a parent, subsidiary or affiliate of the Named insured;

b.  does not have any ownership interest in the Named insured;

c.  is not owned, operated, controlled or managed by the Named insured.


**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - EMPLOYER'S LIABILITY

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The Employer's Liability exclusion under **SECTION I—2. Exclusions**, of this policy is deleted and replaced with the following:

This insurance does not apply to any claim, "suit", cost or expense arising out of "bodily injury" to:

a.  Any "employee" of any insured arising out of and in the course of:

(1)  Employment by any insured; or,
(2)  Performing duties related to the conduct of any insured's business; or

b.  The spouse, child, parent, brother, sister or relative of that "employee" as a consequence of Paragraph a. above.

This exclusion applies:

a.  Whether any insured may be liable as an employer or in any other capacity; and/or
b.  To any obligation to share damages with or repay someone else who must pay damages because of the injury; and/or
c.  To liability assumed under any "insured contract".

Wherever the word "employee" appears above, it includes any member, associate, "leased worker", "temporary worker" or any person or persons loaned to or volunteering services to you.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABSOLUTE POLLUTION AND POLLUTION RELATED LIABILITY – EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following exclusion is added to this policy.  If the policy already includes a pollution exclusion or a pollution-related exclusion, such exclusion(s) is(are) deleted and replaced with the following:

Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising out of or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any insured or any other person or entity is excluded throughout this policy.

This insurance does not apply to any damages, claim, or suit arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" including but not limited to any:

a.  "Bodily injury", "personal and advertising injury", "property damage", or damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

b.  Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess same, the effects of "pollutants", environmental impairments, contaminants or (2) any litigation or administrative procedure in which any insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of "pollutants", environmental impairments, or contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

This exclusion applies regardless of whether:

a.  Injury or damage claimed is included within the "products-completed operations hazard" of the policy; or

b.  An alleged cause for the injury or damage is the insured's negligent hiring, placement, training, supervision, retention, act, error or omission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

The following definition is added to the policy.  If the policy already includes a definition of "pollutants" such definition is deleted and replaced with the following:

"Pollutants" mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or "waste". "Waste" includes medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION—BUSINESS CONDUCT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions i.  Infringement Of Copyright, Patent, Trademark Or Trade Secret** is replaced by the following**:**

**2.i.** This insurance does not apply to any claim or "suit" arising out of:

    (a)  any actual or alleged anti-trust law violation, unfair competition, price fixing or agreement or conspiracy to restrain trade;

    (b)  any actual or alleged infringement of copyright, patent, trademark, service mark, right of publicity, slogan, trade dress, trade secret or other intellectual property rights; whether or not in your "advertisement";

    (c)  any actual or alleged false advertising, false designation of origin, product disparagement, trade libel, or other claims arising out of unfair competition, whether or not in your "advertisement";

    (d)  any actual or alleged violation by any insured, or by anyone with the insured's knowledge, of any law or regulation imposing the payment of any fine, penalty or restitution arising out of the prosecution of any crime or criminal action; or any civil action arising out of such alleged criminal activity, whether or not actually prosecuted; or

    (e)  any products or goods manufactured, sold, handled or distributed or work completed by the Insured or others operating under the direction or control of the Insured in violation of any law, statute or ordinance of any federal, state or municipal government, or any agencies thereof, including violations of the Lanham Act or other unfair competition statutes.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

COMBINED POLICY EXCLUSIONS, DAMAGES LIMITATION EXCLUSION is deleted in its entirety and replaced with the following:

Damages mean a monetary judgment, award, or settlement.  Damages do not include:

    a.  Civil or criminal fines, sanctions or penalties, whether imposed pursuant to statute or otherwise; or
    b.  Judgments or awards arising from acts or omissions deemed uninsurable by law; or
    c.  The restitution of consideration or expense paid to you for professional services rendered or which should have been rendered; or
    d.  Disputed fees or any actual or alleged personal profit or advantage to which you are not legally entitled; or
    e.  Punitive or exemplary damages and the multiplied portion of multiplied damages; or
    f.  Equitable or non-pecuniary relief.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

AP2111US 11-05                                   Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# COMBINED POLICY EXCLUSIONS

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following exclusions are added to this policy:

**ABSOLUTE ASBESTOS, LEAD OR SILICA EXCLUSION**

Injury or damages, including any claim or suit, arising out of, resulting from, caused or contributed to by Asbestos, Lead or Silica is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same, including but not limited to any:

a. "Bodily injury",  "personal and advertising injury", "property damage" or damages of any type, arising out of the inhalation, ingestion, physical exposure to, absorption of, or toxic substances of or from Asbestos, Lead or Silica in any form, or from any goods, products or structures containing same, or "property damage" or devaluation of property arising from any form of same; or

b. Existence of Asbestos, Lead, or Silica, in any form, in occupancy or construction, or the manufacture, sale, transportation, handling, storage, disposal, or removal of same, or goods or products containing same; or

c. Loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of Asbestos, Lead, or Silica, or (2) any litigation or administrative procedure in which any insured or others may be involved as a party in response to the effects or alleged effects of Asbestos, Lead, or Silica; or

d. Supervision, instructions, recommendations, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same or in any way responding to or assessing the effects of same; or

e. Actual or alleged Asbestosis, Lead poisoning, Silicosis or any other similar condition.

This exclusion applies regardless of whether:

a. Injury or damage claimed is included within the "products/completed operations hazard" of the policy; or

b. An alleged cause for the injury or damage is the insured's negligent hiring, placement, training, supervision, retention, act, error or omission.

**DISCRIMINATION EXCLUSION**

Discrimination charges, of any kind, actual and alleged, are not covered under this policy, nor are any expenses or obligation to share damages with or repay another who must pay damages from same.

**DAMAGES LIMITATION**

Damages mean a monetary judgment, award, or settlement.  Damages do not include:

a.        Civil or criminal fines, sanctions or penalties, whether imposed pursuant to statute or otherwise; or

b.        Judgments or awards arising from acts or omissions deemed uninsurable by law; or

c.       The restitution of consideration or expense paid to you for professional services rendered or which should have been rendered; or

d.       Disputed fees or any actual or alleged personal profit or advantage to which you are not legally entitled; or

e.       Equitable or non-pecuniary relief.

**DUTY TO DEFEND EXCLUSION**

Where there is no coverage under this policy, there is no duty to defend.


**PROFESSIONAL LIABILITY EXCLUSION**

Professional liability, malpractice, errors, omissions, or acts of any type including rendering or failure to render any type of professional service is not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same, unless such coverage is specifically endorsed onto this policy.


**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FIDUCIARY EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

This policy does not apply to any claim arising out of the:

1.  Coercion, conversion or misappropriation of others' funds or property;
2.  Any dishonest, fraudulent, criminal, malicious acts or omissions of the insured, partner or employee or any person for whom you are legally responsible; or
3.  Any activities or operations performed in the capacity of a fiduciary.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

This insurance does not apply to any claim or "suit" based on or directly or indirectly arising out of or resulting from:

1.  Any form of communicable disease, any sexually transmitted disease, or disease transmitted by any form of inhalation, absorption or contact, including but not limited to "bodily injury" or "property damage"  or "personal and advertising injury" arising out of:

    a.  HAV, HEV, HBV, HCV,  HEV or any  Hepatitis virus including any exposure, prevention, transmission, infection, treatment, counseling, testing or failure to test for the presence of HAV, HEV, HBV, HCV, HEV or any Hepatitis virus;

    b.  Acquired Immunodeficiency Syndrome, or Human Immunodeficiency Virus, HIV, HTLV, AIDS, or any  AIDS related virus  including any exposure, prevention, transmission, infection, treatment, counseling, testing or failure to test for the presence of HIV, HTLV, AIDS, or any  AIDS related virus;

2.  Failure by an insured to perform services which were either intended to or assumed to prevent communicable diseases or their transmission to others;

3.  Fear of contracting any communicable disease; or

4.  The negligent:

    a.  employment,

    b.  investigation,

    c.  placement,

    d.  supervision,

    e.  reporting to the proper authorities or failure to so report,

    f.  hiring,

    g.  training or

    h.  retention

    of a person for whom any insured is or ever was responsible and whose conduct is excluded in 1. through 3. above.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# REJECTION OF COVERAGE
# FOR CERTIFIED ACTS OF TERRORISM COVERAGE
# (PURSUANT TO TERRORISM RISK INSURANCE ACT)

**SCHEDULE**

---

**THE INSURED WAS OFFERED AND**


**HAS DECLINED TERRORISM COVERAGE ON THIS POLICY**

---

In accordance with the federal Terrorism Risk Insurance Act, this notice confirms that you were offered and have rejected coverage for terrorist acts certified under that Act.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism", or out of an "other act of terrorism" that is committed outside the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25 million (valued in US dollars). In determining whether the $25 million threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

   b. The act resulted in damage:

      (1) Within the United States (including its territories and possessions and Puerto Rico); or

      (2) Outside of the United States in the case of:

         (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

         (b) The premises of any United States mission; and

   c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

   Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Coverage Part.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA - SERVICE OF SUIT

This endorsement modifies and amends insurance provided under the following:

ALL COVERAGE PARTS

Pursuant to California statutes, this Company designates the following as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance:

CSC – Corporation Service Company
Melissa DeKoven
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833

Phone # 888-690-2882
Fax # 302-636-5454
Email: sop@cscglobal.com

The above-named is authorized and directed to accept service of process on behalf of the Company.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| 00061113-8 | 12/2/2021 12:01 AM Standard Time at the address of the Named Insured | JAMES RIVER INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| International Medical Devices Inc | Richard J. Schmitzer |

| COVERAGE PARTS AFFECTED |
|---|
| ALL COVERAGE PARTS |

## AMENDMENT OF LIMITS OF INSURANCE AND RETROACTIVE DATE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This endorsement amends only the Limits of Insurance and the Retroactive Date shown in the Declarations as explained below.

### SCHEDULE OF LIMITS A

| FIRST RETROACTIVE DATE OF 02/07/2014 APPLIES TO LIMITS OF INSURANCE BELOW: | |
|---|---|
| EACH OCCURRENCE LIMIT | $   1,000,000 |
| PRODUCTS/COMPLETED OPERATIONS AGGRE-GATE LIMIT | $   2,000,000 |

### SCHEDULE OF LIMITS B

| SECOND RETROACTIVE DATE OF 03/26/2019 APPLIES TO LIMITS OF INSURANCE BELOW: | |
|---|---|
| EACH OCCURRENCE LIMIT | $   5,000,000 |
| PRODUCTS/COMPLETED OPERATIONS AGGRE-GATE LIMIT | $   5,000,000 |

### SCHEDULE OF LIMITS C

| THIRD RETROACTIVE DATE OF 07/23/2021 APPLIES TO LIMITS OF INSURANCE BELOW: | |
|---|---|
| EACH OCCURRENCE LIMIT | $   10,000,000 |
| PRODUCTS/COMPLETED OPERATIONS AGGRE-GATE LIMIT | $   10,000,000 |

**SCHEDULE OF LIMITS D**

**FOURTH RETROACTIVE DATE OF 12/13/2021 APPLIES TO LIMITS OF INSURANCE BELOW:**

| | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 10,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ | |
| MEDICAL EXPENSE LIMIT | Excluded | |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 10,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 10,000,000 | |

**To determine which Schedule of Limits, if any, applies:**

For all "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" which first occurred or was first committed prior to the Second Retroactive Date, the Schedule of Limits A applies. Schedule of Limits A also applies to all "Bodily Injury, "Property Damage" or offense causing "Personal and Advertising Injury" which first occurred or was first committed prior to the First Retroactive Date provided that the same "Bodily Injury", "Property Damage" and "Personal and Advertising Injury" also occurred or was committed on or after the First Retroactive Date and prior to the end of the policy period.

For all "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" which first occurred or was first committed on or after the Second Retroactive Date and prior to the Third Retroactive Date, the Schedule of Limits B applies.

For all "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" which first occurred or was first committed on or after the Third Retroactive Date and prior to the end of the policy period, the Schedule of Limits C applies.

For all "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" which first occurred or was first committed on or after the Fourth Retroactive Date and prior to the end of the policy period, the Schedule of Limits D applies.

**To determine when the "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury occurred or was committed for purposes of determining which Schedule of Limits, if any, applies:**

All "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" logically or causally connected by any common fact, circumstance, situation, transaction, event, service, advice or decision will be deemed to be the same "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" and will be deemed to have occurred or been committed when the earliest of such connected "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" actually occurred or was committed.  All such "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" will be deemed to be the same "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury" and have occurred or been committed at the same earliest time even though the nature and extent of any resulting injury or damage may change and even though the resulting injury or damage may be continuous, progressive, cumulative, changing or evolving, and even though the resulting injury or damage may be or may involve a continuous or repeated exposure to substantially the same general harm.

Under no circumstance shall more than one Schedule of Limits apply to the same "Bodily Injury", "Property Damage" or offense causing "Personal and Advertising Injury".  The Schedule of Limits cannot apply cumulatively and cannot be stacked or aggregated.

This endorsement does not modify or alter any of the terms or conditions in the policy other than the Limits of Insurance and the Retroactive Date shown in the Declarations.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

Authorized Representative Signature

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# JAMES RIVER INSURANCE COMPANY
## <u>Privacy Policy</u>

**We do not sell customer information to nonaffiliated third parties, and we do not share customer information with nonaffiliated third parties except those parties who perform contractual services for us, and parties to which we are authorized to provide information by law.**  In addition, when we provide information to affiliates or non-affiliates, we limit those disclosures to information about your transactions and experiences with us and to disclosures otherwise permitted by law.  You do not need to take any action to prevent us from selling or sharing information we obtain about you.

**We use security measures and training in our effort to protect the customer information we collect.**  We protect the information we obtain about you by maintaining physical, electronic and procedural safeguards.

**We collect the following types of information about you when you purchase or use our products and services.**  Most of the information that we obtain about you comes directly from you, such as through the insurance applications you submit when requesting insurance products.  These applications and other inquiries we make of you allow us to learn information that we may use to contact you in the future, such as your name, address, telephone number and e-mail address.  In addition, insurance applications and other information you provide enables us to determine the type and value of your insured property, the types of insurance coverages you have or in which you might be interested, and similar information.

If you visit an Internet site that we maintain, we might request or obtain information that will enable us to identify you as a registered user, such as your name, a user identification name, a password, password reminders, and your Internet service provider.  We might use a "cookie" to retain some of this information.  We also might obtain information about your operating system, web browser and similar information to enable us to improve the operation of our site.

When we consider products and services in which you may be interested, we often review information that we have about your past transactions with us or our affiliates, such as your existing or former policy coverages, premiums and payment history.  In addition, we may learn information about your transactions with nonaffiliated third parties, including the types of products or services you obtained from them and your experiences with them.  Finally, we may obtain other information from third parties that has a bearing upon your eligibility for the products or services you seek from us.  This information may include your credit report or information about your creditworthiness, or other information maintained by consumer reporting agencies.

**We provide customer information only to our affiliates and to nonaffiliates that must protect your customer information.**

**We also may provide information as mentioned in this notice to nonaffiliated third parties that perform services for us or perform functions on our behalf, such as marketing and research, or to other financial institutions with which we have joint agreements for activities such as marketing.  By law, our contracts with these parties must prevent them from using the information they receive about you except as described in this notice.**

Finally, we may share customer information as permitted by applicable law.  This means that we will share information with parties as necessary to affect, administer, or enforce transactions that you request.  For example, we might provide information to a company that processes, prints and mails our insurance policies to you, or to a company that adjusts claims under your policies.  We also might disclose customer information to other entities specified by law, such as insurance advisory organizations, our attorneys and accountants, consumer reporting agencies, or civil and regulatory authorities.  Federal law sets the limitations on these types of disclosures.

**We strive to keep our records as accurate as possible.**  We attempt to maintain accurate records about you and we will gladly make appropriate corrections when you notify us.  Of course, we do not control the accuracy of information gathered and provided by third parties, and you may need to notify third parties directly if you believe that any information we received from them is inaccurate.  You may request the name and address of any consumer-reporting agency from which we obtain a report on you.  You then may contact that consumer-reporting agency to request a copy of the report it makes or to advise of any changes to the information they maintain and report.

We will provide one copy of this Privacy Policy to joint contract holders.  Please share this information with everyone covered under your policy or contract.

# EXHIBIT B

# ADMIRAL INSURANCE COMPANY

## A Delaware Corporation

## COMMERCIAL LINES POLICY

**THIS POLICY IS NOT OBTAINED PRIMARILY FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.**

THIS POLICY CONSISTS OF:

Declarations;

Common Policy Conditions; and

One or more Coverage Parts.  A Coverage Part Consists of:

- One or more Coverage Forms; and
- Applicable Forms and Endorsements.

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

W. Robert Berkley, Jr.
President

Philip S. Welt
Secretary

Administrative Office: 7233 E. Butherus Drive, Scottsdale, AZ 85260 (480) 509-6627

Policy Issuing Office:  1000 Howard Blvd., Suite 300, P.O. Box 5430, Mount Laurel, NJ 08054
Telephone (856) 429-9200  Facsimile (856)429-8611

[JA 10 01 07 20]

Policy Number: EO000030651-07    **AI 80 00 09 20**

Effective Date: 09/25/2021



**Carrier:**        Admiral Insurance Company

**Named Insured:**   JAMES J. ELIST MD

---

## IMPORTANT – POLICYHOLDER NOTICES

### NOTICE

Except to such extent as may otherwise be provided here in, the coverage of this policy is limited generally to liability for only those claims that are first made against the insured and reported to us while the policy is in force. Please review the policy carefully and discuss the coverage thereunder with your insurance agent or broker.

Policy Number: EO000030651-07                                              **AI 07 34 12 19**

Effective Date: 09/25/2021

## IMPORTANT NOTICE:

1. **The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.**

2. **The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

3. **The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

4. **The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.**

5. **Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.**

6. **For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

7. **California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance:www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

8. **If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you."**



**PHYSICIANS, SURGEONS & DENTISTS
PROFESSIONAL LIABILITY POLICY
DECLARATIONS
(CLAIMS-MADE AND REPORTED
FORM)**

**Carrier:**  **Admiral Insurance Company**

**Policy No.:**  **EO000030651-07**    Renewal/Rewrite of:    **EO000030651-06**

"Named Insured" and Mailing Address

JAMES J. ELIST MD
8500 WILSHIRE BLVD
SUITE 707
BEVERLY HILLS, CA 90211

"POLICY PERIOD": From    09/25/2021    to    09/25/2022    At 12:01 A.M. Standard Time at the address of the "Named Insured" as stated herein

In consideration of the payment of premium, in reliance upon the statements herein or attached hereto, and subject to all of the terms of this policy, the Company agrees with the "Named Insured" as follows:

| | | |
|---|---|---|
| Item I: | "Named Insured's" Business: Urology Including Surgery | California Premium: $22,920.00 |
| | | Non-Taxable Fees: $675.00 |
| | | Taxable Fees: |
| Item II: | Coverage: Physicians, Surgeons and Dentists  Professional Liability | Surplus Lines Tax: $687.60 |
| | | Stamping Fee: $57.30 |

Item III:    Limits of Liability:

| | |
|---|---|
| $1,000,000 | Each "Claim" |
| $3,000,000 | Aggregate |
| $25,000 | HIPAA Prot. - Each "Hearing" |
| $50,000 | HIPAA Prot. - Aggregate |
| $5,000 | Admin Actions Def-Per Hearing |
| $25,000 | Admin Actions Def-Aggregate |

Item IV:    Deductible:    $2,500    Per Claim (including "claim expenses")

Item V:    "Retroactive Date":
                              09/25/2015

Item VI:    Premium:    $22,920.00    Not Subject to Audit

Item VII:    Forms attached at inception:

See Schedule of Forms AI 00 18 03 98

This policy is not binding unless countersigned by Admiral Insurance Company or its authorized representative.

Countersigned On:    09/23/2021    By: _____
                                                        Authorized Representative

At:    Seattle, WA

# SCHEDULE OF FORMS

**Named Insured:**    JAMES J. ELIST MD                    **Policy No.:** EO000030651-07

| FORM NUMBER | TITLE |
| --- | --- |
| JA10010720 | COVER JACKET - ADMIRAL INSURANCE COMPANY |
| AI07341219 | CALIFORNIA DISCLOSURE NOTICE |
| DE20300820 | PHYSICIANS SURGEONS AND DENTISTS PROFESSIONAL LIABILITY DECLARATIONS |
| AI00180398 | SCHEDULE OF FORMS |
| EO09540820 | PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE |
| AE07210998 | MINIMUM RETAINED PREMIUM |
| EO10640710 | CONSENT TO SETTLE ENDORSEMENT |
| EO12600813 | NON PARTICIPATION DISCLOSURE NOTICE TO POLICY HOLDERS ALL STATES PATIENTS COMPENSATION FUNDS AND INSUREDS WARRANTY OF COMPLIANCE |
| EO10121107 | ABSOLUTE UNSOLICITED COMMUNICATIONS EXCLUSION |
| EO14250321 | CYBER LIABILITY EXCLUSION |
| EO14370320 | AMENDATORY ENDORSEMENT DEFINITION OF PROFESSIONAL SERVICES |
| EO10490317 | ADMINISTRATIVE ACTIONS DEFENSE COVERAGE |
| EO10500710 | HEALTH INSURANCE PORTABILITY & ACCOUNTABILITY ACT (HIPAA) SUBLIMIT |
| EO10510820 | AMENDED EXTENDED OPTIONAL CLAIMS REPORTING PERIOD 1 2 3 YEARS |

| | |
|---|---|
| EO10520710 | LOCUM TENENS PHYSICIAN COVERAGE |
| AI07100818 | SERVICE OF SUIT - CALIFORNIA |
| AI08760220 | SPECIFIED TREATMENT EXCLUSION - REGENERATIVE MEDICINE |
| AI66500115 | PROFESSIONAL LIABILITY TERRORISM EXCLUSION (ABSOLUTE) |

# PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE

**Claims-Made**

THIS IS A CLAIMS-MADE POLICY. COVERAGE AFFORDED BY THIS POLICY IS LIMITED TO LIABILITY FOR ONLY THOSE "CLAIMS" THAT ARE FIRST MADE AGAINST YOU AND REPORTED IN WRITING TO US DURING THE POLICY PERIOD OR AN EXTENDED REPORTING PERIOD. PLEASE REVIEW THIS POLICY CAREFULLY TO DETERMINE YOUR RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.

OUR LIMIT OF LIABILITY WILL BE REDUCED BY THE AMOUNTS INCURRED FOR "DAMAGES" AND "CLAIMS EXPENSES". AMOUNTS INCURRED FOR "DAMAGES" AND/OR "CLAIMS EXPENSES" WILL BE APPLIED AGAINST THE DEDUCTIBLE, IF APPLICABLE, BORNE BY THE INSURED.

Throughout this policy the words "you" and "your" refer to the "Insured". The word "Insured" means any person or organization qualifying as such under Section II. Definitions. The words "we", "us", "our" and "Company" refer to the Company as stated on the Declarations Page of this Policy. Refer to Section II. Definitions, for the meaning of other phrases that appear in quotation marks.

In consideration of the premium paid, and in reliance upon the statements in the Application and subject to the terms and conditions of this policy, the Company agrees with the "Named Insured" as follows:

I.  INSURING AGREEMENT

We will pay on behalf of the "Insured" those amounts in excess of the Deductible stated in the Declarations, if applicable, which you are legally obligated to pay as "damages" for a "claim" first made against you during the "policy period" and reported to us in writing during the "policy period", or an Extended Reporting Period, provided that the following additional conditions are met:

A.  the "claim" results from a "medical incident" that takes place within the Policy Territory;

B.  the "claim" results from a "medical incident" that takes place during the "policy period" or on or after the "retroactive date" stated in the Declarations;

C.  prior to the effective date of this policy, no "Insured" had knowledge of a "medical incident" or circumstance that could reasonably be expected to result in a "claim"; and

D.  we receive notice of a "claim" within sixty (60) days after the expiration or termination date of this policy in accordance with:

1.  Section VII. "INSURED'S" DUTIES IN THE EVENT OF A "CLAIM"

2.  Section V. EXTENDED REPORTING PERIOD.

Our obligation to pay "damages" applies only to the amount that exceeds the deductible, if any, stated in the Declarations.

We have the right and duty to defend any "claim" or suit against the "Insured" seeking "damages" because of a "medical incident", even if any of the allegations of the suit are groundless, false or fraudulent. We may make such investigation of any "claim" or suit as we deem expedient. We shall not be obligated to pay any "claim", settlement or judgment and/or "claims expenses" or to defend any "claim" or suit after the applicable limit of liability has been exhausted by payment of "damages" and/or "claims expenses".

We have no obligation or duty to defend any "claim" or suit for which coverage is excluded hereunder or not otherwise afforded by this policy and we shall not be obligated to pay any "claims expenses" incurred by the "Insured" in the defense of any "claim" or suit not covered by this policy.

II.  DEFINITIONS

A.  "Bodily Injury" means physical injury, sickness, disease, mental anguish, or emotional distress sustained by a person, including death resulting from any of these at any time.

B.  "Claim" means:

    1.  a written demand received by you for money or services; or

    2.  a written notice received by any "Insured" resulting from a "medical incident" that may result in a demand for money or services; or

    3.  service of suit, or notice received of the initiation of arbitration or other proceedings against you.

C.  "Claim Expenses" means:

    1.  fees charged by an attorney designated by us;

    2.  all other fees, costs and expenses resulting from the investigation, adjustment, and defense of a "claim"; and the premiums for appeal, attachment or similar bonds, but only for bond amounts that are within our limit of liability;

    3.  interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under this policy;

    4.  allowable expenses of $250 per day but no more than $5,000 in total for the compensation to all "Insureds" for personally attending any legal proceeding at our request.  These allowable expenses shall not be applied towards reducing the applicable deductible amount and are in addition to the limit of liability.

"Claim Expenses" do not include salaries or expenses of our regular employees or officials.

D.  "Damages" means a monetary judgment, award or settlement.  However, "damages" does not include:

    1.  punitive or exemplary damages or any damages which are a multiple of compensatory damages;

    2.  amounts the "Insured" is required to pay or return as restitution;

    3.  fines, penalties, sanctions, taxes or fees assessed against any "Insured";

    4.  judgments or awards arising from acts deemed uninsurable by law.

E.  "Discrimination" means any alleged violation of any right which is or may be protected by state or federal constitutions; statutory or common law; ordinance; rule or regulation which prohibits conduct that has an unfavorable, unfair or disparate effect on individuals because of their personal status or characteristics, including but not limited to race, color, religion, national origin, age, sex, gender identity, marital or parental status, sexual orientation or preference, disability, handicap, pregnancy, medical condition, or any other physical or mental characteristics or impairment.

F.  "Insured" means:

    1.  the "Named Insured";

    2.  if you are an individual, you are an "Insured". Your current and former employees (other than a physician, surgeon or dentist) are also an "Insured" while acting within the course and scope of their duties on your behalf;

    3.  If you are:

        a.  a partnership, you are an "Insured".  Your partners are also "Insureds", but only with respect to acts or omissions arising out of the furnishing of professional medical or dental services to others, for which they are held liable as a partner;

        b.  a limited liability company, you are an "Insured". Your members and managers are also "Insureds", but only with respect to acts or omissions arising out of the furnishing of professional medical or dental services to others, for which they are held liable as members or managers;

        c.  an association or corporation, you are an "Insured". Your executive officers, directors, trustees, governors and stockholders are "Insureds", but only with respect to acts or omissions arising out of the furnishing of professional medical or dental services to others, for which they are held liable as executive officers, directors, trustees, governors and stockholders;

        d.  a current or former employee of a., b. or c. above (other than a physician, surgeon or dentist), is an "Insured" while acting within the course and scope of their duties on behalf of the "Named Insured".

    4.  If an "Insured" dies or is adjudged incompetent, this insurance will terminate for that "Insured".  But the "Insured's" legal representative will be an "Insured" for any "medical incident" previously committed and covered by this policy.

G.  "Medical Incident" means any negligent act, error or omission arising out of the: (1) furnishing of "professional services" by the "Insured", any member, partner, officer, director or stockholder of the "Insured" or any person

acting under the personal direction, control, or supervision of the "Insured" for whose conduct the "Insured" may be held vicariously liable, or (2) service by the "Insured" as a member of a formal accreditation, standards review or similar professional board or committee.

H.  "Named Insured" means the entity or individual named in the Declarations.

I.  "Other Insurance" includes, but is not limited to, coverage or benefits provided by self-insurance arrangements, pools, self-insurance trusts, captive insurance companies, inter-insurance exchanges, mutual insurance companies, stock insurance companies, risk retention groups, reciprocal exchanges, mutual benefit or assistance programs, or any other plan or agreement of risk assumption.

J.  "Policy Period" means the period noted in the Declarations, or any shorter period resulting from a termination or cancellation of this policy.

K.  "Professional Services" means work performed by you for others involving specialized training, knowledge and skill in the pursuit of the business stated in the Declarations.

L.  "Related claims" means "Claims" based upon, arising from, in consequence of, directly or indirectly resulting from, or involving in any way continuous, repeated, the same, related or substantially similar facts, circumstances, subjects, situations, decisions, causes, transactions, events, or series thereof.

M.  "Retroactive Date" means the date stated in the Declarations as such and is the earliest date that "medical incidents" to which this insurance applies will be covered by this policy.

III.  POLICY TERRITORY

This policy applies to "medical incidents" anywhere in the world provided the original suit for such damages is brought within the United States of America, its territories or possessions and Canada.

IV.  EXCLUSIONS

This policy does not apply to "damages" or "claim expenses" for any "claim" based upon, arising out of, related to or in consequence of, in whole or in part:

A.  Intentional Acts

any knowingly wrongful, dishonest, fraudulent, criminal, malicious or intentional act committed by or at the direction of any "Insured" in the course of providing professional medical or dental services. This exclusion does not apply to any "Named Insured" or any "Insured" who did not personally participate or personally commit the knowingly wrongful, dishonest, fraudulent, criminal or malicious act committed by or at the direction of any "Insured" in the course of providing "professional services";

B.  Antitrust

any "Insured's" interference with contract, statements or acts which violate state and/or federal antitrust laws, interference with prospective advantage, unfair competition, unfair trade and business practices, conspiracy to do any unlawful or tortious act, abuse of process, slander and libel, even if such activities are related to the rendering of or failure to render "Professional Services";

C.  any injury for which any "Insured" may be held liable as a proprietor, hospital administrator, officer, stockholder, or member of the board of directors, trustees or governors of any hospital, sanitarium, clinic with bed and board facilities, nursing home, laboratory or other business enterprise;

D.  Discrimination

"Discrimination";

E.  Under the Influence of Intoxicants or Narcotics

any injury caused by any "Insured" or any person while under the influence of alcohol, narcotics, hallucinogenic agents or any other substance abuse;

F.  General Anesthesia

the administration of general anesthesia by dentists or dental surgeons;

G.  HIV/AIDS

1.  any infection caused by the transmission, testing or failure to test for the presence of any one or more of the following viruses including any counseling related thereto:

    a.  Human Immunodeficiency Virus (HIV), and variations thereof;

    b.  Human T-Lymphotropic Virus (HLV), and variations thereof;

    c.   Lymphadenopathy Associated Virus (LAV);

2.  involving the alleged or actual transmission of Acquired Immune Deficiency Syndrome (AIDS) or any AIDS-like condition caused as a result of the "Named Insured's" professional services, or any other person for whose act or omissions the "Insured" may be held liable as a member, partner, officer, director or stockholder of any professional partnership, association or corporation.

The definition of Acquired Immune Deficiency Syndrome (AIDS), Human Immunodeficiency Virus (HIV), Human T-Lymphotropic Virus (HTLV), and Lymphadenopathy Associated Virus (LAV) includes any revisions or amendments made by the Center for Disease Control (CDC) from time to time.

H.  Weight Reduction

the practice of weight reduction or treatment of obesity (other than by diet and/or exercise) including but not limited to the use, administration, or prescription of amphetamines or Human Chorionic Gonadotropin (HCG), the insertion of the gastric bubble or similar device, jejunoileal or other like bypass procedure, or gastric restrictive surgery such as gastric stapling or banding;

I.  Sexual Abuse

any sexual act or acts including but not limited to behavior or communication that is licentious, immoral or sexual in nature including, but not limited to, physical abuse, undue familiarity, molestation, coercion, quid-pro-quo offer of work-favor for sexual favors, or other verbal or physical conduct to a sexual nature, whether or not such conduct is under the guise of "Professional Services" performed or alleged to have been performed by an "Insured" or an employee or agent of the "Insured";

J.  Silicone Treatment

the "Insured's" use of silicone gel implants, and/or fat recycling; or the use, administration or prescription for injection of silicone fluid;

K.  Prior Knowledge

1. any "medical incident" or circumstances that any "Insured" knows or should reasonably anticipate would result in a "claim" prior to the effective date of this policy;

2. based upon or arising out of any "claim" or circumstance that is reported to any other insurer by an "Insured" prior to the effective date of this policy;

L.  Nuclear

any nuclear reaction, radiation or contamination, under any circumstances and regardless of cause, within or originating from a nuclear facility; however, this exclusion shall not apply where the "claim" is alleging a "medical incident";

M.  Unapproved Drugs/Devices

the use, administration or prescription of any drug, pharmaceutical or medical device not yet having received final approval by the Food and Drug Administration (FDA) for treatment of human beings or which is not an FDA approved study;

N.  Sex Reassignment Surgeries

any sex change operations;

O.  Suspended License

any act, or omission to act, arising from your rendering or failing to render "Professional Services" which takes place while your license to practice medicine is under suspension or has been restricted, revoked, surrendered, or otherwise terminated or any act of dispensing or prescribing controlled substances while your license or registration to dispense such substances is under suspension or has been restricted, revoked, surrendered, or otherwise terminated.

Such coverage as is provided by the policy shall apply to "Claims" which result from any act, or omission to act, arising from your rendering or failing to render "Professional Services" while you are on probation, provided that the probation has been reported to the Company, in writing, and such "Professional Services" are in compliance with the limitations, terms and restrictions of the probation order.

No coverage is afforded under this policy for damages arising out of action taken by any state licensing agency.

P.  Insured versus Insured

A "claim" brought by or on behalf of:

1. an "Insured" against any other "Insured", however, this exclusion shall not apply to an otherwise covered "claim" made against any "Insured", by another "Insured", for "Professional Services" rendered to another "Insured" in their capacity as a client or patient of any "Insured" or the "Named Insured";

2. any entity which is owned or controlled by or is under common ownership or control of the "Insured";

3. any person or entity which owns or controls any entity included within the definition of "Insured";

4. any entity of which the "Insured" is a director, officer, partner or principal shareholder.

Q. Workers' Compensation and Employers' Liability

any obligation for which the "Insured" or any carrier as his insurer may be liable, under any Workers' Compensation, Unemployment Compensation, Disability Benefits Law, the Employee Retirement Income Security Act of 1974, as amended and in effect from time to time, or any rule or regulation promulgated thereunder, or under any similar law; and to any liability arising out of the sickness, disease or death resulting therefrom of any employee of the "Insured" arising out of and in the course of his employment by the "Insured";

R. Unauthorized Data Collection and Accessing

Any unlawful, unauthorized or undisclosed obtaining, gathering, collecting, acquiring, accessing, using, distribution or sale of any information of any type, nature or kind by any "Insured".

V.  EXTENDED "CLAIM" REPORTING PERIOD

A. Automatic Extended "Claim" Reporting Period

If we or you cancel or non-renew this policy for any reason other than non-payment of premium, non-payment of deductible, non-compliance with any terms and conditions of this policy, fraud or material misrepresentation then you shall be entitled to an Automatic Extended Reporting Period (AERP) period of (60) sixty days from the date of policy expiration or cancellation to report "Claims" in writing to us which are first made against the "Insured" during the "policy period" and arise out of a covered "Claim" which takes place subsequent to the retroactive date shown in the Declarations and prior to the policy expiration or cancellation date.

If the Optional Extended Claim Reporting Period offered in item B. below is purchased, then this Automatic Extended Claims Reporting Period shall be included within such Optional Extended Claim Reporting Period.

The Automatic Extended Claim Reporting Period does not reinstate or increase the Limits of Liability of this policy.

The Automatic Extended Claim Reporting Period does not extend the "policy period" or change the scope of coverage afforded by this policy.

B. Optional Extended "Claim" Reporting Period

If we or you cancel or non-renew this policy for any reason other than non-payment of premium, non-payment of deductible, non-compliance with any terms and conditions of this policy, fraud or material misrepresentation then you shall be entitled to purchase an ERP from the options below which begin from the date of policy expiration or cancellation to report "claims" in writing to us which are first made against the "Insured" during the "policy period" or ERP and arise out of a "medical incident(s)" which take place subsequent to the retroactive date shown in the Declarations and prior to the policy expiration or cancellation date.

The premium for the Optional Extended Claims Reporting Period shall not exceed 175% of the annual premium for one (1) year. The purchase of an Optional Extended Claims Reporting Period shall be endorsed hereon.

Your right to purchase the Optional Extended Claims Reporting Period must be exercised by notice in writing to us, not later than thirty (30) days after the expiration or termination date of this policy. Effective notice must indicate the number of months up to 12 months (or one year) for which you are requesting the Optional Extended Claims Reporting Period and must include payment of premium for such period. If such written notice and the premium are not received by us within (30) days, then you shall not be entitled to purchase an Optional Extended Claims Reporting Period at a later date.

At the commencement of any Optional Extended Claims Reporting Period, the entire additional premium shall be deemed earned, and in the event you terminate the Optional Extended Claims Reporting Period before its term for any reason, we shall not be obligated to return to you any portion of the premium.

The purchase of an Optional Extended Claims Reporting Period does not reinstate or increase the Limits of Liability of this policy.

The Optional Extended Claim Reporting Period does not extend the "policy period" or change the scope of coverage afforded by this policy.

With respect to items A. and B. above, any "claims" reported during an Extended Reporting Period must be reported in accordance with Section VII., "INSURED'S" DUTIES IN THE EVENT OF A "CLAIM".

## VI.  LIMITS OF LIABILITY

The applicable limit of liability stated in the Declarations is the maximum we shall pay regardless of the number of:

1.  "Insureds";

2.  individuals or organizations that make a "claim"; or

3.  "claims" made.

A.  Limit of Liability Each" Claim"

The limit of liability shall apply in excess of the Deductible stated in the Declarations, if applicable.  The liability of the Company for each "claim" or series of "related claims" shall not exceed the amount stated in the Declarations as applicable to each "claim". This limit is the maximum amount the Company will pay for "claim expense(s)" and "damages" attributable to each "claim" or series of "related claims", including those "claims" or "related claims" reported in accordance with Section V., Extended Reporting Period.

If two or more policies issued by us apply to the same "claim" or "related claims", the each claim limit shall not exceed the amount stated in the Declarations of the policy in effect at the time the first "claim" was made.

B.  Limit of Liability Aggregate

Subject to Limit of Liability - Each Claim, the liability of the Company shall in no event exceed the amount stated in the Declarations as aggregate as a result of all "claims".  This limit is the total amount of "claim expense(s)" or "damages" or both that the Company will pay under this policy for all "claims" including those "claims" reported in accordance with Section V., Extended Reporting Period.

C.  Deductible Each "Claim"

The deductible amount stated in the Declarations applies to each "claim" and shall be paid by the "Named Insured". The deductible shall be applied to the payment of "damages" or "claim expense(s)" or both.

The Company may advance payment of part or all of the deductible amount and, upon notification of such payment made, the "Insured" must promptly reimburse the Company for the deductible amounts advanced by the Company.

Once the limits of liability have been exhausted by payment of "Damages" and/or "Claims Expense(s)", the Company will not defend, pay "damages" or "claim expense(s)" for any "claim".

D.  Multiple "Claims", "Medical Incidents"

The inclusion herein of more than one "Insured" or the making of "Related claims" by more than one person or organization shall not operate to increase the Company's Limit of Liability. For purposes of this insurance, all "Claims" for "Damages" or "Claim Expenses" directly or indirectly arising out of a single "Medical Incident(s)" that are logically or causally connected shall be treated as a single "Claim". All such "Related Claims", whenever made, shall be considered first made and reported to the Company during the "Policy Period" in which the first of all such "Claims" was first made against any "Insured" or reported to the Company. All "Related Claims" arising out of a single "Medical Incident" or logically or causally connected "Medical Incidents" shall be deemed to constitute a single "Claim" and be subject to the same Limit of Liability – Each "Claim", as stated in the Declarations.

## VII.  "INSURED'S" DUTIES IN THE EVENT OF A "CLAIM"

Each "Insured" must comply with the following conditions:

A.  If a "claim" to which this policy applies is made against you, then you must give written notice, as soon as practicable, and as otherwise required by this policy to us. That notice shall be made to:

Admiral Insurance Group, a Berkley Company

Attention: Claims Department

Mt. Laurel Corporate Park

1000 Howard Blvd., Suite 300,

P.O Box 5430

Mt. Laurel, NJ 08054

admclaims@admiralins.com

B. With regard to Item II. DEFINITIONS, B. 1, 2 and 3, when a "claim" is reported in writing to us, the notice must contain reasonably obtainable information regarding the alleged act, error or omission including, but not limited to names of the potential witnesses, name of the alleged claimant(s), and the extent and type of "claim" anticipated.

C. You must cooperate with us in the defense and investigation of any "claim".  We may require that

you submit to examination under oath, if required, produce and make available all records, documents and other materials which we deem relevant to the "claim".

    1. You must also, at our request, attend hearings, depositions and trials.

    2. In the course of investigation or defense, provide us with written statements as requested by us or your attendance at meetings with us.

    3. You must assist us in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses, all without charge to us.

D. The right to either accept or reject arbitration of any "claim" by you shall be exercised only with our written consent.

E. Except and to the extent otherwise provided in this policy, you must not make any payment, admit any liability, settle any "claim" or assume any obligations without our prior written consent.

F. You must do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment that you may have.

G. You shall refrain from discussing the facts and circumstances of any "claim" with anyone other than our legal counsel or representatives.

VIII. OTHER CONDITIONS

A. Transfer of Rights of Recovery

If there is a payment made by us, we shall be subrogated to all of your rights of recovery against any person or organization.  You will cooperate with us and do whatever is necessary to secure these rights.  You must not waive or prejudice such rights.  We agree to waive this right of subrogation against a client of the "Insured" to the extent that the "Insured" had, prior to the "claim", entered into a written, duly executed agreement to waive such rights.

B. How "Other Insurance" Applies

This insurance shall be excess of and not contribute with "other insurance", whether collectable or not, that affords coverage for a "medical incident". If one or more policies issued by us and one or more policies issued by another insurer apply to the same "claim" or "related claims", our pro-rata share will be determined by the total of the Limits of Liability of our policy in effect at the time the first "claim" was made and reported to us in writing and the Limits of Liability of all "other insurance".

This condition does not apply to "other insurance" that is written to apply in excess of the limits provided by this policy.

The insurance afforded by this policy does not apply to any "medical incident" for which an "Insured" has coverage under any other policy issued by us.

C. Changes Made to this policy

The terms and conditions of this policy cannot be waived or changed except by specific written endorsement issued by us and made part of the policy.

D. Assignment of "Insured's" Interest

The interest of the "Insured" under this policy is not assignable to any other person or organization.

E. Cancellation

This policy may be canceled by the "Named Insured" by returning the policy to us or its authorized representatives. The "Named Insured" can also cancel this policy by written notice to the Company stating at what future date cancellation is to be effective.  If the "Named Insured" cancels, earned premium shall be computed using the customary short rate table or the amount stated elsewhere in this policy as Minimum Earned Premium, whichever is greater.

This policy can be canceled by us by written notice to the "Named Insured", at the address last known to us.  We will provide written notice at least thirty (30) days before cancellation is to be effective.

There are exceptions to the length of the notice that must be provided to the "Named Insured".  The "Named Insured" will only be entitled to at least ten (10) days notice if we cancel:

1. because you have failed to pay a premium when due; or

2. because you have failed to pay applicable deductible amounts due.

If we cancel, earned premium will be computed pro-rata, except that if we cancel for the reason specified in 1. or 2. above, earned premium will be computed in the same manner provided above when the "Named Insured" cancels.

The mailing of any notice of cancellation shall be sufficient proof of notice.

The effective date of cancellation terminates the "policy period". Return of unearned premium is not a condition of cancellation. Unearned premium will be returned by us as soon as practicable.

F.    Bankruptcy

Bankruptcy or insolvency of the "Insured" or the "Insured's" estate shall not relieve us of any of our obligations under this policy.

G.    Application

The statements in the Application are your representations and are deemed material. This policy is issued based upon the truth and accuracy of such representations.

H.    Audit

We may examine and audit your books and records at any time during the "policy period" and within three (3) years after the final termination of this policy, as far as they relate to this policy.

I.    Multiple "Insureds", "Claims" and Claimants

The number of "Insureds" covered by this policy shall not operate to increase the limits of liability as specified in the Declarations.

A series of "related claims" will be considered a single "claim". This policy shall only apply if the first or earliest "claim" arising from a "medical incident" is made during the "policy period". These provisions apply regardless of the number of "Insureds" involved in such a "claim", the number of "claims" made, or the number of people or organizations that make the "claim".

The number of "claims" made or the number of people or organizations that make "claims" shall not operate to increase the limits of liability as specified in the Declarations.

Once a "claim" has been first made under this policy or a predecessor or successor policy of the Company, only the policy against which the "claim" was first made and reported to us shall be available to pay "damages" and/or "claims expenses", if coverage is afforded by the policy, and under no circumstances will any other policy of the Company apply.

J.    Action Against Us

No action shall be brought against us by you to recover for any loss or "damages" under this policy unless, as a condition precedent thereto:

1.    you have fully complied with all the terms and conditions of this policy; and

2.    the amount of such loss or "damages" has been fixed or rendered certain;

    a.    by final judgment against you after trial of the issues; or

    b.    the time to appeal such judgment has expired without an appeal being taken; or

    c.    if appeal is taken, after the appeal has been determined; or

    d.    the "claim" is settled in accordance with the terms and conditions of this policy.

In no event shall any action brought by anyone be maintained against us unless such action is brought within twenty-four (24) months from the time the right to bring action first becomes available.

K.    False or Fraudulent "Claims"

If you report any "claim" knowing such "claim" to be false or fraudulent, this policy shall become void and all insurance coverage hereunder shall be forfeited as of the inception date of this policy.

L.    Terms and Conditions of Policy Conformed to Statute

Where necessary, the terms and conditions of this policy will be amended to conform to applicable law.

M.  Premium

The premium amount for this policy is stated in the Declarations and is for coverage for the "policy period".  If during the "policy period" there is a change in coverage afforded, we have the right to adjust the premium as of the date of change.  Any premium adjustment shall be made in accordance with our prevailing rules and rates.

Premium shown as advance premium is a minimum and deposit premium.  At the close of each audit period we will compute the earned premium for that period.  Audit premiums are due and payable by notice to the first "Named Insured".

If the premium for this policy is a flat premium, it is not subject to adjustment.

IX.  INCIDENT REPORTING PROVISIONS

If during the "policy period", you first become aware of any specific and identifiable "medical incident" and during the "policy period" give written notice to us of:

a.  The specific "medical incident" including the date(s) and parties involved; and

b.  The "damages" which did or may result from such "medical incident"; and

c.  The circumstances by which you first became aware of such "medical incident";

Then any subsequent "claim" made against the "Insured" arising out of the "medical incident", which is the subject of the written notice reported under this provision will be deemed to have been made at the time written notice complying with the above requirements was first reported to us.


This policy shall not be binding upon the Company unless completed by a Declarations Page and countersigned on the aforesaid Declarations Page by a duly authorized representative of the Company.

Policy Number: EO000030651-07                                          **AE 07 21 09 98**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# MINIMUM RETAINED PREMIUM

It is agreed that in the event of cancellation of this policy by the Insured as specified herein, return premium shall be computed at .90 of the pro rata unearned policy premium (or minimum premium if applicable) subject however to a retention by the Company of not less than 25% of the premium shown on the declarations or renewal certificate.

Nothing in this endorsement is deemed to affect the Company's cancellation rights which remain as indicated in the form.

It is further agreed that return premium may be allowed on a pro rate basis if cancelled for non payment, subject however to retention by the Company of the minimum as shown above.

Policy Number: EO000030651-07            **EO 10 64 07 10**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# CONSENT TO SETTLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY COVERAGE PART

The Company shall not agree to the settlement of any "claim" against an "Insured" without first obtaining the consent of the "Insured" against whom the "claim" has been made.  In the event of a demand for settlement, a mediator's proposal, an arbitration award, or a judgment which the Company desires to accept and settle the "claim," the written consent of the "Insured" against whom the "claim" has been made shall be sought by the Company.  In the event the "Insured" refuses to grant consent, then from that date onward, the ultimate liability of the Company to pay "damages," including all "claim expenses" incurred after the date of the refusal to grant consent, shall not exceed the amount for which the "claim" could have been settled and for which the consent of the "Insured" was sought.

All "Insureds" under this policy agree that the Company and its representatives, legal counsel, and employees may engage in settlement discussions and solicit settlement demands, prior to requesting consent from an "Insured" under this policy.  The Company, its representatives, legal counsel and employees are entitled to make all reasonable efforts to ascertain the amount of any potential settlement or resolution amount prior to soliciting the consent of any "Insured" under this policy.  The Company shall be free to agree to mediate or attend any settlement conference at its sole discretion without obtaining prior consent from the "Insured".  No settlement or resolution shall be agreed to outside the provisions of this endorsement.

If the "claim" involves multiple "Insureds" under this policy, only the consent of the "Named Insured" shall be necessary to comply with the provisions of this policy, and all other "Insureds" under this policy will be deemed to consent to any payment or settlement approved by the "Named Insured", and by claiming rights as an "Insured" under this policy, all such "Insureds" confer a limited power of attorney upon the "Named Insured" with regard to the giving or withholding of consent.

**All other terms and conditions under the policy remain unchanged.**

Policy Number: EO000030651-07                                      **EO 12 60 08 13**

Effective Date: 09/25/2021

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NON-PARTICIPATION DISCLOSURE NOTICE TO POLICYHOLDERS - ALL STATES' PATIENTS' COMPENSATION FUNDS AND INSURED'S WARRANTY OF COMPLIANCE

This endorsement modifies insurance provided under the following:

    PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium charged, it is understood and agreed that the following provisions apply.

**I.   NON-PARTICIPATION DISCLOSURE NOTICE TO POLICYHOLDERS**

    THE COMPANY DOES NOT PARTICIPATE IN ANY STATE'S PATIENTS' COMPENSATION FUND, REGARDLESS OF FUND NAME, GOVERNING STATUTE(S), OR GOVERNING BODY.  ANY PERSON OR ENTITY THAT IS REQUIRED BY STATE LAW TO PARTICIPATE IN ANY STATE'S PATIENTS' COMPENSATION FUND (THE "FUND") OR SIMILAR FUND IS SOLELY AND INDEPENDENTLY RESPONSIBLE FOR SATISFYING ANY AND ALL FUND RELATED STATE STATUTES, REGULATIONS AND/OR REQUIREMENTS IMPOSED BY ANY MEDICAL OR OTHER LICENSING BOARD.

**II.  HEALTH CARE FUND EXCLUSION**

    THE COMPANY DOES NOT CAUSE TO BE FILED WITH ANY STATE DEPARTMENT OF INSURANCE OR OTHER REGULATORY BODY PROOF OF FINANCIAL RESPONSIBILITY PURSUANT TO ANY AND ALL FUND REQUIREMENTS AS HAVE BEEN OR MAY BE ESTABLISHED BY STATE LAW AND/OR BY ANY FUND RELATED REGULATIONS.  THE COMPANY DOES NOT PAY ANY FUND RELATED SURCHARGE OR ASSESSMENT THAT MAY BE ASSESSED ON ANY **INSURED** AND/OR OTHER HEALTH CARE PROVIDERS WHETHER THE SURCHARGE OR ASSESSMENT IS IMPOSED BY LAW, BY MEDICAL OR OTHER REGULATORY LICENSING BOARD, AND/OR BY ANY FUND RELATED REGULATIONS.

**III.  ABSOLUTE COVERAGE EXCLUSION**

    THE EXCLUSION SECTION OF THE POLICY IS HEREBY AMENDED TO EXCLUDE ANY OR ALL **CLAIMS** BASED UPON, ARISING FROM OR IN ANY WAY RELATED TO ANY STATE'S PATIENTS' COMPENSATION FUND AND/OR ANY RELATED STATUTES AND/OR REGULATIONS RELATED TO ANY AND/OR ALL STATE PATIENTS' COMPENSATION FUNDS.

**IV.  POLICYHOLDER WARRANTY**

    THE **NAMED INSURED**, **INSUREDS** AND ANY ADDITIONAL **INSUREDS** HEREBY WARRANT THAT ANY FUND OR OTHER RELATED PARTICIPATION REQUIREMENTS HAVE BEEN SATISFIED INDEPENDENTLY OF THIS INSURANCE POLICY.  **INSURED'S** FAILURE TO COMPLY WITH ANY AND ALL MANDATORY PARTICIPATION REQUIREMENTS MAY IMPACT **INSURED'S** AVAILABILITY OF STATE PROVIDED COVERAGE AND/OR CAPS ON LIABILITY, AS WELL AS POTENTIALLY JEOPARDIZE AN **INSURED'S** OR OTHER HEALTH CARE PROVIDER'S PROFESSIONAL LICENSE AND EXPOSE **INSUREDS** TO FINES AND/OR PENALTIES.  ALL **INSUREDS** ARE ADVISED TO CONSULT WITH INDEPENDENT LEGAL COUNSEL TO ENSURE FULL COMPLIANCE WITH ANY AND ALL STATUTES AND APPLICABLE REQUIREMENTS.

**V.  DEFINED TERMS AND COMPATABILITY WITH POLICY**

ANY AND ALL VERSIONS OF DEFINED TERMS SHOWN IN THIS ENDORSEMENT CORRESPOND TO THE DEFINED TERMS AS SHOWN IN THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED AND APPLY.

Policy Number: EO000030651-07                                              **EO 10 12 11 07**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABSOLUTE UNSOLICITED COMMUNICATIONS EXCLUSION

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY COVERAGE PART

This insurance does not apply to any "claim" contributed to by or in any way connected with "unsolicited communications" made by or on behalf of any insured.

"Unsolicited communications" means any form of communication, distribution, or the transmittal or publication of information or material, including, but not limited to facsimile, electronic mail, postal mail, express mail, telephone, internet or web-based advertisement, instant message, SMS message or text message that the recipient has not specifically requested.

"Unsolicited communications" includes, but is not limited to actual or alleged violations of:

   **1.** The Telephone Consumer Protection Act (47 U.S.C. §227), including any amendment of, or addition to, such statute;

   **2.** The Controlling the Assault of Non-Solicited Pornography and Marketing Act (15 U.S.C. §7701, *et seq.*), including any amendment of, or addition to, such statute; or

   **3.** Any other statute, ordinance or regulation relating to the communication, distribution or transmittal of unwanted content, information or material.

It is further agreed that for any "claim" made or suit brought which is excluded under the terms of this endorsement, the Company shall not have the obligation to defend, adjust, investigate or pay any cost for investigation, defense, adjustment or attorney fees arising out of such "claim".

All other terms and conditions remain unchanged.

Policy Number: EO000030651-07                                                    **EO 14 25 03 21**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CYBER LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium charged, it is understood and agreed that SECTION II. DEFINITIONS of this policy is amended to include the following:

- "Network Security and Data Privacy Incident" means:
    1. The "Insured's" failure to properly handle, manage, transmit, store, destroy or otherwise control confidential personally identifiable or corporate information;
    2. Any violation of the "Insured's" privacy policy, or any violation by the "Insured" of a "Privacy Law"; or
    3. Failure in network security, including but not limited to activities performed by the "Insured" to protect against unauthorized access to, unauthorized use of, denial of service attack directed against, or transmission of malicious code to the computer, communication or network systems of (a) an "Insured" or (b) a third party.

- "Privacy Law" means statutes, ordinances or regulations pertaining to the protection, collection, dissemination, transmission, distribution, disposal or use of non-public personal identifiable information as defined in those statutes, including:
    a. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191)(HIPAA);
    b. Health Insurance Technology for Economic and Clinical Health Act of 2009 (HITECH);
    c. Gramm-Leach-Bliley Act of 1999 (Financial Services Modernization Act of 1999);
    d. The Family Educational Rights and Privacy Act (FERPA);
    e. Children's Online Privacy Protection Act of 1998 (COPPA);
    f. California Database Protection Act of 2003 (Cal SB 1386);
    g. California Consumer Privacy Act of 2018;
    h. EU General Data Protection Regulation (effective May 25, 2018); and
    i. Any international, federal, state or local statute, ordinance or regulation that addresses, prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

It is further understood and agreed that Section IV. EXCLUSIONS of this policy is amended by adding the following:

<u>Network Security and Data Privacy Exclusion</u>

- Any "claim" based upon or arising out of, in whole or in part, or directly or indirectly attributable to, a "Network Security and Data Privacy Incident".

This exclusion applies even if "damages" or "claims expenses" are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations, loss or impairment of computer functionality or any other loss, cost or expense incurred by you or others arising out of a "Network Security and Data Privacy Incident".

However, this exclusion shall not apply to "Defense Costs" if such definition has been added to this policy by another endorsement.

It is further agreed that for any "claim" made or Suit brought which is excluded under the terms of this endorsement, the Company shall not have the obligation to defend, adjust, investigate or pay any cost for investigation, defense, adjustment or attorney fees arising out of such "claims".

All other terms and conditions of this policy remain unchanged and apply.

Policy Number: EO000030651-07                                                    **EO 14 37 03 20**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDATORY ENDORSEMENT
# DEFINITION OF PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium charged, it is understood and agreed that the policy is amended as follows:

SECTION II. DEFINITIONS, K. is deleted in its entirety and replaced with the following:

K.  "Professional Services" means services performed in person, by telephone or by other form of electronic communication by you for others involving specialized training, knowledge and skill while in pursuit of the profession or services as stated in the "Named Insured's" Business on the Declarations, including "Good Samaritan Acts".

For purposes of this endorsement, a "Good Samaritan Act" is defined as services rendered, or failed to be rendered, as a professional during a sudden and unforeseen emergency for which no fee is expected, demanded or received.

All other terms and conditions of the policy remain unchanged and apply.

Policy Number: EO000030651-07                                    **EO 10 49 03 17**

Effective Date: 09/25/2021

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADMINISTRATIVE ACTIONS DEFENSE COVERAGE

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium charged, it is understood and agreed that we will pay on behalf of the "Named Insured" all "Defense Costs" arising solely and directly out of any "Hearing" initiated during the "Policy Period" and reported by the "Named Insured" to us during the "Policy Period", the sole subject of which is the restriction, suspension or revocation of the "Named Insured's":

1. License to practice medicine, or
2. License to prescribe controlled substances, or
3. Privileges to practice at a healthcare facility.

DEFINITIONS

The following definitions apply for the purposes of this endorsement only:

"Defense Costs" means:

1. Fees charged by an attorney designated by us, and
2. All other fees, costs and expenses resulting directly from the investigation, adjustment and defense of the "Named Insured" for a "Hearing".

"Defense Costs" do not include fines or penalties.

"Hearing" means a formal administrative proceeding or series of proceedings conducted by a Medical Licensing Board or Healthcare facility.  A series of related proceedings arising out of the same allegations, and before the same administrative body, shall constitute one "Hearing".

LIMITS OF LIABILITY

For the purposes of this endorsement the following sub-limit shall apply:

| $5,000 | Per "Hearing" |
|---|---|
| $25,000 | Aggregate |

Coverage afforded by this endorsement is also subject to the following:

1. The sub-limit set forth in this endorsement is the maximum limit available for all "Defense Costs" paid under this endorsement involving "Hearing(s)".
2. The sub-limit afforded hereunder is included within, and is not in addition to the Limits of Liability stated in the Declarations.
3. The coverage afforded by this endorsement is not subject to any Deductible.

All other terms and conditions of the policy remain unchanged and apply.

Policy Number: EO000030651-07                                                **EO 10 50 07 10**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) SUBLIMIT

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium charged, it is hereby agreed that we will pay on behalf of the "Named Insured" "defense costs" arising out of a "hearing" subject to the following sub-limit:

| | |
|---|---|
| $   25,000 | each "hearing" |
| $   50,000 | aggregate |

DEFINITIONS

The following definitions apply for the purposes of this endorsement only:

"Defense Costs" means:

fees charged by an attorney appointed by us, and all other fees, costs and expenses resulting from the investigation, adjustment and defense of: **1)** a "hearing"; or **2)** any allegation of violations of HIPAA's patient privacy regulations arising out of a "medical incident".

"Defense Costs" do not include fines or penalties.

"Hearing(s)" means:

an administrative proceeding: **1)** mandated by a governmental entity responsible for administration of  HIPAA; and 2) alleging a violation of HIPAA's patient privacy regulations arising out of a "medical incident".

"Hearing" includes "related hearings".  "Related hearings" mean two or more "hearings" arising out of a "medical incident" or "medical incidents" that are logically or causally connected.

Coverage afforded by this endorsement is also subject to the following:

1. The sub-limit set forth in this endorsement is the maximum limit available for all "defense costs" paid under this policy involving "hearing(s)".

2. If any "claim" made under this policy includes:

    **(a)** "claims" arising from HIPAA and

    **(b)** "claims" other than those arising from HIPAA,

    and the "claims" described in **(a)** and **(b)** arose from the same "medical incident" and are otherwise not excluded by this policy, only the sub-limit set forth in this endorsement shall apply to such "claim" or the portion of the "claim" for which coverage is not otherwise excluded.

3. The sub-limit afforded hereunder is included within, and is not in addition to, the Limits of Liability stated in the Declarations.

4. The coverage afforded by this endorsement is not subject to any Deductible.

**All other terms and conditions of the policy remain unchanged.**

**EO 10 50 07 10**                                                              **Page 1 of 1**    ❑

Policy Number: EO000030651-07                                                    **EO 10 51 08 20**

Effective Date: 09/25/2021

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

# AMENDED EXTENDED OPTIONAL "CLAIMS" REPORTING PERIOD – 1, 2 AND 3 YEARS

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium charged it is hereby understood and agreed that **V.** EXTENDED "CLAIM" REPORTING PERIOD, paragraph **B.** is deleted and replaced with the following:

**B.**   Optional Extended "Claim" Reporting Period

If we or you cancel or non-renew this Policy for any reason other than non-payment of premium, non-payment of deductible, non-compliance with any terms and conditions of this Policy, fraud or material misrepresentation then you shall be entitled to purchase an ERP from the options below which begin from the date of policy expiration or cancellation to report "Claims" in writing to us which are first made against the "Insured" during the "policy period" or ERP and arise out of a "medical incident(s)" which take place subsequent to the retroactive date shown in the Declarations and prior to the policy expiration or cancellation date.

The premium for the Optional Extended "Claim" Reporting Period shall be:

a.   One year for a premium of       100% of the annual premium;

b.   Two years for a premium of      150% of the annual premium;

c.   Three years for a premium of   200% of the annual premium.

The purchase of an Optional Extended "Claim" Reporting Period shall be endorsed hereon.

Your right to purchase the Optional Extended "Claim" Reporting Period must be exercised by notice in writing to us, not later than thirty (30) days after the expiration or termination date of this policy. Effective notice must indicate the number of months up to 36 months (or 3 years) for which you are requesting the Optional Extended "Claim" Reporting Period and must include payment of premium for such period. If such written notice and the premium are not received by us within (30) days, then you shall not be entitled to purchase an Optional Extended "Claim" Reporting Period at a later date.

At the commencement of any Optional Extended "Claim" Reporting Period, the entire additional premium shall be deemed earned, and in the event you terminate the Optional Extended "Claim" Reporting Period before its term for any reason, we shall not be obligated to return to you any portion of the premium.

The purchase of an Optional Extended "Claim" Reporting Period does not reinstate or increase the Limits of Liability of this Policy.

The Optional Extended "Claim" Reporting Period does not extend the "policy period" or change the scope of coverage afforded by this Policy.

All other terms and conditions of this Policy remain unchanged and apply.

Policy Number: EO000030651-07                                      **EO 10 52 07 10**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# LOCUM TENENS PHYSICIAN COVERAGE

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY COVERAGE PART

It is hereby agreed that "insured" as shown under Section II. DEFINITIONS is amended to include the following:

**5.** Locum Tenens Physicians temporarily employed by, or contracted with the "Named Insured", but only for a "medical incident" arising out of services provided while the Locum Tenens Physician is serving in the place of the "Named Insured" and not working simultaneously with the "Named Insured", subject to a maximum of 45 days per "policy period".

**All other terms and conditions remain unchanged.**

Policy Number: EO000030651-07                                    **AI 07 10 08 18**

Effective Date: 09/25/2021

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

# SERVICE OF SUIT - CALIFORNIA

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other Officer specified for that purpose in the Statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the below named as the person to whom the said Officer is authorized to mail such process or a true copy thereof.

The Company may be sued upon any cause of action arising in the State of California upon any policy issued by it, or any evidence of insurance issued or delivered by a surplus lines broker, pursuant to the procedures of Sections 1610 to 1620 of the Insurance Code. Nothing herein shall constitute a selection or designation of forum, or a waiver of any of our rights to select a forum or court, including any of the federal courts of the United States.  This includes any right to commence an action in or remove or transfer an action to the United States District Court or any other court of competent jurisdiction, as permitted by law.

It is further agreed that service of process in such suit may be made upon Vivian Imperial, in care of CT Corporation System, 818 West Seventh St., Suite 930, Los Angeles, CA 90017 and that in any suit instituted against the Company upon this policy, it will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

**AI 07 10 08 18**                                                    Page 1 of 1    ☐

Policy Number: EO000030651-07                                      **AI 08 76 02 20**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

# SPECIFIED TREATMENT EXCLUSION – REGENERATIVE MEDICINE

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium charged, it is agreed that the insurance afforded by this policy does not apply to any "claim" based upon or arising out of, directly or indirectly, in whole or in part, any stem cell or exosome therapy, including any derivative products thereof, conducted by or for the "Named Insured".  However, this exclusion does not apply to treatment involving platelet-rich plasma (PRP) therapy.

It is further agreed that for any "claim" made or suit brought which is excluded under the terms of this endorsement, the Company shall have no obligation to defend, adjust, investigate or pay any cost for defense, adjustment, investigation or attorney fees arising out of such "claims" or suits.

All other terms and conditions of this policy remain unchanged and apply.

Policy Number: EO000030651-07                                                    **AI 66 50 01 15**

Effective Date: 09/25/2021

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROFESSIONAL LIABILITY TERRORISM EXCLUSION (ABSOLUTE)

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY COVERAGE PART

This policy does not apply to any **claim**, **claim expenses**, or **damages**, including but not limited to **bodily injury**, **property damage**, **personal injury** and **advertising injury** arising, directly or indirectly, out of an **Act of terrorism**.

With respect to this endorsement only, **Act of terrorism** means activities against persons, organizations or property of any nature:

**a.** That involve the following or preparation for the following:

**(1)** Use or threat of force or violence; or

**(2)** Commission or threat of a dangerous act; or

**(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**b.** When one or both of the following applies:

**(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

With respect to this endorsement only, **bodily injury** means physical injury, sickness, disease, mental anguish, or emotional distress sustained by a person, including death resulting from any of these at any time.

For any **claim** made or **suit** brought which is excluded under the terms of this endorsement, the Company shall not have the obligation to defend, adjust, investigate or pay any cost for investigation, defense, adjustment or attorney fees arising out of such **claim** or **suit**.

All other terms and conditions of the Policy remain unchanged and apply.

**AI 66 50 01 15**                                                                          Page 1 of 1    ☐

Policy Number: EO000030651-07                                        **EO 13 55 01 19**

Effective Date: 09/25/2022

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXTENDED REPORTING PERIOD ENDORSEMENT

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS AND DENTISTS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium paid, it is hereby understood and agreed that the Policy is amended as follows:

The "Named Insured**"** has exercised their option to purchase the Extended Reporting Period pursuant to Section V. EXTENDED "CLAIM" REPORTING PERIOD.

For the additional premium of $22,920.00, the Company grants an Extended Reporting Period of One (1) year(s) with an effective date of 09/25/2022 (12:01am) and an expiration date of  09/25/2023 (12:01am).

The Extended Reporting Period entitles the "Insured**"** to notify us in writing of "claims" which are first made against the "Insured" during the "Policy Period" and arise out of a "medical incident" which takes place subsequent to the retroactive date and prior to the Policy expiration or cancellation date.   The purchase of this Extended Reporting Period does not reinstate or increase the Limits of Liability of the Policy.

Pursuant to SECTION V. EXTENDED "CLAIM" REPORTING PERIOD, it is understood and agreed that by purchasing the Extended Reporting Period, the Automatic Extended "Claim" Reporting Period shall be included within such Extended Reporting Period and will not further extend such Extended Reporting Period.

It is further understood and agreed that the entire Extended Reporting Period premium is fully earned and non-refundable as of the date you notify us in writing of your intent to purchase the Extended Reporting Period and full payment must be made at that time for the Extended Reporting Period to apply.

All other terms and conditions of the Policy remain unchanged and apply.

# EXHIBIT C

Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
Monterey, CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

EDWARD PEÑA, individually
and on behalf of others
similarly situated,

     *Plaintiff*,

     *v.*

INTERNATIONAL
MEDICAL DEVICES, INC.,
MENOVA
INTERNATIONAL, INC.,
GESIVA MEDICAL, LLC,
JAMES J. ELIST M. D., a
Medical Corporation, and Dr.
James ELIST,

     *Defendants*.

CASE No. 2:22-cv-03391

**PLAINTIFF'S ORIGINAL
CLASS ACTION
COMPLAINT**

Plaintiff Edward Peña files this Original Class Action Complaint against Defendants International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova"), Gesiva Medical, LLC ("Gesiva"), James J. Elist, M.D., a Medical Corporation, and Dr. James Elist and in support of his claims alleges as follows.

## I. INTRODUCTION

1. Defendants have jointly developed and marketed the "Penuma" device, a silicone penile implant, as a penis enlargement device. Since at least January 2017, Defendants have engaged in a systematic, coordinated campaign to market Penuma for cosmetic penis enlargement. Their websites and advertisements target men who have healthy, normal bodies but simply want larger penises.

2. Dr. James J. Elist has also developed a surgical procedure for implanting the device. He has performed thousands of these procedures, handling patient consults at his clinic in Beverly Hills and performing penile implant surgeries in his operating room at the Beverly Hills South Pacific Surgery Center. Defendants falsely and misleadingly tout the device and procedure as "FDA-cleared," giving reasonable consumers the false impression that the U.S. Food and Drug Administration ("FDA") has determined that Penuma is safe and effective for cosmetic penis enlargement procedures in men with healthy, normal bodies.

3. Unbeknownst to the men who undergo these procedures, however, Penuma is not safe and effective—nor is it FDA-cleared—for cosmetic penile enlargement. Instead, Penuma is FDA-cleared only "***for use in the cosmetic correction of soft tissue deformities***." Worse, implantation of the Penuma device not only does not usually result in any lengthening of the penis, it frequently causes scarring, resulting in the penis becoming shorter. In addition, contrary to Defendants' misrepresentations that the procedure is "permanent" but "reversible," the procedure frequently leads to infections and complications that require removal of the device, which, in turn, causes permanent damage to the penis. Defendants

knew these facts at least by 2015, but nevertheless continued to market Penuma as "the first FDA-cleared penile implant for cosmetic enhancement" and to urge consumers with healthy, normal penises to purchase the Penuma device and procedure to "enhance and enlarge the length, girth, and size of your penis."

4. Defendants profited substantially from these misrepresentations, selling the Penuma device and procedure to thousands of men at a cost of $15,000–$20,000 each. Plaintiff accordingly brings this action to recover damages and restitution on behalf of similarly situated consumers and to enjoin Defendants from continuing to falsely advertise and market Penuma as a safe and effective FDA-cleared procedure for cosmetic enhancement of penis size in men with healthy penises.

## II. PARTIES

5. Plaintiff Edward Peña is a resident of Hidalgo County, Texas.

6. Defendant International Medical Devices, Inc. ("IMD") is a California corporation located at 717 N. Maple Drive, Beverly Hills, CA 90210, in Los Angeles County. It may be served through its registered agent, Jonathan Elist, at the same address.

7. Defendant Menova International, Inc., ("Menova") is a California corporation located at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211, in Los Angeles County. It may be served through its registered agent, James Elist, at the same address.

8. Defendant Gesiva Medical, LLC is a Minnesota limited liability corporation headquartered at 6385 Old Shady Oak Road, Suite 250, Eden Prairie, MN 55344. It may be served through its registered agent, Thomas A. Hopper, at the same address.

9. Defendant James J. Elist, M.D., a Medical Corporation, is a California corporation headquartered at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA

90211. It may be served through its registered agent, James J. Elist, at the same address.

10. Defendant Dr. James Elist is an individual residing in Beverly Hills, California. Dr. Elist may be served at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211.

### III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving over 100 class members in which at least one member of the class is a citizen of a State different from at least one Defendant and the matter in controversy exceeds $5,000,000, exclusive of interests and costs.

12. Defendants IMD, Menova, James J. Elist, M.D., a Medical Corporation, and Dr. Elist are subject to general personal jurisdiction in California because IMD, Menova, and James J. Elist, M.D., a Medical Corporation are incorporated in California and maintain their principal places of business in California, and Dr. Elist is a California resident.

13. The Court also has specific personal jurisdiction over all Defendants because Defendants purposefully availed themselves of the privilege of doing business in California, and this action arises out of and relates to Defendants' California business activities.

14. Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Los Angeles County.

15. In addition, venue is also proper in this district pursuant to 28 U.S.C. § 1391(a). Defendants are deemed to reside in this district because their contacts with this district would be sufficient to subject them to personal jurisdiction if this district were a separate state.

# IV.  JOINT ENTERPRISE LIABILITY

16. Defendants shared a common plan or design for illegally marketing the Penuma device and procedure for cosmetic enlargement of normal penises.

17. Each Defendant had knowledge of and agreed to market Penuma for the cosmetic enlargement of normal penises.

18. Defendants acted as a joint enterprise with regard to all of the actions alleged in this Complaint.

19. Whenever this Complaint makes reference to any act of Defendants, the allegations refer to each of the Defendants, acting individually, and also to all of the Defendants acting jointly.

20. All acts of each of the Defendants were ratified and adopted by each of their Co-Defendants.

# V.  STATEMENT OF FACTS

21. Before undergoing the Penuma implantation procedure, Plaintiff Edward Peña had a normal, healthy penis. He had no soft tissue deformity of the penis, nor any urological problems of any kind.

22. While browsing the Internet, Mr. Peña saw advertisements for the Penuma device and procedure, including Dr. Elist's website. Defendants made the marketing decisions that led to these advertisements in Los Angeles, California.

23. Having read Defendants' advertisements, Mr. Peña reasonably believed that the Penuma device was safe and effective for men like him who had normal penises, but simply wanted their penises to be larger. He further reasonably believed, based on the misrepresentations in Defendants' advertisements, that the Penuma device had been approved by the FDA, and this belief gave him a sense of comfort that the device was safe and effective. Had Mr. Peña known that Penuma had not in fact been approved or cleared by the FDA for cosmetic penile enlargement in men

with normal penises and/or that it was not safe and effective for men with normal, healthy penises, he would not have purchased the Penuma device or procedure.

24. Mr. Peña also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure was permanent and completely reversible and that there would be no adverse consequences from removal of the device. Had Mr. Peña known that the Penuma implantation procedure was not permanent and could not be reversed without causing permanent damage to the penis, he would not have purchased the Penuma device or procedure.

25. Mr. Peña also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure would result in a natural looking penis. Had Mr. Peña known that the Penuma procedure often results in abnormal and deformed-looking penises, he would not have purchased the Penuma device or procedure.

26. Mr. Peña contacted Dr. Elist and scheduled an appointment with him for October of 2020. Dr. Elist consulted with Mr. Peña for approximately 15 minutes. Mr. Peña also met with three or four other employees of Dr. Elist and filled out a questionnaire. At no point did Dr. Elist or his employees inform Mr. Peña that Penuma was not safe and effective or not FDA cleared for cosmetic enlargement of normal penises. One or two days later, Dr. Elist performed surgery to implant the Penuma device in Mr. Peña's body.

27. Mr. Peña paid $14,500 to Dr. James Elist for the device and surgery.

28. Following the surgery, Mr. Peña's penis did not look or feel natural. Instead, he had no feeling on the top of the shaft and pain on bottom of the shaft. Two corners of the implant began sticking out in a manner that was not aesthetically pleasing. Mr. Peña suffered pain during intercourse and especially severe pain after intercourse. The implant eventually punctured the skin and poked out through a small hole, through which fluid discharged. Mr. Peña could not sleep on his back or

his stomach. He woke up multiple times in the middle of the night with painful erections, making it extremely difficult for him to sleep for at least 3 months. Mr. Peña could not even bend down to tie his shoe without pain.

29. Mr. Peña then decided to have the Penuma device removed. He had the device removed by Dr. Bryan Kansas, a reconstructive urological surgeon in Austin. Following the removal, Mr. Peña has continued to suffer complications, including retraction, loss of sensation, and scarring. These complications have caused Mr. Peña significant pain and mental anguish.

30. Mr. Peña's experience led him to conclude that the Penuma device and procedure have no value and are not safe or effective for healthy men with normal penises, many of whom had been and would continue to be misled by Defendants' misrepresentations to pay thousands of dollars for a device and surgery that have no value. He further understood that many of these men were unlikely to be able to secure legal representation on their own to pursue their claims against Defendants. He therefore files this action on his own behalf and on behalf of similarly situated persons.

## VI. CLASS ALLEGATIONS

### A. Defendants jointly developed and marketed the Penuma device and implantation procedure.

31. Promoting himself as the "Thomas Edison of penis surgeries," Dr. Elist received a patent on the device that was later to be named "Penuma" in 2002. He submitted an application for FDA clearance in 2004, analogizing the device to a silicone implant used for reconstructive surgery of the ear, nose, and throat. In this and all subsequent FDA clearance applications, Defendants specifically limited the intended use for the device to the "correction of soft-tissue deformities."

32. Beginning in 2004, Dr. Elist created National Medical Devices, Inc. ("NMD")—the predecessor of Defendant IMD—to manufacture the device and

serve as its exclusive distributor. Through NMD, Dr. Elist began marketing the device and offering surgical services to implant the device from his clinic in Beverly Hills.

33. In 2013, Dr. Elist renamed NMD "International Medical Devices, Inc." Dr. Elist is the President of IMD and owns 100% of IMD. His son, Jonathan Elist, is IMD's chief executive officer.

34. Dr. Elist subsequently created Menova to hold the intellectual property associated with his silicone penile implant device. On January 10, 2016, Menova applied for trademark registration for the "Penuma" mark with the United States Patent and Trademark Office ("USPTO"). On September 20, 2016, the USPTO issued a trademark for "Penuma." Since that time, Menova has owned the Penuma trademark and all intellectual property rights associated with the device. Dr. Elist is the president of Menova and owns 100% of Menova.

35. In May 2017, IMD entered into an agreement with Gesiva for the distribution of Penuma devices. Menova and Dr. Elist have authorized IMD and Gesiva to contract with approximately 12 urologists around the United States to perform hundreds of Penuma implantation procedures and use the Penuma trademark. Dr. Elist personally trains all urologists authorized to implant the Penuma.

36. Penuma's advertising claims that the device will make patients' penises longer. That is false. There is no evidence that the Penuma device makes patients' non-erect penises longer. Worse, Penuma's design results in patients' erect penises becoming *shorter* in most cases and in many cases disfigured. Defendants have known about these complications for at least over half a decade. In a 2015 post titled "My Elist Implant Experience," a former patient detailed his effort at seeking a refund from Dr. Elist after his "erect length" shrank between 1–1.5" post-surgery. He received no refund. Similar patient complaints were posted on the internet during

the same timeframe. Instead of correcting his false and misleading claims, Dr. Elist responded to these complaints with cease-and-desist letters. Patient concerns regarding the Penuma were echoed by practitioners and academics as well. For example, a 2018 article published in the Journal of Sexual Medicine titled "Complications of Genital Enlargement Surgery" identified "major penile shortening and disabling curvature" as Penuma complications.

37. Instead of disclosing these material risks, Defendants directed consumers to a self-authored, and self-serving, Elist study from 2018 ("*A Single-Surgeon Retrospective and Preliminary Evaluation of the Safety and Effectiveness of the Penuma Silicone Sleeve Implant for Elective Cosmetic Correction of the Flaccid Penis*") throughout their marketing. This study, however, was not conducted according to scientific standards, and its unreliability has been noted in the medical literature. Drs. Kapadia, Olson, and Furr, among others, concluded that Dr. Elist's study failed to consider "long-term sequelae of such adverse events and implant removal, such as penile shortening, fibrosis, and sexual dysfunction."[1] Because "the infection and explantation rate may be higher than reported in this retrospective study due to incomplete cohort response to surveys,"[2] several urologists have cautioned that "rigorous investigation with accurate reporting of complications should be mandated before more men take on the physical, mental, and significant financial burden associated with subcutaneous silicone penile implants."[3] Defendants' marketing failed to disclose and actively concealed these facts from consumers.

---

[1] Hehemann, *Penile Girth Enlargement Strategies: What's the Evidence?*, 7 SEXUAL MEDICINE REVIEW 535–547, 542 (2019).

[2] Olson, *Management of infected Penuma implant: Case Report*, 6 J. CASE REPORTS AND IMAGES IN UROLOGY 1–3, 2 (2021).

[3] Hehemann at 543.

**B. Penuma has been FDA-cleared only for cosmetic correction of deformities.**

38. Because Penuma is a medical device, it is subject to the Medical Device Amendments of 1976 ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA"). The MDA established three "classes" of medical devices: Class I, II, and III. "The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective."[4] A post-1976 medical device is automatically placed into Class III and is subject to premarket approval ("PMA") requirements, including the FDA's independent "scientific review to ensure the safety and effectiveness" of the device. The PMA process is highly rigorous, requiring manufacturers to submit detailed information regarding the safety and effectiveness of their devices. The FDA spends an average of 1,200 hours reviewing each submission.

39. Devices that were on the market before the MDA was enacted, however, are grandfathered in and are not required to go through the PMA process. Manufacturers seeking a less stringent review can thus avoid the FDA's thorough, scientific PMA process by showing that their devices are "substantially equivalent" to devices that were already on the market in 1976. This less rigorous "clearance" to market a device based on substantial equivalency to a pre-1976 device is known as the FDCA Section 510(k) Premarket Notification process (the "510(k) clearance" process).

40. Section 510(k) clearance allows device manufacturers, like Defendants, to submit a relatively short "summary" to the FDA describing how their medical devices are "substantially equivalent" to a pre-1976 device (the "predicate device"). The significant evidence needed to obtain full FDA approval of a medical device is

---

[4] U.S. Food and Drug Administration, PMA Approvals, *available at* https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/pma-approvals (last visited August 9, 2021).

not required when a medical device manufacturer instead applies for FDA "clearance" via the 510(k) process.

41. If the FDA determines that a device is "substantially equivalent" for the indicated uses to a pre-1976 device, manufacturers may obtain a fast-tracked 510(k) clearance to market the device while avoiding rigorous PMA testing for safety and effectiveness. 510(k) clearance is limited, however, to authorization to market the device *for the indicated uses*. In submitting a 510(k) clearance application, the manufacturer must identify the device's intended use. This intended use must match the intended use of the pre-1976 device to which the manufacturer claims "substantial equivalency." *See* 21 C.F.R. § 807.81(a)(ii). If a major change or modification of the intended use is identified, the 510(k) clearance process is unavailable, and the device must go through the full PMA process instead. *Id.*

42. On or about September 1, 2004, National Medical Devices, Inc. (the predecessor to IMD) submitted its "Silicone Block" for Section 510(k) premarket notification of intent to market the device. National Medical Devices, Inc. submitted that the implant was substantially equivalent to an "ear, nose and throat synthetic polymer material," which is regulated as a Class II Device under 21 CFR § 874.3620, which provides:

> Ear, nose, and throat synthetic polymer material is a device material that is intended to be implanted for use as a space-occupying substance in the reconstructive surgery of the head and neck. The device is used, for example, in augmentation rhinoplasty and in tissue defect closures in the esophagus. The device is shaped and formed by the surgeon to conform to the patient's needs. This generic type of device is made of material such as polyamide mesh or foil and porous polyethylene.

On October 25, 2004, the FDA granted 510(k) clearance to the Silicone Block that "is intended ***for use in the cosmetic correction of soft tissue deformities***, and is contoured at the surgeon's discretion to create a custom implant to aid in the reconstruction process." (Emphasis added.)

43. Due to certain design changes to Dr. Elist's penile implant device, on December 20, 2016, Defendants caused International Medical Devices, Inc. ("IMD")—the successor to National Medical Devices—to submit a second Section 510(k) premarket notification for a "Pre-Formed Penile Silicone Block." This application identified National Medical Device's Silicone Block, which had been cleared in 2004 based on its asserted similarity to an ear, nose, and throat reconstructive implant, as the predicate device to which IMD's Pre-Formed Penile Silicone Block was "substantially equivalent." The FDA granted 510(k) clearance on February 1, 2017, describing the "Indications for Use" as follows: "Pre-Formed Penile Silicone Block is intended for use in the cosmetic correction of soft tissue deformities, and is contoured at the surgeon's discretion to create a custom implant." Following certain additional design changes, on December 19, 2018, IMD again applied for Section 510(k) premarket notification. Again, the FDA's 510(k) clearance, dated January 23, 2019, identified the exact same "Indications for Use," *i.e.,* limited to "***use in the cosmetic correction of soft tissue deformities***."

44. Despite these clear limitations to the uses for which the device is FDA-cleared, Defendants regularly misrepresent Penuma as safe and effective and FDA-cleared for cosmetic enlargement of normal penises.

45. Penile soft tissue deformities, including Peyronie's disease, congenital micropenis, and congenital ventral curvature, are serious medical conditions that can cause significant pain and prevent men from having sexual intercourse, in addition to shortening the penis. These deformities are rare, with Peyronie's affecting

approximately 10% of men over 40, and congenital ventral curvature and congenital micropenis affecting less than 1% and 0.6% of the population, respectively. The market for a device limited to "use in the cosmetic correction of soft tissue deformities" is therefore relatively small.

46. A much larger market, however, exists for the cosmetic enhancement of penis size in men with normal penises. Many healthy men with normal penises desire larger penises for cosmetic reasons or to improve their sense of sexual self-confidence. This market, for which Penuma is *neither safe and effective nor FDA-cleared*, is potentially worth millions.

47. Seeking to capitalize on this larger, more lucrative market, Defendants regularly falsely and misleadingly represent that Penuma is safe, effective, and FDA-cleared for "cosmetic enhancement" and advertise it as a penis enlargement device. In fact, Penuma is not safe and effective for use as a penis enlargement device and has not been FDA-cleared for such use. Defendants regularly fail to disclose and actively conceal these facts from consumers.

48. Defendants market Penuma on Dr. Elist's personal website, https://www.drelist.com/, as well as at http://www.penuma.com. Defendants advertise Penuma at www.penuma.com as a "Penis Enhancement Implant for Men." The same website claims that Penuma is "the first FDA-cleared penile implant for cosmetic enhancement." The website also claims that Penuma will cause "[s]ignificant, permanent cosmetic enhancements to the penis." The website is intended to and does cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the website discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities. Defendants have made these material misrepresentations and omissions consistently since at least 2017, and they continue to do so as of the date of the filing of this Complaint.

49. Defendants similarly market Penuma on Dr. Elist's website as "the first FDA-cleared penile implant for cosmetic enhancement." The website's tab identifies Dr. Elist as performing "Penile Enlargement Surgery" and urges men to "Enhance and enlarge the length, girth, and size of your penis."

**PENILE ENLARGEMENT**

Surgery
—

Enhance and enlarge the length, girth, and size of your penis. Looks, feels, and functions just like nature intended – just significantly larger.

Figure 1: www.drelist.com

50. Gesiva's website similarly misrepresents that Penuma is "FDA-cleared for cosmetic enhancement." *See* Gesiva Medical, Penis Enlargement Surgery: Cost and Risk, *available at https://www.gesiva.com/2019/12/penis-enlargement-surgery-cost-and-risk/*.

51. Defendants have been making these same misrepresentations for over half a decade, at least:

1    **2017**:

Figure 2: https://twitter.com/gesivamedical

**2018**

Figure 3: https://web.archive.org/web/20180626111235/http://www.penuma.com/



Figure 4:
https://web.archive.org/web/20201001025806/https://www.drelist.com/penile-procedures/penuma-implant/

**2019**:



Figure 5: https://web.archive.org/web/20190714095548/https://www.drelist.com/

Figure 6: https://web.archive.org/web/20190609121832/https://www.penuma.com/

− 17 −

**2020**:

Figure 7: https://web.archive.org/web/20200701020552/https://www.drelist.com/

Figure 8: https://web.archive.org/web/20190609121832/https://www.penuma.com/

**2021**:

Figure 9: https://www.drelist.com/

Figure 10: https://penuma.com/



Figure 11: https://www.instagram.com/realpenuma/?hl=en

52. The websites are intended to and do cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the websites discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities, that it is not effective to enhance the appearance of normal penises, or that it frequently causes complications that require the implant to be removed, causing permanent damage to the penis.

53. In fact, Defendants have no data to support any claim that Penuma will cause an increase in penile length. To the contrary, implantation of the Penuma device frequently causes scarring, resulting in the penis becoming shorter. When the Penuma is placed, a sheath of scar tissue—termed a "pseudocapsule"—forms around the entire foreign body. This is the body's reaction to healing. Because scar tissue does not stretch, when the penis fills with blood during an erection, the ventral surface of the penis stretches and becomes longer, but the dorsal surface is restricted by the pseudocapsule. This results in a dorsal curvature and apparent shortening of the erection. Neither IMD nor Dr. Elist acknowledges these complications. Instead, their website simply shuffles consumers to their self-published study—a study which Dr. Elist himself admits had skewed results because over a hundred patients (approximately 24% of the potential pool) refused to participate.

54. Dr. Elist and IMD similarly tout that the post-Penuma penis is "natural looking," indicating that it is effective for cosmetic enhancement in men with normal, healthy penises; however, many patients experience a penguin or batwing

1    shape post-surgery, causing the body of the penis to be wider than the head of the
2    penis:



10        55. Defendants also claim that the Penuma procedure is "reversible." The
11   prevailing medical literature disagrees, concluding that in "all patients in our series,
12   corrective surgery resulted in both cosmetic and functional improvement. However,
13   **none** resulted in a completely normal penis, as was the appearance prior to initial
14   enhancement surgery":[5]



Figure 4. Severe penile deformity and ulceration and loss of penile length after penis enlargement surgery with a subcutaneous silicone penile implant (A). Following removal and debridement (B), inadequate dorsal skin coverage required skin grafting (C and D). Figure 4 is available in color online at www.jsm.jsexmed.org.

---

[5] Furr, *Complications of Genital Enlargement Surgery*, 15 SEX. MED. REV. 1811–17, 1816 (2018) (emphasis added).

56. Defendants also claim that the Penuma implant causes no interference with normal penis function. Yet many patients experience sexual dysfunction, including loss of sensation, as a consequence of the receiving the Penuma implant.

57. Defendants knew when they made these representations that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises and that the procedure frequently caused side effects requiring removal of the device. Defendants also knew that the Penuma procedure could not be reversed without permanent damage to the penis, but they nevertheless failed to disclose and actively concealed this information from Plaintiff and the Class members.

58. Dr. Elist and other doctors performing Penuma implant surgery regularly refer patients to the Penuma website and to Dr. Elist's website for information regarding the Penuma device. In making the representations and omissions described above, Defendants intend for consumers to rely on their representations that Penuma is a safe and effective, FDA-cleared device for cosmetic penile enlargement that is permanent and reversible, and thousands of reasonable consumers did in fact so rely.

59. Plaintiff and the Class members purchased the Penuma device and implantation procedure in reasonable reliance on Defendants' misrepresentations that Penuma was safe and effective and FDA-cleared for cosmetic enhancement and that it was permanent and could be reversed without negative consequences. Plaintiff and Class members also relied on Defendants' misrepresentations that the Penuma implant would result in a natural looking penis and that the implant would cause no interference with normal penis function. If Plaintiff and the Class members had known that Penuma was not safe and effective or FDA-cleared for the cosmetic enhancement of normal penises, that Defendants in fact had no data to support any claims of increase in penis length as a result of the procedure, that the implant often interfered with normal penis function, and that the procedure frequently led to complications requiring removal of the device, resulting in permanent damage to the

penis, they would not have purchased the device and would not have had the implantation procedure performed.

**C. Plaintiff and the Class members paid thousands of dollars for a product and service that had no value.**

60. The total cost for purchase of the Penuma device and the implantation surgery ranges from $14,500–$20,000. Of this payment, approximately $6,000 is paid to IMD for purchase of the Penuma device. Because the procedure is cosmetic, it is not covered by medical insurance. All Defendants profit, either directly or indirectly, from the sales of the Penuma device to patients.

61. Dr. Elist has performed thousands of Penuma implantation procedures at his clinic in Beverly Hills. He has also, with Gesiva's help, marketed and licensed his Penuma implantation procedures to 12 doctors nationwide, who all perform the surgery in substantially the same manner, using the product and procedure developed by Dr. Elist in his Beverly Hills clinic, resulting in substantial profits to Defendants.

62. The actual value of the procedure, however, is non-existent. Instead of the cosmetic enlargement of the penis consumers were misled to expect, Penuma does not increase the length of patients' flaccid penises, but causes disfigurement and scarring that often leads to a shortening of the erect penis in the majority of cases. The scarring also often interferes with normal penis function by reducing sensation in the penis, leading to sexual dysfunction.

63. Not only does the procedure not produce the cosmetic enhancement consumers are misled to expect, but it also frequently causes painful infections that lead to yet more scarring. A substantial number of men have had to have the Penuma device removed because of such infection and scarring, leading to a loss of sensation in and/or permanent shortening of the penis.

64. When infection, disfigurement, or other complications require the Penuma to be removed, patients suffer a significant shortening of their non-erect

penises. Because the pseudocapsule of scar tissue, which is attached to the penile shaft, contracts over time after removal of the Penuma device, patients' flaccid penises appear shorter—often one to two inches shorter. The same shortening appears in the erect penises of patients who have had the Penuma removed.

65. These complications have been well-reported in medical literature. A 2021 article specially identified "penile shortening and erectile dysfunction (ED)" as "reported complications in literature" following Penuma removal.[6] A 2018 article also from the Journal of Sexual Medicine similarly identified "penile shortening due to fibrosis."[7]

66. Given these risks, reputable urologists recognize that penile implant procedures, including the Penuma procedure, are not safe and effective for cosmetic enhancement in men with normal penises. For example, the Mayo Clinic notes that penis-enlargement surgery is "experimental" and should be reserved for "men whose penises don't function normally because of a birth defect or injury":

> The need for penis-enlargement surgery is rare. Surgery is typically reserved for men whose penises don't function normally because of a birth defect or injury. Although some surgeons offer cosmetic penis enlargement using various techniques, it's controversial and considered by many to be unnecessary and in some cases permanently harmful. These surgeries should be considered experimental.

Mayo Clinic, *Penis-enlargement products: Do they work?*, *available at* https://www.mayoclinic.org/healthy-lifestyle/sexual-health/in-depth/penis-art-

---

[6] Kapadia et al., *Evaluation and Treatment of Complications of Penuma Penile Implant*, 18 JOURNAL OF SEXUAL MEDICINE 80 (2021).

[7] Furr et al., *Complications of Genital Enlargement Surgery*, 15 J. SEX. MED. 1811 (2018).

20045363 (last visited Sept. 23, 2021); *see also Marra*, *Systematic Review of Surgical and Nonsurgical Interventions in Normal Men Complaining of Penis Size*, 8 SEX. MED. REV. 158, 177 (2020) ("We believe that surgery should be a last resort, undertaken as an experimental treatment only in a clinical trial setting after expert psychosexual assessment.")

67. As a result of their reliance on Defendants' representations and omissions, consumers have suffered an ascertainable loss of money, namely, the cost of purchasing the Penuma device and procedure. Further, as a result of their deceptive marketing and unfair competition, Defendants realized sizable profits.

68. As the intended, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants have been unjustly enriched through sales of Penuma devices and procedures at the expense of Plaintiff and the Class members.

69. If the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff would purchase a Penuma device and procedure in the future.

70. Plaintiff and the Class members suffered injuries in fact caused by the false, fraudulent, unfair, deceptive, and misleading practice alleged herein and accordingly seek restitution and injunctive relief.

**D. Class Definition**

Plaintiff brings this lawsuit as a class action on behalf of himself and on behalf of the following Class:

All individuals in the United States, including its territories and the District of Columbia, who purchased a Penuma device and implantation procedure and whose procedures were performed by Dr. James Elist at the Beverly Hills South Pacific Surgery Center from four years prior to the filing of this complaint through the date of certification.

Excluded from the Class are (1) any employees, officers, directors, or immediate family members of Defendants; (2) any attorneys appearing in this case; (3) any judges assigned to hear this case, as well as their immediate family and staff; (4) any judges who may hear an appeal in this case, as well as their immediate family and staff; (5) any individuals whose Penuma implantation procedures were covered by medical insurance; (6) any individuals who have been diagnosed with a soft tissue deformity of the penis; and (7) any individuals who have filed an individual action for personal injuries caused by the Penuma device and/or procedure.

71. **Ascertainability**. FED. R. CIV. P. 23(a). The Class is ascertainable in that they comprise individuals who can be identified by reference to purely objective criteria, including information in Defendants' business records. Notice may be mailed to members of the Class using the information in Defendants' files, as updated through the National Change of Address Registry and other commercially available means.

72. **Numerosity**. FED. R. CIV. P. 23(a)(1). The Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is not currently known, the scope of Penuma's sales and Dr. Elist's practice shows that the Class likely consists of at least hundreds of persons and, therefore, it would be impracticable to bring all these persons before the Court as individual plaintiffs.

73. **Typicality**. FED. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of each member of the Class he seeks to represent. These claims all arise from the same operative facts and are based on the same legal theories.

74. **Adequacy of Representation**. FED. R. CIV. P. 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to vigorously litigating this matter, and his interests are aligned with those of the Class. Plaintiff has retained counsel experienced in handling consumer class action litigation.

75. **Commonality and Predominance**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common issues of law and fact exist regarding Plaintiff's and the Class members' claims and predominate over any individual issues. These common issues include:

(a) whether Defendants misrepresented that Penuma was FDA-cleared for cosmetic enhancement of normal penises;

(b) whether the Penuma device and procedure are safe and effective for cosmetic penis enlargement;

(c) whether Defendants falsely and misleadingly marketed Penuma as a cosmetic penis enlargement device;

(d) whether Defendants misrepresented that Penuma was permanent;

(e) whether Defendants misrepresented that the Penuma procedure was reversible;

(f) whether Defendants misrepresented that the Penuma device results in a normal looking penis;

(g) whether Defendants misrepresented that the Penuma device causes no interference with penile function;

(h) whether Defendants' marketing of the Penuma device and procedure is an unfair business practice;

(i) whether Defendants violated California's False Advertising Law;

(j) whether Defendants violated California's Consumer Legal Remedies Act;

(k) whether Defendants violated California's Unfair Competition Law;

(l) whether injunctive relief is appropriate; and

(m) the appropriate measure of restitution.

76. **Superiority**. **FED. R. CIV. P. 23(b)(3)**. A class action is a superior method for the fair and efficient adjudication of this controversy. The interests of Class members in individually controlling the prosecution of separate claims against Defendant is small, as the maximum damages recoverable by any one Class member is limited. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual cases.

77. **Injunctive Relief Appropriate to the Class**. **FED. R. CIV. P. 23(b)(2)**. This action should also be maintained as a class action because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VII. CLAIMS

### COUNT ONE – Violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 ("FAL")

78. Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

79. Plaintiff brings this claim individually and on behalf of the Class members against all Defendants.

80. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." CAL. BUS. & PROF. CODE § 17500.

81. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

82. As alleged herein, Defendants' advertisements relating to the Penuma device and implantation procedure misled reasonable consumers as to the uses for which Penuma had been cleared for use by the FDA, as to its safety and effectiveness for use as a penis enlargement device, and as to whether the procedure was permanent, natural looking, and reversible.

83. The FAL applies to Defendants' advertisements because the marketing decisions that that led to the false and misleading advertising were made in California.

84. Defendants' business practices alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants knew or reasonably should have known that their advertisements were untrue and misleading, and Defendants omitted material information from their advertising.

85. Defendants profited from their sale of the falsely and deceptively advertised device and procedure.

86. As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

87. Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and the Class, seeks an order enjoining Defendants from continuing to engage in deceptive business practices and false advertising.

### COUNT TWO – Violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA")

88. Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

89. Plaintiff brings this claim individually and on behalf of the Class members against all Defendants.

90. The California Consumer Legal Remedies Act ("CLRA") prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

91. The CLRA applies to Defendants' conduct because the marketing decisions that that led to the false and misleading advertising were made in California and the surgical procedures at issue were performed in California.

92. Defendants are "person(s)" as defined by Cal. Civ. Code § 1761(c).

93. Plaintiff and the Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d) because they purchased the Penuma device and procedure for personal purposes.

94. Defendants' false and misleading advertising was designed to and did induce the purchase of the Penuma device and implantation procedure for personal, family, or household purposes by Plaintiff and the Class members, in violation of the following sections of the CLRA:

(a) § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

(b) § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another; and

(c) § 1770(a)(9): advertising goods with intent not to sell them as advertised.

95. Defendants knew the Penuma device and procedure did not posses the characteristics and benefits as represented and were not of the particular standard, quality, or grade as represented.

96. Defendants had a duty to Plaintiff and the Class members to disclose the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared because:

(a) Defendants were in a superior position to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared;

(b) Plaintiff and the Class members could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared; and

(c) Defendants knew that Plaintiff and the Class members could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared.

97. In failing to disclose and misrepresenting the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

98. The facts Defendants concealed from and/or misrepresented to Plaintiff and the Class members are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase the Penuma device and procedure. If Plaintiff and the Class members had known that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises, or that it was not permanent and frequently led to complications requiring removal, causing permanent damage to the penis, they would not have purchased the device and procedure.

99. Plaintiff and the Class members are reasonable consumers who expect device manufacturers and medical service providers like Defendants to provide accurate and truthful representations regarding the safety and efficacy of their products. Further, reasonable consumers, like Plaintiff and the Class members, rely on the representations made by device manufacturers and medical service providers regarding the safety and efficacy of their medical devices in determining whether to purchase and consider that information important to their purchase decision.

100. Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

101. Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

102. Pursuant to the provisions of CAL. CIV. CODE § 1782(a), Plaintiff will provide a letter to Defendants concurrently with the filing of this Original Class Action Complaint with notice of their alleged violations of the CLRA, demanding that Defendants correct such violations, and providing them with the opportunity to correct their business practices. If Defendants do not thereafter correct their business practices, Plaintiff will amend the complaint to add claims for monetary relief, including restitution for Defendants' CLRA violations.

103. Pursuant to CAL. CIV. CODE § 1780, Plaintiff seeks injunctive relief, his reasonable attorney fees and costs, and any other relief that the Court deems proper.

1    **COUNT THREE – Violation of California's Unfair**
     **Competition Law, CAL. BUS. & PROF. CODE**
2    **§ 17200 *et seq.* ("UCL")**

3        104.    Plaintiff incorporates by reference all of the foregoing allegations as if

4    they were fully set forth here.

5        105.    Plaintiff brings this claim individually and on behalf of the Class

6    against all Defendants.

7        106.    The UCL prohibits acts of unfair competition, including any

8    "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive,

9    untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

10       107.    The UCL applies to Defendants' advertisements because the marketing

11   decisions that that led to the false and misleading advertising were made in

12   California.

13       108.    Defendants' business acts and practices alleged herein are unlawful in

14   that they violate:

15       (a)    The False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500

16              *et seq.*

17       (b)    The Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1750 *et*

18              *seq.*;

19       (c)    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et*

20              *seq.*; and

21       (d)    The California Sherman Food, Drug, and Cosmetic Law, CAL.

22              HEALTH & SAFETY CODE §§ 110100 et seq.

23       109.    Defendants' conduct alleged herein was also unfair because this

24   conduct is immoral, unethical, unscrupulous, and substantially injurious to

25   consumers. The utility of Defendants' conduct is non-existent and does not outweigh

26   the gravity of the harm to Plaintiff and the Class members.

27

28

110.    Defendants' conduct is also unfair because it violates public policy as declared by specific statutory and regulatory provisions, including but not limited to the applicable sections of the False Advertising Law, the Consumer Legal Remedies Act, the federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

111.    Defendants' conduct alleged herein was also fraudulent because an objective, reasonable consumer is likely to be misled by Defendants' claims to believe that Penuma is safe and effective and FDA-cleared for cosmetic enhancement of normal penises, as well as that the procedure is permanent and reversible.

112.    Defendants profited from their sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

113.    Plaintiff and the Class members are likely to continue to be damaged by Defendants' deceptive trade practices, because if the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff and the Class members would purchase a Penuma device and procedure in the future. Thus, injunctive relief enjoining Defendants' false and misleading advertising is proper.

114.    Defendants' conduct has caused and continues to cause substantial injuries in fact to Plaintiff and Class members. As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiff and the Class members suffered ascertainable losses of money and property—namely the money they paid for the valueless Penuma device and implantation procedure.

115.    In accordance with CAL. BUS. & PROF. CODE § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

116.   Plaintiff, on behalf of the Class, also seeks an order for restitution of all monies from the sale of the Penuma device and implantation procedure, which were unjustly acquired through acts of unlawful competition.

## VIII.  CONCLUSION AND PRAYER

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment ordering relief as follows:

(a)  certifying the Class pursuant to FED. R. CIV. P. 23(b)(3) and/or (b)(2);

(b)  appointing Plaintiff to represent the Class;

(c)  appointing Plaintiff's counsel as Class Counsel;

(d)  enjoining Defendants from further deceptive advertising, marketing, and other false and misleading business practices with respect to their representations regarding the Penuma device and procedure;

(e)  enjoining Defendants to cease and desist stating that Penuma is "FDA-cleared for cosmetic enhancement" on their websites and in advertisements and other marketing materials without disclosing that it is cleared for use only for "use in the cosmetic correction of soft tissue deformities."

(f)  awarding Plaintiff and the Class members restitution in an amount to be proven at trial;

(g)  awarding Plaintiff and the Class members reasonable attorneys' fees, expenses, and costs of suit pursuant to CAL. CODE CIV. P. § 1021.5;

(h)  awarding pre-judgment and post-judgment interest, as provided by law;

(i) granting leave to amend the Complaint to conform to the evidence produced at trial; and

(j) awarding such other relief as this Court may deem just and proper.

## IX.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 19, 2022

Respectfully submitted,

By: */s/ Michael A. Caddell*

Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
Monterey CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*

# EXHIBIT D

1  Michael A. Caddell (SBN 249469)
   mac@caddellchapman.com
2  Cynthia B. Chapman (SBN 164471)
   cbc@caddellchapman.com
3  Amy E. Tabor (SBN 297660)
   aet@caddellchapman.com
4  CADDELL & CHAPMAN
   P.O. Box 1311
5  Monterey, CA 93942
   Tel.: (713) 751-0400
6  Fax: (713) 751-0906

7  *Attorneys for Plaintiff*

8  **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
9  **WESTERN DIVISION**

10  EDWARD PEÑA, individually
    and on behalf of others
11  similarly situated,

                                        CASE NO. 2:22-cv-03391
12          *Plaintiff,*

                                        **PLAINTIFF'S FIRST**
13          *v.*                        **AMENDED CLASS ACTION**
                                        **COMPLAINT**
14  INTERNATIONAL
    MEDICAL DEVICES, INC.,
15  MENOVA
    INTERNATIONAL, INC.,
16  GESIVA MEDICAL, LLC,
    JAMES J. ELIST M. D., a
17  Medical Corporation, and Dr.
    James ELIST,
18
            *Defendants.*
19

20

21

22

23

24

25

26

27

28
    CASE NO. 2:22-cv-03391

    PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Edward Peña files this Original Class Action Complaint against Defendants International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova"), Gesiva Medical, LLC ("Gesiva"), James J. Elist, M.D., a Medical Corporation, and Dr. James Elist and in support of his claims alleges as follows.

## I. INTRODUCTION

1.  Defendants have jointly developed and marketed the "Penuma" device, a silicone penile implant, as a penis enlargement device. Since at least January 2017, Defendants have engaged in a systematic, coordinated campaign to market Penuma for cosmetic penis enlargement. Their websites and advertisements target men who have healthy, normal bodies but simply want larger penises.

2.  Dr. James J. Elist has also developed a surgical procedure for implanting the device. He has performed thousands of these procedures, handling patient consults at his clinic in Beverly Hills and performing penile implant surgeries in his operating room at the Beverly Hills South Pacific Surgery Center. Defendants falsely and misleadingly tout the device and procedure as "FDA-cleared," giving reasonable consumers the false impression that the U.S. Food and Drug Administration ("FDA") has determined that Penuma is safe and effective for cosmetic penis enlargement procedures in men with healthy, normal bodies.

3.  Unbeknownst to the men who undergo these procedures, however, Penuma is not safe and effective—nor is it FDA-cleared—for cosmetic penile enlargement. Instead, Penuma is FDA-cleared only "***for use in the cosmetic correction of soft tissue deformities***." Worse, implantation of the Penuma device not only does not usually result in any lengthening of the penis, it frequently causes scarring, resulting in the penis becoming shorter. In addition, contrary to Defendants' misrepresentations that the procedure is "permanent" but "reversible," the procedure frequently leads to infections and complications that require removal of the device, which, in turn, causes permanent damage to the penis. Defendants

knew these facts at least by 2015, but nevertheless continued to market Penuma as "the first FDA-cleared penile implant for cosmetic enhancement" and to urge consumers with healthy, normal penises to purchase the Penuma device and procedure to "enhance and enlarge the length, girth, and size of your penis."

4. Defendants profited substantially from these misrepresentations, selling the Penuma device and procedure to thousands of men at a cost of $15,000–$20,000 each. Plaintiff accordingly brings this action to recover damages and restitution on behalf of similarly situated consumers and to enjoin Defendants from continuing to falsely advertise and market Penuma as a safe and effective FDA-cleared procedure for cosmetic enhancement of penis size in men with healthy penises.

## II. PARTIES

5. Plaintiff Edward Peña is a resident of Hidalgo County, Texas.

6. Defendant International Medical Devices, Inc. ("IMD") is a California corporation located at 717 N. Maple Drive, Beverly Hills, CA 90210, in Los Angeles County. It may be served through its registered agent, Jonathan Elist, at the same address.

7. Defendant Menova International, Inc., ("Menova") is a California corporation located at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211, in Los Angeles County. It may be served through its registered agent, James Elist, at the same address.

8. Defendant Gesiva Medical, LLC is a Minnesota limited liability corporation headquartered at 6385 Old Shady Oak Road, Suite 250, Eden Prairie, MN 55344. It may be served through its registered agent, Thomas A. Hopper, at the same address.

9. Defendant James J. Elist, M.D., a Medical Corporation, is a California corporation headquartered at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA

90211. It may be served through its registered agent, James J. Elist, at the same address.

10. Defendant Dr. James Elist is an individual residing in Beverly Hills, California. Dr. Elist may be served at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211.

### III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving over 100 class members in which at least one member of the class is a citizen of a State different from at least one Defendant and the matter in controversy exceeds $5,000,000, exclusive of interests and costs.

12. Defendants IMD, Menova, James J. Elist, M.D., a Medical Corporation, and Dr. Elist are subject to general personal jurisdiction in California because IMD, Menova, and James J. Elist, M.D., a Medical Corporation are incorporated in California and maintain their principal places of business in California, and Dr. Elist is a California resident.

13. The Court also has specific personal jurisdiction over all Defendants because Defendants purposefully availed themselves of the privilege of doing business in California, and this action arises out of and relates to Defendants' California business activities.

14. Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Los Angeles County.

15. In addition, venue is also proper in this district pursuant to 28 U.S.C. § 1391(a). Defendants are deemed to reside in this district because their contacts with this district would be sufficient to subject them to personal jurisdiction if this district were a separate state.

## IV.  JOINT ENTERPRISE LIABILITY

16. Defendants shared a common plan or design for illegally marketing the Penuma device and procedure for cosmetic enlargement of normal penises.

17. Each Defendant had knowledge of and agreed to market Penuma for the cosmetic enlargement of normal penises.

18. Defendants acted as a joint enterprise with regard to all of the actions alleged in this Complaint.

19. Whenever this Complaint makes reference to any act of Defendants, the allegations refer to each of the Defendants, acting individually, and also to all of the Defendants acting jointly.

20. All acts of each of the Defendants were ratified and adopted by each of their Co-Defendants.

## V.  STATEMENT OF FACTS

21. Before undergoing the Penuma implantation procedure, Plaintiff Edward Peña had a normal, healthy penis. He had no soft tissue deformity of the penis, nor any urological problems of any kind.

22. While browsing the Internet, Mr. Peña saw advertisements for the Penuma device and procedure, including Dr. Elist's website. Defendants made the marketing decisions that led to these advertisements in Los Angeles, California.

23. Having read Defendants' advertisements, Mr. Peña reasonably believed that the Penuma device was safe and effective for men like him who had normal penises, but simply wanted their penises to be larger. He further reasonably believed, based on the misrepresentations in Defendants' advertisements, that the Penuma device had been approved by the FDA, and this belief gave him a sense of comfort that the device was safe and effective. Had Mr. Peña known that Penuma had not in fact been approved or cleared by the FDA for cosmetic penile enlargement in men

with normal penises and/or that it was not safe and effective for men with normal, healthy penises, he would not have purchased the Penuma device or procedure.

24. Mr. Peña also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure was permanent and completely reversible and that there would be no adverse consequences from removal of the device. Had Mr. Peña known that the Penuma implantation procedure was not permanent and could not be reversed without causing permanent damage to the penis, he would not have purchased the Penuma device or procedure.

25. Mr. Peña also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure would result in a natural looking penis. Had Mr. Peña known that the Penuma procedure often results in abnormal and deformed-looking penises, he would not have purchased the Penuma device or procedure.

26. Mr. Peña contacted Dr. Elist and scheduled an appointment with him for October of 2020. Dr. Elist consulted with Mr. Peña for approximately 15 minutes. Mr. Peña also met with three or four other employees of Dr. Elist and filled out a questionnaire. At no point did Dr. Elist or his employees inform Mr. Peña that Penuma was not safe and effective or not FDA cleared for cosmetic enlargement of normal penises. One or two days later, Dr. Elist performed surgery to implant the Penuma device in Mr. Peña's body.

27. Mr. Peña paid $14,500 to Dr. James Elist for the device and surgery.

28. Following the surgery, Mr. Peña's penis did not look or feel natural. Instead, he had no feeling on the top of the shaft and pain on bottom of the shaft. Two corners of the implant began sticking out in a manner that was not aesthetically pleasing. Mr. Peña suffered pain during intercourse and especially severe pain after intercourse. The implant eventually punctured the skin and poked out through a small hole, through which fluid discharged. Mr. Peña could not sleep on his back or

his stomach. He woke up multiple times in the middle of the night with painful erections, making it extremely difficult for him to sleep for at least 3 months. Mr. Peña could not even bend down to tie his shoe without pain.

29. Mr. Peña then decided to have the Penuma device removed. He had the device removed by Dr. Bryan Kansas, a reconstructive urological surgeon in Austin. Following the removal, Mr. Peña has continued to suffer complications, including retraction, loss of sensation, and scarring. These complications have caused Mr. Peña significant pain and mental anguish.

30. Mr. Peña's experience led him to conclude that the Penuma device and procedure have no value and are not safe or effective for healthy men with normal penises, many of whom had been and would continue to be misled by Defendants' misrepresentations to pay thousands of dollars for a device and surgery that have no value. He further understood that many of these men were unlikely to be able to secure legal representation on their own to pursue their claims against Defendants. He therefore files this action on his own behalf and on behalf of similarly situated persons.

## VI.  CLASS ALLEGATIONS

### A. Defendants jointly developed and marketed the Penuma device and implantation procedure.

31. Promoting himself as the "Thomas Edison of penis surgeries," Dr. Elist received a patent on the device that was later to be named "Penuma" in 2002. He submitted an application for FDA clearance in 2004, analogizing the device to a silicone implant used for reconstructive surgery of the ear, nose, and throat. In this and all subsequent FDA clearance applications, Defendants specifically limited the intended use for the device to the "correction of soft-tissue deformities."

32. Beginning in 2004, Dr. Elist created National Medical Devices, Inc. ("NMD")—the predecessor of Defendant IMD—to manufacture the device and

serve as its exclusive distributor. Through NMD, Dr. Elist began marketing the device and offering surgical services to implant the device from his clinic in Beverly Hills.

33. In 2013, Dr. Elist renamed NMD "International Medical Devices, Inc." Dr. Elist is the President of IMD and owns 100% of IMD. His son, Jonathan Elist, is IMD's chief executive officer.

34. Dr. Elist subsequently created Menova to hold the intellectual property associated with his silicone penile implant device. On January 10, 2016, Menova applied for trademark registration for the "Penuma" mark with the United States Patent and Trademark Office ("USPTO"). On September 20, 2016, the USPTO issued a trademark for "Penuma." Since that time, Menova has owned the Penuma trademark and all intellectual property rights associated with the device. Dr. Elist is the president of Menova and owns 100% of Menova.

35. In May 2017, IMD entered into an agreement with Gesiva for the distribution of Penuma devices. Menova and Dr. Elist have authorized IMD and Gesiva to contract with approximately 12 urologists around the United States to perform hundreds of Penuma implantation procedures and use the Penuma trademark. Dr. Elist personally trains all urologists authorized to implant Penuma.

36. Penuma's advertising claims that the device will make patients' penises longer. That is false. There is no evidence that the Penuma device makes patients' non-erect penises longer. Worse, Penuma's design results in patients' erect penises becoming *shorter* in most cases and in many cases disfigured. Defendants have known about these complications for at least over half a decade. In a 2015 post titled "My Elist Implant Experience," a former patient detailed his effort at seeking a refund from Dr. Elist after his "erect length" shrank between 1–1.5" post-surgery. He received no refund. Similar patient complaints were posted on the internet during

the same timeframe. Instead of correcting his false and misleading claims, Dr. Elist responded to these complaints with cease-and-desist letters. Patient concerns regarding the Penuma were echoed by practitioners and academics as well. For example, a 2018 article published in the Journal of Sexual Medicine titled "Complications of Genital Enlargement Surgery" identified "major penile shortening and disabling curvature" as Penuma complications.

37. Instead of disclosing these material risks, Defendants directed consumers to a self-authored, and self-serving, Elist study from 2018 ("*A Single-Surgeon Retrospective and Preliminary Evaluation of the Safety and Effectiveness of the Penuma Silicone Sleeve Implant for Elective Cosmetic Correction of the Flaccid Penis*") throughout their marketing. This study, however, was not conducted according to scientific standards, and its unreliability has been noted in the medical literature. Drs. Kapadia, Olson, and Furr, among others, concluded that Dr. Elist's study failed to consider "long-term sequelae of such adverse events and implant removal, such as penile shortening, fibrosis, and sexual dysfunction."[1] Because "the infection and explantation rate may be higher than reported in this retrospective study due to incomplete cohort response to surveys,"[2] several urologists have cautioned that "rigorous investigation with accurate reporting of complications should be mandated before more men take on the physical, mental, and significant financial burden associated with subcutaneous silicone penile implants."[3] Defendants' marketing failed to disclose and actively concealed these facts from consumers.

---

[1] Hehemann, *Penile Girth Enlargement Strategies: What's the Evidence?*, 7 SEXUAL MEDICINE REVIEW 535–547, 542 (2019).

[2] Olson, *Management of infected Penuma implant: Case Report*, 6 J. CASE REPORTS AND IMAGES IN UROLOGY 1–3, 2 (2021).

[3] Hehemann at 543.

**B. Penuma has been FDA-cleared only for cosmetic correction of deformities.**

38. Because Penuma is a medical device, it is subject to the Medical Device Amendments of 1976 ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA"). The MDA established three "classes" of medical devices: Class I, II, and III. "The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective."[4] A post-1976 medical device is automatically placed into Class III and is subject to premarket approval ("PMA") requirements, including the FDA's independent "scientific review to ensure the safety and effectiveness" of the device. The PMA process is highly rigorous, requiring manufacturers to submit detailed information regarding the safety and effectiveness of their devices. The FDA spends an average of 1,200 hours reviewing each submission.

39. Devices that were on the market before the MDA was enacted, however, are grandfathered in and are not required to go through the PMA process. Manufacturers seeking a less stringent review can thus avoid the FDA's thorough, scientific PMA process by showing that their devices are "substantially equivalent" to devices that were already on the market in 1976. This less rigorous "clearance" to market a device based on substantial equivalency to a pre-1976 device is known as the FDCA Section 510(k) Premarket Notification process (the "510(k) clearance" process).

40. Section 510(k) clearance allows device manufacturers, like Defendants, to submit a relatively short "summary" to the FDA describing how their medical devices are "substantially equivalent" to a pre-1976 device (the "predicate device"). The significant evidence needed to obtain full FDA approval of a medical device is

---

[4] U.S. Food and Drug Administration, PMA Approvals, *available at* https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/pma-approvals (last visited August 9, 2021).

not required when a medical device manufacturer instead applies for FDA "clearance" via the 510(k) process.

41. If the FDA determines that a device is "substantially equivalent" for the indicated uses to a pre-1976 device, manufacturers may obtain a fast-tracked 510(k) clearance to market the device while avoiding rigorous PMA testing for safety and effectiveness. 510(k) clearance is limited, however, to authorization to market the device *for the indicated uses*. In submitting a 510(k) clearance application, the manufacturer must identify the device's intended use. This intended use must match the intended use of the pre-1976 device to which the manufacturer claims "substantial equivalency." *See* 21 C.F.R. § 807.81(a)(ii). If a major change or modification of the intended use is identified, the 510(k) clearance process is unavailable, and the device must go through the full PMA process instead. *Id.*

42. On or about September 1, 2004, National Medical Devices, Inc. (the predecessor to IMD) submitted its "Silicone Block" for Section 510(k) premarket notification of intent to market the device. National Medical Devices, Inc. submitted that the implant was substantially equivalent to an "ear, nose and throat synthetic polymer material," which is regulated as a Class II Device under 21 CFR § 874.3620, which provides:

> Ear, nose, and throat synthetic polymer material is a device material that is intended to be implanted for use as a space-occupying substance in the reconstructive surgery of the head and neck. The device is used, for example, in augmentation rhinoplasty and in tissue defect closures in the esophagus. The device is shaped and formed by the surgeon to conform to the patient's needs. This generic type of device is made of material such as polyamide mesh or foil and porous polyethylene.

On October 25, 2004, the FDA granted 510(k) clearance to the Silicone Block that "is intended *for use in the cosmetic correction of soft tissue deformities*, and is contoured at the surgeon's discretion to create a custom implant to aid in the reconstruction process." (Emphasis added.)

43. Due to certain design changes to Dr. Elist's penile implant device, on December 20, 2016, Defendants caused International Medical Devices, Inc. ("IMD")—the successor to National Medical Devices—to submit a second Section 510(k) premarket notification for a "Pre-Formed Penile Silicone Block." This application identified National Medical Device's Silicone Block, which had been cleared in 2004 based on its asserted similarity to an ear, nose, and throat reconstructive implant, as the predicate device to which IMD's Pre-Formed Penile Silicone Block was "substantially equivalent." The FDA granted 510(k) clearance on February 1, 2017, describing the "Indications for Use" as follows: "Pre-Formed Penile Silicone Block is intended for use in the cosmetic correction of soft tissue deformities, and is contoured at the surgeon's discretion to create a custom implant." Following certain additional design changes, on December 19, 2018, IMD again applied for Section 510(k) premarket notification. Again, the FDA's 510(k) clearance, dated January 23, 2019, identified the exact same "Indications for Use," *i.e.,* limited to "*use in the cosmetic correction of soft tissue deformities*."

44. Despite these clear limitations to the uses for which the device is FDA-cleared, Defendants regularly misrepresent Penuma as safe and effective and FDA-cleared for cosmetic enlargement of normal penises.

45. Penile soft tissue deformities, including Peyronie's disease, congenital micropenis, and congenital ventral curvature, are serious medical conditions that can cause significant pain and prevent men from having sexual intercourse, in addition to shortening the penis. These deformities are rare, with Peyronie's affecting

approximately 10% of men over 40, and congenital ventral curvature and congenital micropenis affecting less than 1% and 0.6% of the population, respectively. The market for a device limited to "use in the cosmetic correction of soft tissue deformities" is therefore relatively small.

46. A much larger market, however, exists for the cosmetic enhancement of penis size in men with normal penises. Many healthy men with normal penises desire larger penises for cosmetic reasons or to improve their sense of sexual self-confidence. This market, for which Penuma is *neither safe and effective nor FDA-cleared*, is potentially worth millions.

47. Seeking to capitalize on this larger, more lucrative market, Defendants regularly falsely and misleadingly represent that Penuma is safe, effective, and FDA-cleared for "cosmetic enhancement" and advertise it as a penis enlargement device. In fact, Penuma is not safe and effective for use as a penis enlargement device and has not been FDA-cleared for such use. Defendants regularly fail to disclose and actively conceal these facts from consumers.

48. Defendants market Penuma on Dr. Elist's personal website, https://www.drelist.com/, as well as at http://www.penuma.com. Defendants advertise Penuma at www.penuma.com as a "Penis Enhancement Implant for Men." The same website claims that Penuma is "the first FDA-cleared penile implant for cosmetic enhancement." The website also claims that Penuma will cause "[s]ignificant, permanent cosmetic enhancements to the penis." The website is intended to and does cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the website discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities. Defendants have made these material misrepresentations and omissions consistently since at least 2017, and they continue to do so as of the date of the filing of this Complaint.

49. Defendants similarly market Penuma on Dr. Elist's website as "the first FDA-cleared penile implant for cosmetic enhancement." The website's tab identifies Dr. Elist as performing "Penile Enlargement Surgery" and urges men to "Enhance and enlarge the length, girth, and size of your penis."

**PENILE ENLARGEMENT**

Surgery

Enhance and enlarge the length, girth, and size of your penis. Looks, feels, and functions just like nature intended – just significantly larger.

Figure 1: www.drelist.com

50. Gesiva's website similarly misrepresents that Penuma is "FDA-cleared for cosmetic enhancement." *See* Gesiva Medical, Penis Enlargement Surgery: Cost and Risk, *available at https://www.gesiva.com/2019/12/penis-enlargement-surgery-cost-and-risk/.*

51. Defendants have been making these same misrepresentations for over half a decade, at least:

**2017**:

Figure 2: https://twitter.com/gesivamedical

**2018**

Figure 3: https://web.archive.org/web/20180626111235/http://www.penuma.com/



Figure 4:
https://web.archive.org/web/20201001025806/https://www.drelist.com/penile-procedures/penuma-implant/

**2019**:



Figure 5: https://web.archive.org/web/20190714095548/https://www.drelist.com/

Figure 6: https://web.archive.org/web/20190609121832/https://www.penuma.com/

**2020**:



Figure 7: https://web.archive.org/web/20200701020552/https://www.drelist.com/

Figure 8: https://web.archive.org/web/20190609121832/https://www.penuma.com/

**<u>2021</u>**:

Figure 9: https://www.drelist.com/

Figure 10: https://penuma.com/

– 20 –

PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT



Figure 11: https://www.instagram.com/realpenuma/?hl=en

52. The websites are intended to and do cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the websites discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities, that it is not effective to enhance the appearance of normal penises, or that it frequently causes complications that require the implant to be removed, causing permanent damage to the penis.

53. In fact, Defendants have no data to support any claim that Penuma will cause an increase in penile length. To the contrary, implantation of the Penuma device frequently causes scarring, resulting in the penis becoming shorter. When the Penuma is placed, a sheath of scar tissue—termed a "pseudocapsule"—forms around the entire foreign body. This is the body's reaction to healing. Because scar tissue does not stretch, when the penis fills with blood during an erection, the ventral surface of the penis stretches and becomes longer, but the dorsal surface is restricted by the pseudocapsule. This results in a dorsal curvature and apparent shortening of the erection. Neither IMD nor Dr. Elist acknowledges these complications. Instead, their website simply shuffles consumers to their self-published study—a study which Dr. Elist himself admits had skewed results because over a hundred patients (approximately 24% of the potential pool) refused to participate.

54. Dr. Elist and IMD similarly tout that the post-Penuma penis is "natural looking," indicating that it is effective for cosmetic enhancement in men with normal, healthy penises; however, many patients experience a penguin or batwing

shape post-surgery, causing the body of the penis to be wider than the head of the penis:



55. Defendants also claim that the Penuma procedure is "reversible." The prevailing medical literature disagrees, concluding that in "all patients in our series, corrective surgery resulted in both cosmetic and functional improvement. However, **none** resulted in a completely normal penis, as was the appearance prior to initial enhancement surgery":[5]



**Figure 4.** Severe penile deformity and ulceration and loss of penile length after penis enlargement surgery with a subcutaneous silicone penile implant (A). Following removal and debridement (B), inadequate dorsal skin coverage required skin grafting (C and D). Figure 4 is available in color online at www.jsm.jsexmed.org.

---

[5] Furr, *Complications of Genital Enlargement Surgery*, 15 SEX. MED. REV. 1811–17, 1816 (2018) (emphasis added).

56. Defendants also claim that the Penuma implant causes no interference with normal penis function. Yet many patients experience sexual dysfunction, including loss of sensation, as a consequence of the receiving the Penuma implant.

57. Defendants knew when they made these representations that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises and that the procedure frequently caused side effects requiring removal of the device. Defendants also knew that the Penuma procedure could not be reversed without permanent damage to the penis, but they nevertheless failed to disclose and actively concealed this information from Plaintiff and the Class members.

58. Dr. Elist and other doctors performing Penuma implant surgery regularly refer patients to the Penuma website and to Dr. Elist's website for information regarding the Penuma device. In making the representations and omissions described above, Defendants intend for consumers to rely on their representations that Penuma is a safe and effective, FDA-cleared device for cosmetic penile enlargement that is permanent and reversible, and thousands of reasonable consumers did in fact so rely.

59. Plaintiff and the Class members purchased the Penuma device and implantation procedure in reasonable reliance on Defendants' misrepresentations that Penuma was safe and effective and FDA-cleared for cosmetic enhancement and that it was permanent and could be reversed without negative consequences. Plaintiff and Class members also relied on Defendants' misrepresentations that the Penuma implant would result in a natural looking penis and that the implant would cause no interference with normal penis function. If Plaintiff and the Class members had known that Penuma was not safe and effective or FDA-cleared for the cosmetic enhancement of normal penises, that Defendants in fact had no data to support any claims of increase in penis length as a result of the procedure, that the implant often interfered with normal penis function, and that the procedure frequently led to complications requiring removal of the device, resulting in permanent damage to the

penis, they would not have purchased the device and would not have had the implantation procedure performed.

**C. Plaintiff and the Class members paid thousands of dollars for a product and service that had no value.**

60. The total cost for purchase of the Penuma device and the implantation surgery ranges from $14,500–$20,000. Of this payment, approximately $6,000 is paid to IMD for purchase of the Penuma device. Because the procedure is cosmetic, it is not covered by medical insurance. All Defendants profit, either directly or indirectly, from the sales of the Penuma device to patients.

61. Dr. Elist has performed thousands of Penuma implantation procedures at his clinic in Beverly Hills. He has also, with Gesiva's help, marketed and licensed his Penuma implantation procedures to 12 doctors nationwide, who all perform the surgery in substantially the same manner, using the product and procedure developed by Dr. Elist in his Beverly Hills clinic, resulting in substantial profits to Defendants.

62. The actual value of the procedure, however, is non-existent. Instead of the cosmetic enlargement of the penis consumers were misled to expect, Penuma does not increase the length of patients' flaccid penises, but causes disfigurement and scarring that often leads to a shortening of the erect penis in the majority of cases. The scarring also often interferes with normal penis function by reducing sensation in the penis, leading to sexual dysfunction.

63. Not only does the procedure not produce the cosmetic enhancement consumers are misled to expect, but it also frequently causes painful infections that lead to yet more scarring. A substantial number of men have had to have the Penuma device removed because of such infection and scarring, leading to a loss of sensation in and/or permanent shortening of the penis.

64. When infection, disfigurement, or other complications require the Penuma to be removed, patients suffer a significant shortening of their non-erect

penises. Because the pseudocapsule of scar tissue, which is attached to the penile shaft, contracts over time after removal of the Penuma device, patients' flaccid penises appear shorter—often one to two inches shorter. The same shortening appears in the erect penises of patients who have had the Penuma removed.

65. These complications have been well-reported in medical literature. A 2021 article specially identified "penile shortening and erectile dysfunction (ED)" as "reported complications in literature" following Penuma removal.[6] A 2018 article also from the Journal of Sexual Medicine similarly identified "penile shortening due to fibrosis."[7]

66. Given these risks, reputable urologists recognize that penile implant procedures, including the Penuma procedure, are not safe and effective for cosmetic enhancement in men with normal penises. For example, the Mayo Clinic notes that penis-enlargement surgery is "experimental" and should be reserved for "men whose penises don't function normally because of a birth defect or injury":

> The need for penis-enlargement surgery is rare. Surgery is typically reserved for men whose penises don't function normally because of a birth defect or injury. Although some surgeons offer cosmetic penis enlargement using various techniques, it's controversial and considered by many to be unnecessary and in some cases permanently harmful. These surgeries should be considered experimental.

Mayo Clinic, *Penis-enlargement products: Do they work?*, *available at* https://www.mayoclinic.org/healthy-lifestyle/sexual-health/in-depth/penis-art-

---

[6] Kapadia et al., *Evaluation and Treatment of Complications of Penuma Penile Implant*, 18 JOURNAL OF SEXUAL MEDICINE 80 (2021).

[7] Furr et al., *Complications of Genital Enlargement Surgery*, 15 J. SEX. MED. 1811 (2018).

20045363 (last visited Sept. 23, 2021); *see also Marra*, *Systematic Review of Surgical and Nonsurgical Interventions in Normal Men Complaining of Penis Size*, 8 SEX. MED. REV. 158, 177 (2020) ("We believe that surgery should be a last resort, undertaken as an experimental treatment only in a clinical trial setting after expert psychosexual assessment.")

67. As a result of their reliance on Defendants' representations and omissions, consumers have suffered an ascertainable loss of money, namely, the cost of purchasing the Penuma device and procedure. Further, as a result of their deceptive marketing and unfair competition, Defendants realized sizable profits.

68. As the intended, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants have been unjustly enriched through sales of Penuma devices and procedures at the expense of Plaintiff and the Class members.

69. If the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff would purchase a Penuma device and procedure in the future.

70. Plaintiff and the Class members suffered injuries in fact caused by the false, fraudulent, unfair, deceptive, and misleading practice alleged herein and accordingly seek restitution and injunctive relief.

**D. Class Definition**

Plaintiff brings this lawsuit as a class action on behalf of himself and on behalf of the following Class:

All individuals in the United States, including its
territories and the District of Columbia, who purchased a
Penuma device and implantation procedure and whose
procedures were performed by Dr. James Elist at the
Beverly Hills South Pacific Surgery Center from four
years prior to the filing of this complaint through the date
of certification.

Excluded from the Class are (1) any employees, officers, directors, or immediate
family members of Defendants; (2) any attorneys appearing in this case; (3) any
judges assigned to hear this case, as well as their immediate family and staff; (4) any
judges who may hear an appeal in this case, as well as their immediate family and
staff; (5) any individuals whose Penuma implantation procedures were covered by
medical insurance; (6) any individuals who have been diagnosed with a soft tissue
deformity of the penis; and (7) any individuals who have filed an individual action
for personal injuries caused by the Penuma device and/or procedure.

71. **Ascertainability**. FED. R. CIV. P. 23(a). The Class is ascertainable in that
they comprise individuals who can be identified by reference to purely objective
criteria, including information in Defendants' business records. Notice may be
mailed to members of the Class using the information in Defendants' files, as
updated through the National Change of Address Registry and other commercially
available means.

72. **Numerosity**. FED. R. CIV. P. 23(a)(1). The Class is so numerous that
joinder of all members is impracticable. Although the precise number of Class
members is not currently known, the scope of Penuma's sales and Dr. Elist's practice
shows that the Class likely consists of at least hundreds of persons and, therefore, it
would be impracticable to bring all these persons before the Court as individual
plaintiffs.

73. **Typicality**. FED. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of each member of the Class he seeks to represent. These claims all arise from the same operative facts and are based on the same legal theories.

74. **Adequacy of Representation**. FED. R. CIV. P. 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to vigorously litigating this matter, and his interests are aligned with those of the Class. Plaintiff has retained counsel experienced in handling consumer class action litigation.

75. **Commonality and Predominance**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common issues of law and fact exist regarding Plaintiff's and the Class members' claims and predominate over any individual issues. These common issues include:

(a)    whether Defendants misrepresented that Penuma was FDA-cleared for cosmetic enhancement of normal penises;

(b)    whether the Penuma device and procedure are safe and effective for cosmetic penis enlargement;

(c)    whether Defendants falsely and misleadingly marketed Penuma as a cosmetic penis enlargement device;

(d)    whether Defendants misrepresented that Penuma was permanent;

(e)    whether Defendants misrepresented that the Penuma procedure was reversible;

(f)    whether Defendants misrepresented that the Penuma device results in a normal looking penis;

(g)    whether Defendants misrepresented that the Penuma device causes no interference with penile function;

(h)    whether Defendants' marketing of the Penuma device and procedure is an unfair business practice;

PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

(i)     whether Defendants violated California's False Advertising Law;

(j)     whether Defendants violated California's Consumer Legal Remedies Act;

(k)     whether Defendants violated California's Unfair Competition Law;

(l)     whether injunctive relief is appropriate; and

(m)     the appropriate measure of restitution.

76. **Superiority**. **FED. R. CIV. P. 23(b)(3)**. A class action is a superior method for the fair and efficient adjudication of this controversy. The interests of Class members in individually controlling the prosecution of separate claims against Defendant is small, as the maximum damages recoverable by any one Class member is limited. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual cases.

77. **Injunctive Relief Appropriate to the Class**. **FED. R. CIV. P. 23(b)(2)**. This action should also be maintained as a class action because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VII.  CLAIMS

### COUNT ONE – Violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 ("FAL")

78. Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

79. Plaintiff brings this claim individually and on behalf of the Class members against all Defendants.

80. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." CAL. BUS. & PROF. CODE § 17500.

81. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

82. As alleged herein, Defendants' advertisements relating to the Penuma device and implantation procedure misled reasonable consumers as to the uses for which Penuma had been cleared for use by the FDA, as to its safety and effectiveness for use as a penis enlargement device, and as to whether the procedure was permanent, natural looking, and reversible.

83. The FAL applies to Defendants' advertisements because the marketing decisions that that led to the false and misleading advertising were made in California.

84. Defendants' business practices alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants knew or reasonably should have known that their advertisements were untrue and misleading, and Defendants omitted material information from their advertising.

85. Defendants profited from their sale of the falsely and deceptively advertised device and procedure.

86. As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

87. Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and the Class, seeks an order enjoining Defendants from continuing to engage in deceptive business practices and false advertising.

### COUNT TWO – Violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA")

88. Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

89. Plaintiff brings this claim individually and on behalf of the Class members against all Defendants.

90. The California Consumer Legal Remedies Act ("CLRA") prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

91. The CLRA applies to Defendants' conduct because the marketing decisions that that led to the false and misleading advertising were made in California and the surgical procedures at issue were performed in California.

92. Defendants are "person(s)" as defined by Cal. Civ. Code § 1761(c).

93. Plaintiff and the Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d) because they purchased the Penuma device and procedure for personal purposes.

94. Defendants' false and misleading advertising was designed to and did induce the purchase of the Penuma device and implantation procedure for personal, family, or household purposes by Plaintiff and the Class members, in violation of the following sections of the CLRA:

> (a) § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

(b) § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another; and

(c) § 1770(a)(9): advertising goods with intent not to sell them as advertised.

95. Defendants knew the Penuma device and procedure did not posses the characteristics and benefits as represented and were not of the particular standard, quality, or grade as represented.

96. Defendants had a duty to Plaintiff and the Class members to disclose the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared because:

(a) Defendants were in a superior position to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared;

(b) Plaintiff and the Class members could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared; and

(c) Defendants knew that Plaintiff and the Class members could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared.

97. In failing to disclose and misrepresenting the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

98. The facts Defendants concealed from and/or misrepresented to Plaintiff and the Class members are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase the Penuma device and procedure. If Plaintiff and the Class members had known that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises, or that it was not permanent and frequently led to complications requiring removal, causing permanent damage to the penis, they would not have purchased the device and procedure.

99. Plaintiff and the Class members are reasonable consumers who expect device manufacturers and medical service providers like Defendants to provide accurate and truthful representations regarding the safety and efficacy of their products. Further, reasonable consumers, like Plaintiff and the Class members, rely on the representations made by device manufacturers and medical service providers regarding the safety and efficacy of their medical devices in determining whether to purchase and consider that information important to their purchase decision.

100. Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

101. Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

102. Plaintiff and Class members have been harmed and have suffered actual damages in that they paid substantial amounts of money for the valueless Penuma device and implantation procedure.

103. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and the Class members have suffered and will continue to suffer actual damages.

104. Pursuant to CAL. CIV. CODE § 1780, Plaintiff seeks injunctive relief, his reasonable attorney fees and costs, and any other relief that the Court deems proper.

105.    Plaintiff has provided Defendants with notice of their alleged violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a). Defendants failed to provide appropriate relief for their violations of the CLRA. Plaintiff therefore is now amending his Complaint to seek monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

**COUNT THREE – Violation of California's Unfair
Competition Law, CAL. BUS. & PROF. CODE
§ 17200 *et seq.* ("UCL")**

106.    Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

107.    Plaintiff brings this claim individually and on behalf of the Class against all Defendants.

108.    The UCL prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

109.    The UCL applies to Defendants' advertisements because the marketing decisions that that led to the false and misleading advertising were made in California.

110.    Defendants' business acts and practices alleged herein are unlawful in that they violate:

(a)    The False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500 *et seq*.

(b)    The Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1750 *et seq*.;

(c)    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq*.; and

(d)     The California Sherman Food, Drug, and Cosmetic Law, CAL.
HEALTH & SAFETY CODE §§ 110100 et seq.

111.    Defendants' conduct alleged herein was also unfair because this conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers. The utility of Defendants' conduct is non-existent and does not outweigh the gravity of the harm to Plaintiff and the Class members.

112.    Defendants' conduct is also unfair because it violates public policy as declared by specific statutory and regulatory provisions, including but not limited to the applicable sections of the False Advertising Law, the Consumer Legal Remedies Act, the federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

113.    Defendants' conduct alleged herein was also fraudulent because an objective, reasonable consumer is likely to be misled by Defendants' claims to believe that Penuma is safe and effective and FDA-cleared for cosmetic enhancement of normal penises, as well as that the procedure is permanent and reversible.

114.    Defendants profited from their sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

115.    Plaintiff and the Class members are likely to continue to be damaged by Defendants' deceptive trade practices, because if the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff and the Class members would purchase a Penuma device and procedure in the future. Thus, injunctive relief enjoining Defendants' false and misleading advertising is proper.

116.    Defendants' conduct has caused and continues to cause substantial injuries in fact to Plaintiff and Class members. As a result of their reliance on

Defendants' misrepresentations and omissions, Plaintiff and the Class members suffered ascertainable losses of money and property—namely the money they paid for the valueless Penuma device and implantation procedure.

117.    In accordance with CAL. BUS. & PROF. CODE § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

118.    Plaintiff, on behalf of the Class, also seeks an order for restitution of all monies from the sale of the Penuma device and implantation procedure, which were unjustly acquired through acts of unlawful competition.

## VIII.  CONCLUSION AND PRAYER

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment ordering relief as follows:

      (a) certifying the Class pursuant to FED. R. CIV. P. 23(b)(3) and/or (b)(2);

      (b) appointing Plaintiff to represent the Class;

      (c) appointing Plaintiff's counsel as Class Counsel;

      (d) enjoining Defendants from further deceptive advertising, marketing, and other false and misleading business practices with respect to their representations regarding the Penuma device and procedure;

      (e) enjoining Defendants to cease and desist stating that Penuma is "FDA-cleared for cosmetic enhancement" on their websites and in advertisements and other marketing materials without disclosing that it is cleared for use only for "use in the cosmetic correction of soft tissue deformities."

      (f) awarding Plaintiff and the Class members restitution in an amount to be proven at trial;

(g) awarding Plaintiff and the Class members reasonable attorneys' fees, expenses, and costs of suit pursuant to CAL. CODE CIV. P. § 1021.5;

(h) awarding pre-judgment and post-judgment interest, as provided by law;

(i) granting leave to amend the Complaint to conform to the evidence produced at trial; and

(j) awarding such other relief as this Court may deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 15, 2022

Respectfully submitted,

By: */s/ Michael A. Caddell*
Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
Monterey CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*

# EXHIBIT E

Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
Monterey, CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

EDWARD PEÑA, individually
and on behalf of others
similarly situated,

        *Plaintiff*,

        *v.*

INTERNATIONAL
MEDICAL DEVICES, INC.,
MENOVA
INTERNATIONAL, INC.,
GESIVA MEDICAL, LLC,
JAMES J. ELIST M. D., a
Medical Corporation, and Dr.
James ELIST,

        *Defendants*.

CASE NO. 2:22-cv-03391-SSS (PLAx)

**PLAINTIFF'S SECOND
AMENDED CLASS ACTION
COMPLAINT**

Plaintiff Edward Peña files this Second Amended Class Action Complaint against Defendants International Medical Devices, Inc. ("IMD"), Menova International, Inc. ("Menova"), Gesiva Medical, LLC ("Gesiva"), James J. Elist, M.D., a Medical Corporation, and Dr. James Elist and in support of his claims alleges as follows.

## I. INTRODUCTION

1.   Defendants have jointly developed and marketed the "Penuma" device, a silicone penile implant, as a penis enlargement device. Since at least January 2017, Defendants have engaged in a systematic, coordinated campaign to market Penuma for cosmetic penis enlargement. Their websites and advertisements target men who have healthy, normal bodies but simply want larger penises.

2.   Dr. James J. Elist has also developed a surgical procedure for implanting the device. He has performed thousands of these procedures, handling patient consults at his clinic in Beverly Hills and performing penile implant surgeries in his operating room at the Beverly Hills South Pacific Surgery Center. Defendants falsely and misleadingly tout the device and procedure as "FDA-cleared," giving reasonable consumers the false impression that the U.S. Food and Drug Administration ("FDA") has determined that Penuma is safe and effective for cosmetic penis enlargement procedures in men with healthy, normal bodies.

3.   Unbeknownst to the men who undergo these procedures, however, Penuma is not safe and effective—nor is it FDA-cleared—for cosmetic penile enlargement. Instead, Penuma is FDA-cleared only "*for use in the cosmetic correction of soft tissue deformities*." Worse, implantation of the Penuma device not only does not usually result in any lengthening of the penis, it frequently causes scarring, resulting in the penis becoming shorter. In addition, contrary to Defendants' misrepresentations that the procedure is "permanent" but "reversible," the procedure frequently leads to infections and complications that require removal

of the device, which, in turn, causes permanent damage to the penis. Defendants knew these facts at least by 2015, but nevertheless continued to market Penuma as "the first FDA-cleared penile implant for cosmetic enhancement" and to urge consumers with healthy, normal penises to purchase the Penuma device and procedure to "enhance and enlarge the length, girth, and size of your penis."

4.   Defendants profited substantially from these misrepresentations, selling the Penuma device and procedure to thousands of men at a cost of $15,000–$20,000 each. Plaintiff accordingly brings this action to recover damages and restitution on behalf of similarly situated consumers and to enjoin Defendants from continuing to falsely advertise and market Penuma as a safe and effective FDA-cleared procedure for cosmetic enhancement of penis size in men with healthy penises.

## II.  PARTIES

5.   Plaintiff Edward Peña is a resident of Hidalgo County, Texas.

6.   Defendant International Medical Devices, Inc. ("IMD") is a California corporation located at 717 N. Maple Drive, Beverly Hills, CA 90210, in Los Angeles County. It may be served through its registered agent, Jonathan Elist, at the same address.

7.   Defendant Menova International, Inc., ("Menova") is a California corporation located at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211, in Los Angeles County. It may be served through its registered agent, James Elist, at the same address.

8.   Defendant Gesiva Medical, LLC is a Minnesota limited liability corporation headquartered at 6385 Old Shady Oak Road, Suite 250, Eden Prairie, MN 55344. It may be served through its registered agent, Thomas A. Hopper, at the same address.

9.   Defendant James J. Elist, M.D., a Medical Corporation, is a California corporation headquartered at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA

90211. It may be served through its registered agent, James J. Elist, at the same address.

10. Defendant Dr. James Elist is an individual residing in Beverly Hills, California. Dr. Elist may be served at 8500 Wilshire Blvd., Suite 707, Beverly Hills, CA 90211.

### III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving over 100 class members in which at least one member of the class is a citizen of a State different from at least one Defendant and the matter in controversy exceeds $5,000,000, exclusive of interests and costs.

12. Defendants IMD, Menova, James J. Elist, M.D., a Medical Corporation, and Dr. Elist are subject to general personal jurisdiction in California because IMD, Menova, and James J. Elist, M.D., a Medical Corporation are incorporated in California and maintain their principal places of business in California, and Dr. Elist is a California resident.

13. The Court also has specific personal jurisdiction over all Defendants because Defendants purposefully availed themselves of the privilege of doing business in California, and this action arises out of and relates to Defendants' California business activities.

14. Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Los Angeles County.

15. In addition, venue is also proper in this district pursuant to 28 U.S.C. § 1391(a). Defendants are deemed to reside in this district because their contacts with this district would be sufficient to subject them to personal jurisdiction if this district were a separate state.

# IV. JOINT ENTERPRISE LIABILITY

16. Defendants shared a common plan or design for illegally marketing the Penuma device and procedure for cosmetic enlargement of normal penises.

17. Each Defendant had knowledge of and agreed to market Penuma for the cosmetic enlargement of normal penises.

18. Defendants acted as a joint enterprise with regard to all of the actions alleged in this Complaint.

19. Whenever this Complaint makes reference to any act of Defendants, the allegations refer to each of the Defendants, acting individually, and also to all of the Defendants acting jointly.

20. All acts of each of the Defendants were ratified and adopted by each of their Co-Defendants.

# V. STATEMENT OF FACTS

21. Before undergoing the Penuma implantation procedure, Plaintiff Edward Peña had a normal, healthy penis. He had no soft tissue deformity of the penis, nor any urological problems of any kind.

22. While browsing the Internet, Mr. Peña saw advertisements for the Penuma device and procedure, including Dr. Elist's website. Defendants made the marketing decisions that led to these advertisements in Los Angeles, California.

23. Having read Defendants' advertisements, Mr. Peña reasonably believed that the Penuma device was safe and effective for men like him who had normal penises, but simply wanted their penises to be larger. He further reasonably believed, based on the misrepresentations in Defendants' advertisements, that the Penuma device had been approved by the FDA, and this belief gave him a sense of comfort that the device was safe and effective. Had Mr. Peña known that Penuma had not in fact been approved or cleared by the FDA for cosmetic penile enlargement in men

with normal penises and/or that it was not safe and effective for men with normal, healthy penises, he would not have purchased the Penuma device or procedure.

24. Mr. Peña also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure was permanent and completely reversible and that there would be no adverse consequences from removal of the device. Had Mr. Peña known that the Penuma implantation procedure was not permanent and could not be reversed without causing permanent damage to the penis, he would not have purchased the Penuma device or procedure.

25. Mr. Peña also reasonably believed, based on misrepresentations in Defendants' advertisements, that the Penuma procedure would result in a natural looking penis. Had Mr. Peña known that the Penuma procedure often results in abnormal and deformed-looking penises, he would not have purchased the Penuma device or procedure.

26. Mr. Peña contacted Dr. Elist and scheduled an appointment with him for October of 2020. Dr. Elist consulted with Mr. Peña for approximately 15 minutes. Mr. Peña also met with three or four other employees of Dr. Elist and filled out a questionnaire. At no point did Dr. Elist or his employees inform Mr. Peña that Penuma was not safe and effective or not FDA cleared for cosmetic enlargement of normal penises. One or two days later, Dr. Elist performed surgery to implant the Penuma device in Mr. Peña's body.

27. Mr. Peña paid $14,500 to Dr. James Elist for the device and surgery.

28. Following the surgery, Mr. Peña's penis did not look or feel natural. Instead, he had no feeling on the top of the shaft and pain on bottom of the shaft. Two corners of the implant began sticking out in a manner that was not aesthetically pleasing. Mr. Peña suffered pain during intercourse and especially severe pain after intercourse. The implant eventually punctured the skin and poked out through a small hole, through which fluid discharged. Mr. Peña could not sleep on his back or

his stomach. He woke up multiple times in the middle of the night with painful erections, making it extremely difficult for him to sleep for at least 3 months. Mr. Peña could not even bend down to tie his shoe without pain.

29. Mr. Peña then decided to have the Penuma device removed. He had the device removed by Dr. Bryan Kansas, a reconstructive urological surgeon in Austin. Following the removal, Mr. Peña has continued to suffer complications, including retraction, loss of sensation, and scarring. These complications have caused Mr. Peña significant pain and mental anguish.

30. Mr. Peña's experience led him to conclude that the Penuma device and procedure have no value and are not safe or effective for healthy men with normal penises, many of whom had been and would continue to be misled by Defendants' misrepresentations to pay thousands of dollars for a device and surgery that have no value. He further understood that many of these men were unlikely to be able to secure legal representation on their own to pursue their claims against Defendants. He therefore files this action on his own behalf and on behalf of similarly situated persons.

## VI. CLASS ALLEGATIONS

### A. Defendants jointly developed and marketed the Penuma device and implantation procedure.

31. Promoting himself as the "Thomas Edison of penis surgeries," Dr. Elist received a patent on the device that was later to be named "Penuma" in 2002. He submitted an application for FDA clearance in 2004, analogizing the device to a silicone implant used for reconstructive surgery of the ear, nose, and throat. In this and all subsequent FDA clearance applications, Defendants specifically limited the intended use for the device to the "correction of soft-tissue deformities."

32. Beginning in 2004, Dr. Elist created National Medical Devices, Inc. ("NMD")—the predecessor of Defendant IMD—to manufacture the device and

serve as its exclusive distributor. Through NMD, Dr. Elist began marketing the device and offering surgical services to implant the device from his clinic in Beverly Hills.

33. In 2013, Dr. Elist renamed NMD "International Medical Devices, Inc." Dr. Elist is the President of IMD and owns 100% of IMD. His son, Jonathan Elist, is IMD's chief executive officer.

34. Dr. Elist subsequently created Menova to hold the intellectual property associated with his silicone penile implant device. On January 10, 2016, Menova applied for trademark registration for the "Penuma" mark with the United States Patent and Trademark Office ("USPTO"). On September 20, 2016, the USPTO issued a trademark for "Penuma." Since that time, Menova has owned the Penuma trademark and all intellectual property rights associated with the device. Dr. Elist is the president of Menova and owns 100% of Menova.

35. In May 2017, IMD entered into an agreement with Gesiva for the distribution of Penuma devices. Menova and Dr. Elist have authorized IMD and Gesiva to contract with approximately 12 urologists around the United States to perform hundreds of Penuma implantation procedures and use the Penuma trademark. Dr. Elist personally trains all urologists authorized to implant Penuma.

36. Penuma's advertising claims that the device will make patients' penises longer. That is false. There is no evidence that the Penuma device makes patients' non-erect penises longer. Worse, Penuma's design results in patients' erect penises becoming *shorter* in most cases and in many cases disfigured. Defendants have known about these complications for at least over half a decade. In a 2015 post titled "My Elist Implant Experience," a former patient detailed his effort at seeking a refund from Dr. Elist after his "erect length" shrank between 1–1.5" post-surgery. He received no refund. Similar patient complaints were posted on the internet during

the same timeframe. Instead of correcting his false and misleading claims, Dr. Elist responded to these complaints with cease-and-desist letters. Patient concerns regarding the Penuma were echoed by practitioners and academics as well. For example, a 2018 article published in the Journal of Sexual Medicine titled "Complications of Genital Enlargement Surgery" identified "major penile shortening and disabling curvature" as Penuma complications.

37. Instead of disclosing these material risks, Defendants directed consumers to a self-authored, and self-serving, Elist study from 2018 ("*A Single-Surgeon Retrospective and Preliminary Evaluation of the Safety and Effectiveness of the Penuma Silicone Sleeve Implant for Elective Cosmetic Correction of the Flaccid Penis*") throughout their marketing. This study, however, was not conducted according to scientific standards, and its unreliability has been noted in the medical literature. Drs. Kapadia, Olson, and Furr, among others, concluded that Dr. Elist's study failed to consider "long-term sequelae of such adverse events and implant removal, such as penile shortening, fibrosis, and sexual dysfunction."[1] Because "the infection and explantation rate may be higher than reported in this retrospective study due to incomplete cohort response to surveys,"[2] several urologists have cautioned that "rigorous investigation with accurate reporting of complications should be mandated before more men take on the physical, mental, and significant financial burden associated with subcutaneous silicone penile implants."[3] Defendants' marketing failed to disclose and actively concealed these facts from consumers.

---

[1] Hehemann, *Penile Girth Enlargement Strategies: What's the Evidence?*, 7 SEXUAL MEDICINE REVIEW 535–547, 542 (2019).

[2] Olson, *Management of infected Penuma implant: Case Report*, 6 J. CASE REPORTS AND IMAGES IN UROLOGY 1–3, 2 (2021).

[3] Hehemann at 543.

**B. Penuma has been FDA-cleared only for cosmetic correction of deformities.**

38. Because Penuma is a medical device, it is subject to the Medical Device Amendments of 1976 ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA"). The MDA established three "classes" of medical devices: Class I, II, and III. "The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective."[4] A post-1976 medical device is automatically placed into Class III and is subject to premarket approval ("PMA") requirements, including the FDA's independent "scientific review to ensure the safety and effectiveness" of the device. The PMA process is highly rigorous, requiring manufacturers to submit detailed information regarding the safety and effectiveness of their devices. The FDA spends an average of 1,200 hours reviewing each submission.

39. Devices that were on the market before the MDA was enacted, however, are grandfathered in and are not required to go through the PMA process. Manufacturers seeking a less stringent review can thus avoid the FDA's thorough, scientific PMA process by showing that their devices are "substantially equivalent" to devices that were already on the market in 1976. This less rigorous "clearance" to market a device based on substantial equivalency to a pre-1976 device is known as the FDCA Section 510(k) Premarket Notification process (the "510(k) clearance" process).

40. Section 510(k) clearance allows device manufacturers, like Defendants, to submit a relatively short "summary" to the FDA describing how their medical devices are "substantially equivalent" to a pre-1976 device (the "predicate device"). The significant evidence needed to obtain full FDA approval of a medical device is

---

[4] U.S. Food and Drug Administration, PMA Approvals, *available at* https://www.fda.gov/medical-devices/device-approvals-denials-and-clearances/pma-approvals (last visited August 9, 2021).

not required when a medical device manufacturer instead applies for FDA "clearance" via the 510(k) process.

41. If the FDA determines that a device is "substantially equivalent" for the indicated uses to a pre-1976 device, manufacturers may obtain a fast-tracked 510(k) clearance to market the device while avoiding rigorous PMA testing for safety and effectiveness. 510(k) clearance is limited, however, to authorization to market the device *for the indicated uses*. In submitting a 510(k) clearance application, the manufacturer must identify the device's intended use. This intended use must match the intended use of the pre-1976 device to which the manufacturer claims "substantial equivalency." *See* 21 C.F.R. § 807.81(a)(ii). If a major change or modification of the intended use is identified, the 510(k) clearance process is unavailable, and the device must go through the full PMA process instead. *Id.*

42. On or about September 1, 2004, National Medical Devices, Inc. (the predecessor to IMD) submitted its "Silicone Block" for Section 510(k) premarket notification of intent to market the device. National Medical Devices, Inc. submitted that the implant was substantially equivalent to an "ear, nose and throat synthetic polymer material," which is regulated as a Class II Device under 21 CFR § 874.3620, which provides:

> Ear, nose, and throat synthetic polymer material is a device material that is intended to be implanted for use as a space-occupying substance in the reconstructive surgery of the head and neck. The device is used, for example, in augmentation rhinoplasty and in tissue defect closures in the esophagus. The device is shaped and formed by the surgeon to conform to the patient's needs. This generic type of device is made of material such as polyamide mesh or foil and porous polyethylene.

On October 25, 2004, the FDA granted 510(k) clearance to the Silicone Block that "is intended *for use in the cosmetic correction of soft tissue deformities*, and is contoured at the surgeon's discretion to create a custom implant to aid in the reconstruction process." (Emphasis added.)

43. Due to certain design changes to Dr. Elist's penile implant device, on December 20, 2016, Defendants caused International Medical Devices, Inc. ("IMD")—the successor to National Medical Devices—to submit a second Section 510(k) premarket notification for a "Pre-Formed Penile Silicone Block." This application identified National Medical Device's Silicone Block, which had been cleared in 2004 based on its asserted similarity to an ear, nose, and throat reconstructive implant, as the predicate device to which IMD's Pre-Formed Penile Silicone Block was "substantially equivalent." The FDA granted 510(k) clearance on February 1, 2017, describing the "Indications for Use" as follows: "Pre-Formed Penile Silicone Block is intended for use in the cosmetic correction of soft tissue deformities, and is contoured at the surgeon's discretion to create a custom implant." Following certain additional design changes, on December 19, 2018, IMD again applied for Section 510(k) premarket notification. Again, the FDA's 510(k) clearance, dated January 23, 2019, identified the exact same "Indications for Use," *i.e.,* limited to "*use in the cosmetic correction of soft tissue deformities*."

44. Despite these clear limitations to the uses for which the device is FDA-cleared, Defendants regularly misrepresent Penuma as safe and effective and FDA-cleared for cosmetic enlargement of normal penises.

45. Penile soft tissue deformities, including Peyronie's disease, congenital micropenis, and congenital ventral curvature, are serious medical conditions that can cause significant pain and prevent men from having sexual intercourse, in addition to shortening the penis. These deformities are rare, with Peyronie's affecting

approximately 10% of men over 40, and congenital ventral curvature and congenital micropenis affecting less than 1% and 0.6% of the population, respectively. The market for a device limited to "use in the cosmetic correction of soft tissue deformities" is therefore relatively small.

46. A much larger market, however, exists for the cosmetic enhancement of penis size in men with normal penises. Many healthy men with normal penises desire larger penises for cosmetic reasons or to improve their sense of sexual self-confidence. This market, for which Penuma is *neither safe and effective nor FDA-cleared*, is potentially worth millions.

47. Seeking to capitalize on this larger, more lucrative market, Defendants regularly falsely and misleadingly represent that Penuma is safe, effective, and FDA-cleared for "cosmetic enhancement" and advertise it as a penis enlargement device. In fact, Penuma is not safe and effective for use as a penis enlargement device and has not been FDA-cleared for such use. Defendants regularly fail to disclose and actively conceal these facts from consumers.

48. Defendants market Penuma on Dr. Elist's personal website, https://www.drelist.com/, as well as at http://www.penuma.com. Defendants advertise Penuma at www.penuma.com as a "Penis Enhancement Implant for Men." The same website claims that Penuma is "the first FDA-cleared penile implant for cosmetic enhancement." The website also claims that Penuma will cause "[s]ignificant, permanent cosmetic enhancements to the penis." The website is intended to and does cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the website discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities. Defendants have made these material misrepresentations and omissions consistently since at least 2017, and they continue to do so as of the date of the filing of this Complaint.

49. Defendants similarly market Penuma on Dr. Elist's website as "the first FDA-cleared penile implant for cosmetic enhancement." The website's tab identifies Dr. Elist as performing "Penile Enlargement Surgery" and urges men to "Enhance and enlarge the length, girth, and size of your penis."

Figure 1: www.drelist.com

50. Gesiva's website similarly misrepresents that Penuma is "FDA-cleared for cosmetic enhancement." *See* Gesiva Medical, Penis Enlargement Surgery: Cost and Risk, *available at https://www.gesiva.com/2019/12/penis-enlargement-surgery-cost-and-risk/.*

51. Defendants have been making these same misrepresentations for over half a decade, at least:

**2017**:

Figure 2: https://twitter.com/gesivamedical

**2018**

Figure 3: https://web.archive.org/web/20180626111235/http://www.penuma.com/

− 15 −



Figure 4:
https://web.archive.org/web/20201001025806/https://www.drelist.com/penile-procedures/penuma-implant/

**2019**:



Figure 5: https://web.archive.org/web/20190714095548/https://www.drelist.com/

Figure 6: https://web.archive.org/web/20190609121832/https://www.penuma.com/

**2020**:



Figure 7: https://web.archive.org/web/20200701020552/https://www.drelist.com/

Figure 8: https://web.archive.org/web/20190609121832/https://www.penuma.com/

**2021**:

Figure 9: https://www.drelist.com/

Figure 10: https://penuma.com/



Figure 11: https://www.instagram.com/realpenuma/?hl=en

52. The websites are intended to and do cause a reasonable consumer to believe, falsely, that Penuma is safe and effective and FDA-cleared for cosmetic enlargement of normal penises in healthy men. Nothing on the websites discloses that Penuma is FDA-cleared only for use in the cosmetic correction of soft tissue deformities, that it is not effective to enhance the appearance of normal penises, or that it frequently causes complications that require the implant to be removed, causing permanent damage to the penis.

53. In fact, Defendants have no data to support any claim that Penuma will cause an increase in penile length. To the contrary, implantation of the Penuma device frequently causes scarring, resulting in the penis becoming shorter. When the Penuma is placed, a sheath of scar tissue—termed a "pseudocapsule"—forms around the entire foreign body. This is the body's reaction to healing. Because scar tissue does not stretch, when the penis fills with blood during an erection, the ventral surface of the penis stretches and becomes longer, but the dorsal surface is restricted by the pseudocapsule. This results in a dorsal curvature and apparent shortening of the erection. Neither IMD nor Dr. Elist acknowledges these complications. Instead, their website simply shuffles consumers to their self-published study—a study which Dr. Elist himself admits had skewed results because over a hundred patients (approximately 24% of the potential pool) refused to participate.

54. Dr. Elist and IMD similarly tout that the post-Penuma penis is "natural looking," indicating that it is effective for cosmetic enhancement in men with normal, healthy penises; however, many patients experience a penguin or batwing

shape post-surgery, causing the body of the penis to be wider than the head of the penis:



55. Defendants also claim that the Penuma procedure is "reversible." The prevailing medical literature disagrees, concluding that in "all patients in our series, corrective surgery resulted in both cosmetic and functional improvement. However, **none** resulted in a completely normal penis, as was the appearance prior to initial enhancement surgery":[5]



**Figure 4.** Severe penile deformity and ulceration and loss of penile length after penis enlargement surgery with a subcutaneous silicone penile implant (A). Following removal and debridement (B), inadequate dorsal skin coverage required skin grafting (C and D). Figure 4 is available in color online at www.jsm.jsexmed.org.

---

[5] Furr, *Complications of Genital Enlargement Surgery*, 15 SEX. MED. REV. 1811–17, 1816 (2018) (emphasis added).

56. Defendants also claim that the Penuma implant causes no interference with normal penis function. Yet many patients experience sexual dysfunction, including loss of sensation, as a consequence of the receiving the Penuma implant.

57. Defendants knew when they made these representations that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises and that the procedure frequently caused side effects requiring removal of the device. Defendants also knew that the Penuma procedure could not be reversed without permanent damage to the penis, but they nevertheless failed to disclose and actively concealed this information from Plaintiff and the Class members.

58. Dr. Elist and other doctors performing Penuma implant surgery regularly refer patients to the Penuma website and to Dr. Elist's website for information regarding the Penuma device. In making the representations and omissions described above, Defendants intend for consumers to rely on their representations that Penuma is a safe and effective, FDA-cleared device for cosmetic penile enlargement that is permanent and reversible, and thousands of reasonable consumers did in fact so rely.

59. Plaintiff and the Class members purchased the Penuma device and implantation procedure in reasonable reliance on Defendants' misrepresentations that Penuma was safe and effective and FDA-cleared for cosmetic enhancement and that it was permanent and could be reversed without negative consequences. Plaintiff and Class members also relied on Defendants' misrepresentations that the Penuma implant would result in a natural looking penis and that the implant would cause no interference with normal penis function. If Plaintiff and the Class members had known that Penuma was not safe and effective or FDA-cleared for the cosmetic enhancement of normal penises, that Defendants in fact had no data to support any claims of increase in penis length as a result of the procedure, that the implant often interfered with normal penis function, and that the procedure frequently led to complications requiring removal of the device, resulting in permanent damage to the

penis, they would not have purchased the device and would not have had the implantation procedure performed.

**C. Plaintiff and the Class members paid thousands of dollars for a product and service that had no value.**

60. The total cost for purchase of the Penuma device and the implantation surgery ranges from $14,500–$20,000. Of this payment, approximately $6,000 is paid to IMD for purchase of the Penuma device. Because the procedure is cosmetic, it is not covered by medical insurance. All Defendants profit, either directly or indirectly, from the sales of the Penuma device to patients.

61. Dr. Elist has performed thousands of Penuma implantation procedures at his clinic in Beverly Hills. He has also, with Gesiva's help, marketed and licensed his Penuma implantation procedures to 12 doctors nationwide, who all perform the surgery in substantially the same manner, using the product and procedure developed by Dr. Elist in his Beverly Hills clinic, resulting in substantial profits to Defendants.

62. The actual value of the procedure, however, is non-existent. Instead of the cosmetic enlargement of the penis consumers were misled to expect, Penuma does not increase the length of patients' flaccid penises, but causes disfigurement and scarring that often leads to a shortening of the erect penis in the majority of cases. The scarring also often interferes with normal penis function by reducing sensation in the penis, leading to sexual dysfunction.

63. Not only does the procedure not produce the cosmetic enhancement consumers are misled to expect, but it also frequently causes painful infections that lead to yet more scarring. A substantial number of men have had to have the Penuma device removed because of such infection and scarring, leading to a loss of sensation in and/or permanent shortening of the penis.

64. When infection, disfigurement, or other complications require the Penuma to be removed, patients suffer a significant shortening of their non-erect

penises. Because the pseudocapsule of scar tissue, which is attached to the penile shaft, contracts over time after removal of the Penuma device, patients' flaccid penises appear shorter—often one to two inches shorter. The same shortening appears in the erect penises of patients who have had the Penuma removed.

65. These complications have been well-reported in medical literature. A 2021 article specially identified "penile shortening and erectile dysfunction (ED)" as "reported complications in literature" following Penuma removal.[6] A 2018 article also from the Journal of Sexual Medicine similarly identified "penile shortening due to fibrosis."[7]

66. Given these risks, reputable urologists recognize that penile implant procedures, including the Penuma procedure, are not safe and effective for cosmetic enhancement in men with normal penises. For example, the Mayo Clinic notes that penis-enlargement surgery is "experimental" and should be reserved for "men whose penises don't function normally because of a birth defect or injury":

> The need for penis-enlargement surgery is rare. Surgery is typically reserved for men whose penises don't function normally because of a birth defect or injury. Although some surgeons offer cosmetic penis enlargement using various techniques, it's controversial and considered by many to be unnecessary and in some cases permanently harmful. These surgeries should be considered experimental.

Mayo Clinic, *Penis-enlargement products: Do they work?*, *available at* https://www.mayoclinic.org/healthy-lifestyle/sexual-health/in-depth/penis-art-

---

[6] Kapadia et al., *Evaluation and Treatment of Complications of Penuma Penile Implant*, 18 JOURNAL OF SEXUAL MEDICINE 80 (2021).

[7] Furr et al., *Complications of Genital Enlargement Surgery*, 15 J. SEX. MED. 1811 (2018).

20045363 (last visited Sept. 23, 2021); *see also Marra*, *Systematic Review of Surgical and Nonsurgical Interventions in Normal Men Complaining of Penis Size*, 8 SEX. MED. REV. 158, 177 (2020) ("We believe that surgery should be a last resort, undertaken as an experimental treatment only in a clinical trial setting after expert psychosexual assessment.")

67. As a result of their reliance on Defendants' representations and omissions, consumers have suffered an ascertainable loss of money, namely, the cost of purchasing the Penuma device and procedure. Further, as a result of their deceptive marketing and unfair competition, Defendants realized sizable profits.

68. As the intended, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants have been unjustly enriched through sales of Penuma devices and procedures at the expense of Plaintiff and the Class members.

69. Plaintiff and Class Members have also suffered irreparable injury from these false representations. Their bodily integrity has been violated, creating a substantial risk of permanent injury. Plaintiff continues to desire a safe, effective penile implant. If the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, Plaintiff would purchase a Penuma device and procedure in the future. There is a threat that Plaintiff and the Class members will purchase the Penuma device or procedure in the future, despite the fact that it was once marred by false advertising, because they may reasonably, but incorrectly, assume the product was improved. On information and belief, multiple men have paid Dr. Elist for repeated procedures based on misrepresentations that their initial poor results were unusual and that subsequent procedures would improve the results. In the alternative, because of Defendants' false, misleading, and deceptive representations and omissions, there is a threat that Plaintiff and the Class members will be unable to

rely on Penuma's advertising or labeling in the future, and so will not purchase a Penuma device or procedure although they would like to. Due to the continuing imminent threat of such injuries, Plaintiff and Class members have no adequate remedy at law, and Plaintiff and Class members are therefore entitled to injunctive relief.

70. Plaintiff and the Class members suffered injuries in fact caused by the false, fraudulent, unfair, deceptive, and misleading practice alleged herein and accordingly seek restitution and injunctive relief.

**D. Class Definition**

Plaintiff brings this lawsuit as a class action on behalf of himself and on behalf of the following Class:

> All individuals in the United States, including its territories and the District of Columbia, who purchased a Penuma device and implantation procedure and whose procedures were performed by Dr. James Elist at the Beverly Hills South Pacific Surgery Center from four years prior to the filing of this complaint through the date of certification.

Excluded from the Class are (1) any employees, officers, directors, or immediate family members of Defendants; (2) any attorneys appearing in this case; (3) any judges assigned to hear this case, as well as their immediate family and staff; (4) any judges who may hear an appeal in this case, as well as their immediate family and staff; (5) any individuals whose Penuma implantation procedures were covered by medical insurance; (6) any individuals who have been diagnosed with a soft tissue deformity of the penis; and (7) any individuals who have filed an individual action for personal injuries caused by the Penuma device and/or procedure.

71. **Ascertainability**. FED. R. CIV. P. 23(a). The Class is ascertainable in that they comprise individuals who can be identified by reference to purely objective criteria, including information in Defendants' business records. Notice may be mailed to members of the Class using the information in Defendants' files, as updated through the National Change of Address Registry and other commercially available means.

72. **Numerosity**. FED. R. CIV. P. 23(a)(1). The Class is so numerous that joinder of all members is impracticable. Although the precise number of Class members is not currently known, the scope of Penuma's sales and Dr. Elist's practice shows that the Class likely consists of at least hundreds of persons and, therefore, it would be impracticable to bring all these persons before the Court as individual plaintiffs.

73. **Typicality**. FED. R. CIV. P. 23(a)(3). Plaintiff's claims are typical of each member of the Class he seeks to represent. These claims all arise from the same operative facts and are based on the same legal theories.

74. **Adequacy of Representation**. FED. R. CIV. P. 23(a)(4). Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is committed to vigorously litigating this matter, and his interests are aligned with those of the Class. Plaintiff has retained counsel experienced in handling consumer class action litigation.

75. **Commonality and Predominance**. FED. R. CIV. P. 23(a)(2) & (b)(3). Common issues of law and fact exist regarding Plaintiff's and the Class members' claims and predominate over any individual issues. These common issues include:

    (a)    whether Defendants misrepresented that Penuma was FDA-cleared for cosmetic enhancement of normal penises;

    (b)    whether the Penuma device and procedure are safe and effective for cosmetic penis enlargement;

(c)    whether Defendants falsely and misleadingly marketed Penuma as a cosmetic penis enlargement device;

(d)    whether Defendants misrepresented that Penuma was permanent;

(e)    whether Defendants misrepresented that the Penuma procedure was reversible;

(f)    whether Defendants misrepresented that the Penuma device results in a normal looking penis;

(g)    whether Defendants misrepresented that the Penuma device causes no interference with penile function;

(h)    whether Defendants' marketing of the Penuma device and procedure is an unfair business practice;

(i)    whether Defendants violated California's False Advertising Law;

(j)    whether Defendants violated California's Consumer Legal Remedies Act;

(k)    whether Defendants violated California's Unfair Competition Law;

(l)    whether injunctive relief is appropriate; and

(m)    the appropriate measure of restitution.

76. **Superiority**. **FED. R. CIV. P. 23(b)(3)**. A class action is a superior method for the fair and efficient adjudication of this controversy. The interests of Class members in individually controlling the prosecution of separate claims against Defendant is small, as the maximum damages recoverable by any one Class member is limited. Management of the Class's claims in a single proceeding will avoid inconsistent judgments and result in a more efficient use of judicial resources than resolving these same issues in many individual cases.

77. **Injunctive Relief Appropriate to the Class**. FED. R. CIV. P. 23(b)(2). This action should also be maintained as a class action because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VII.  CLAIMS

### COUNT ONE – Violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500 ("FAL")

78. Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

79. Plaintiff brings this claim individually and on behalf of the Class members against all Defendants.

80. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." CAL. BUS. & PROF. CODE § 17500.

81. It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which [are] known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

82. As alleged herein, Defendants' advertisements relating to the Penuma device and implantation procedure misled reasonable consumers as to the uses for which Penuma had been cleared for use by the FDA, as to its safety and effectiveness for use as a penis enlargement device, and as to whether the procedure was permanent, natural looking, and reversible.

83. The FAL applies to Defendants' advertisements because the marketing decisions that that led to the false and misleading advertising were made in California.

84. Defendants' business practices alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants knew or reasonably should have known that their advertisements were untrue and misleading, and Defendants omitted material information from their advertising.

85. Defendants profited from their sale of the falsely and deceptively advertised device and procedure.

86. As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

87. Pursuant to CAL. BUS. & PROF. CODE § 17535, Plaintiff, on behalf of himself and the Class, seeks an order enjoining Defendants from continuing to engage in deceptive business practices and false advertising.

## COUNT TWO – Violation of California's Consumers Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.* ("CLRA")

88. Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

89. Plaintiff brings this claim individually and on behalf of the Class members against all Defendants.

90. The California Consumer Legal Remedies Act ("CLRA") prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

91. The CLRA applies to Defendants' conduct because the marketing decisions that that led to the false and misleading advertising were made in California and the surgical procedures at issue were performed in California.

92. Defendants are "person(s)" as defined by CAL. CIV. CODE § 1761(c).

93. Plaintiff and the Class members are "consumers" within the meaning of CAL. CIV. CODE § 1761(d) because they purchased the Penuma device and procedure for personal purposes.

94. Defendants' false and misleading advertising was designed to and did induce the purchase of the Penuma device and implantation procedure for personal, family, or household purposes by Plaintiff and the Class members, in violation of the following sections of the CLRA:

      (a) § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

      (b) § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another; and

      (c) § 1770(a)(9): advertising goods with intent not to sell them as advertised.

95. Defendants knew the Penuma device and procedure did not posses the characteristics and benefits as represented and were not of the particular standard, quality, or grade as represented.

96. Defendants had a duty to Plaintiff and the Class members to disclose the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared because:

      (a) Defendants were in a superior position to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared;

(b) Plaintiff and the Class members could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared; and

(c) Defendants knew that Plaintiff and the Class members could not reasonably have been expected to know the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared.

97. In failing to disclose and misrepresenting the scope of intended uses for which the Penuma device and procedure were safe and effective and FDA-cleared, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

98. The facts Defendants concealed from and/or misrepresented to Plaintiff and the Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Penuma device and procedure. If Plaintiff and the Class members had known that Penuma was not safe and effective or FDA-cleared for cosmetic enhancement of normal penises, or that it was not permanent and frequently led to complications requiring removal, causing permanent damage to the penis, they would not have purchased the device and procedure.

99. Plaintiff and the Class members are reasonable consumers who expect device manufacturers and medical service providers like Defendants to provide accurate and truthful representations regarding the safety and efficacy of their products. Further, reasonable consumers, like Plaintiff and the Class members, rely on the representations made by device manufacturers and medical service providers regarding the safety and efficacy of their medical devices in determining whether to purchase and consider that information important to their purchase decision.

100.   Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

101.   Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

102.   Plaintiff and Class members have been harmed and have suffered actual damages in that they paid substantial amounts of money for the valueless Penuma device and implantation procedure.

103.   As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and the Class members have suffered and will continue to suffer actual damages.

104.   Pursuant to CAL. CIV. CODE § 1780, Plaintiff seeks injunctive relief, his reasonable attorney fees and costs, and any other relief that the Court deems proper.

105.   Plaintiff has provided Defendants with notice of their alleged violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a). Defendants failed to provide appropriate relief for their violations of the CLRA. Plaintiff therefore is now amending his Complaint to seek monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

### COUNT THREE – Violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* ("UCL")

106.   Plaintiff incorporates by reference all of the foregoing allegations as if they were fully set forth here.

107.   Plaintiff brings this claim individually and on behalf of the Class against all Defendants.

108.    The UCL prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.

109.    The UCL applies to Defendants' advertisements because the marketing decisions that that led to the false and misleading advertising were made in California.

110.    Defendants' business acts and practices alleged herein are unlawful in that they violate:

(a)    The False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500 *et seq*.

(b)    The Consumer Legal Remedies Act, CAL. CIV. CODE §§ 1750 *et seq*.;

(c)    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq*.; and

(d)    The California Sherman Food, Drug, and Cosmetic Law, CAL. HEALTH & SAFETY CODE §§ 110100 et seq.

111.    Defendants' conduct alleged herein was also unfair because this conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers. The utility of Defendants' conduct is non-existent and does not outweigh the gravity of the harm to Plaintiff and the Class members.

112.    Defendants' conduct is also unfair because it violates public policy as declared by specific statutory and regulatory provisions, including but not limited to the applicable sections of the False Advertising Law, the Consumer Legal Remedies Act, the federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

113.    Defendants' conduct alleged herein was also fraudulent because an objective, reasonable consumer is likely to be misled by Defendants' claims to

believe that Penuma is safe and effective and FDA-cleared for cosmetic enhancement of normal penises, as well as that the procedure is permanent and reversible.

114.    Defendants profited from their sale of the falsely, deceptively, and unlawfully advertised device and procedure to consumers.

115.    Plaintiff and the Class members are likely to continue to be damaged by Defendants' deceptive trade practices, because if the Penuma device and procedure were redesigned to be safe and effective for cosmetic penile enlargement, FDA-cleared for this use, and truthfully marketed, there is a possibility that Plaintiff and the Class members would purchase a Penuma device and procedure in the future. Thus, injunctive relief enjoining Defendants' false and misleading advertising is proper.

116.    Defendants' conduct has caused and continues to cause substantial injuries in fact to Plaintiff and Class members. As a result of their reliance on Defendants' misrepresentations and omissions, Plaintiff and the Class members suffered ascertainable losses of money and property—namely the money they paid for the valueless Penuma device and implantation procedure.

117.    In accordance with CAL. BUS. & PROF. CODE § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

118.    Plaintiff, on behalf of the Class, also seeks an order for restitution of all monies from the sale of the Penuma device and implantation procedure, which were unjustly acquired through acts of unlawful competition.

## VIII.  CONCLUSION AND PRAYER

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment ordering relief as follows:

(a) certifying the Class pursuant to FED. R. CIV. P. 23(b)(3) and/or (b)(2);

(b) appointing Plaintiff to represent the Class;

(c) appointing Plaintiff's counsel as Class Counsel;

(d) enjoining Defendants from further deceptive advertising, marketing, and other false and misleading business practices with respect to their representations regarding the Penuma device and procedure;

(e) enjoining Defendants to cease and desist stating that Penuma is "FDA-cleared for cosmetic enhancement" on their websites and in advertisements and other marketing materials without disclosing that it is cleared for use only for "use in the cosmetic correction of soft tissue deformities."

(f) awarding Plaintiff and the Class members restitution in an amount to be proven at trial;

(g) awarding Plaintiff and the Class members reasonable attorneys' fees, expenses, and costs of suit pursuant to CAL. CODE CIV. P. § 1021.5;

(h) awarding pre-judgment and post-judgment interest, as provided by law;

(i) granting leave to amend the Complaint to conform to the evidence produced at trial; and

(j) awarding such other relief as this Court may deem just and proper.

## IX.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

1    Dated: January 20, 2023            Respectfully submitted,

2                                                 By: */s/ Michael A. Caddell*

3                                               Michael A. Caddell (SBN 249469)
mac@caddellchapman.com

4                                               Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com

5                                               Amy E. Tabor (SBN 297660)
aet@caddellchapman.com

6                                               CADDELL & CHAPMAN

7                                               P.O. Box 1311
Monterey CA 93942

8                                               Tel.: (713) 751-0400
Fax: (713) 751-0906

9                                               *Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT